# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| GWEN B. DALUGE, MURRAY YOUNG, AND HELENE K. BIRNBAUM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CONTINENTAL CASUALTY COMPANY, <br><br> Defendant. | Civil Action No.: 3:15-cv-00297-WMC <br><br><br><br> SECOND AMENDED CLASS ACTION COMPLAINT <br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs Gwen B. Daluge, Murray Young, and Helene K. Birnbaum ("Plaintiffs"), bring this action on behalf of themselves and all others similarly situated (the "Class") against Defendant Continental Casualty Company ("Defendant" or "CNA").

## NATURE OF THE ACTION

1.      After decades of collecting billions of dollars in long-term care insurance premiums from its now elderly policyholders – and paying claims for years under certain policy forms while these consumers entered assisted-living facilities all over the country – CNA abruptly began denying claims for stays in assisted-living facilities that it had previously been

covering.  Plaintiffs Gwen Daluge (Wisconsin), and Murray Young (Florida) both had previous claims paid at assisted-living facilities where CNA is now denying coverage.[1]

2.      Defendant has engaged in an illegal course of conduct designed to reduce its exposure to costly assisted-living facility claims in eleven states by asserting that the policies at issue were "written on a form that was designed exclusively to cover nursing facilities, not assisted-living facilities."

3.      CNA is engaged in this conduct in order to save money on claims, as it originally mispriced the policies when they were sold in the early 1990's by using the claims experience of a "skilled nursing facility policy" sold by CNA from 1979 to 1986.

4.      Defendant has taken broadly-worded long-term care insurance policies that, for years, covered stays at facilities ranging from assisted-living to nursing facilities, and converted them to nursing facility-only policies in eleven states when the policy language does not support such a narrow reading.  Indeed, even CNA itself did not previously interpret the policies so narrowly.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

6.      Venue is appropriate because Plaintiff Ms. Daluge is a citizen of the State of Wisconsin. Venue is also proper in this Court because Defendant systematically transacts business in the State of Wisconsin, and certain causes of action set forth in this Complaint, in

---

[1] An additional absent class member from Massachusetts also had a previous claim paid at an assisted living facility before having a subsequent claim denied at the same type of facility.

part, arose in the State of Wisconsin.  The policies, moreover, were sold in Wisconsin, premium payments were made from Wisconsin, claim denial letters were sent from CNA to Wisconsin, and some of the assisted-living facilities for which coverage is sought are located in the State of Wisconsin, and regulated by the State of Wisconsin.

## THE PARTIES

7.      Plaintiff Gwen Daluge ("Ms. Daluge") is a 94-year-old individual currently residing on the assisted-living floor of Cedar Crest, a Janesville, WI, long-term care facility ("Cedar Crest").  Ms. Daluge is the owner of a CNA long-term care insurance "LTC1" policy, is owed benefits under her policy, and is a citizen of Wisconsin.

8.      Plaintiff Murray Young ("Mr. Young") is an 87-year-old individual currently residing at Brookdale Palm Beach Gardens ("Brookdale"), a Palm Beach Gardens, Florida assisted-living facility.[2] Mr. Young is the owner of a CNA long-term care insurance "LTC1" policy, is owed benefits under his policy, and is a citizen of Florida.

9.      Plaintiff Helene K. Birnbaum ("Ms. Birnbaum") is an 88-year-old individual currently residing at Newbridge on the Charles ("Newbridge"), a Cambridge, Massachusetts assisted-living facility.  Ms. Birnbaum is the owner of a CNA long-term care insurance "LTC1" policy, is owed benefits under her policy, and is a citizen of Massachusetts.

10.     Defendant CNA is a corporation organized under the laws of Illinois, is the underwriter of the policies, has the authority to approve and/or deny claims under the policies, is financially responsible for claims made on the policies and other liabilities in connection therewith, and has a principal place of business and headquarters in Illinois.  CNA's corporate citizenship is Illinois.

---

[2] Mr. Young's current claim is now being paid at Brookdale Palm Beach Gardens, however previous claims at two other assisted living facilities in Florida remain unpaid.

## FACTUAL ALLEGATIONS

11.     Long-term care insurance provides benefits to an insured in the event that the individual's health situation requires a level of care that she cannot safely provide for herself.

12.     The policies at issue in this litigation were sold nationwide decades before the vast majority of claims were filed. Regardless of where the policies were originally sold - there is no restriction on insureds to only use a policy in the state where it was purchased - the focus of this litigation is on CNA's practice of categorically excluding assisted living facility coverage for residents of the following eleven states: Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee and Wisconsin (the "Class States").[3]

13.     In order to qualify for long-term care benefits under the policies, claimants are required to demonstrate: (1) they are medically eligible; and (2) that the facility at which they will reside meets the definition of a Long-Term Care Facility.

14.     CNA does not dispute that all three Plaintiffs are medically eligible for benefits. The dispute in this matter solely relates to what type of facility can qualify for coverage under the policies.

15.     The issue raised in this litigation is whether CNA's treatment of the policies as so-called nursing home-only policies – to the exclusion of assisted-living facilities in eleven states – is supported by the policies' language, and whether CNA's interpretation of such policies is in bad faith.

---

[3] CNA's practice of categorically excluding assisted living facility coverage is also occurring in the State of Connecticut as alleged in the currently pending *Gardner et. al. v Continental Casualty Company*, No. 13-cv-01918-JBA (Dist. of Conn.). The *Gardner* matter was recently certified by Judge Arterton as a FRCP 23(b)(2) and (3) class action. *See* Exhibit A.

16.     The policies generally define a facility at which an insured can stay and receive policy benefits as a "Long-Term Care Facility," [4] which is defined within the LTC1 policies as follows:

LONG-TERM CARE FACILITY

A place primarily providing Long-Term Care and related services on an inpatient basis, which:

1.  is licensed by the state where it is located; and

2.  provides skilled, intermediate, or custodial nursing care under the supervision of a physician; and

3.  has 24-hour-a-day nursing services provided by or under the supervision of a registered nurse (R.N.), licensed vocational nurse (L.V.N.), or licensed practical nurse (L.P.N.), and

4.  keeps a daily medical record of each patient; and

5.  may be either a freestanding facility or a distinct part of a facility such as a ward, wing, unit, or swing-bed of a hospital or other institution.

A Long-Term Care Facility does not mean a hospital or clinic, boarding home, home for the aged or mentally ill, rest home, community living center, place that provides domiciliary, residential, or retirement care, place which operates primarily for the treatment of

---

[4] The Class Policies issued in Massachusetts use the term "Nursing Home" rather than "Long Term Care Facility" however the definition of Nursing Home in the Massachusetts issued policies is exceedingly broad and not limited to just skilled nursing facilities as CNA contends - it should cover assisted living facilities in Massachusetts and elsewhere that are capable of providing nursing care and related services, "A facility which is primarily engaged In providing nursing care and related services on an inpatient basis under a license issued by the Department of Public Health or the appropriate licensing agency of the state in which it is located. It may be a freestanding facility, or it may be a distinct part of a facility, including a ward, wing, unit or a swing-bed of a hospital or other institution."

alcoholics or drug addicts, or a hospice.[5]

*See* Exhibit B.

### The Plaintiffs' Assisted-Living Facilities
### Are Covered by the Policies

17.     Each of the three named Plaintiffs filed a claim for a stay at an assisted-living facility in their home state. Each of these assisted-living facilities provided "Long-Term Care" to inpatients, was licensed by the state, offered custodial-nursing care supervised by at least the insured's treating physician, had custodial-nursing care available as needed whenever needed 24/7, had licensed nurses providing or supervising the custodial-nursing care 24/7, had licensed nurses on call 24/7 covering times when licensed nurses were not physically present on-site, and kept a daily medical record of any care or services received by the Plaintiffs.

18.     Despite their assisted-living facilities meeting all of the requirements of a Long-Term Care Facility under the policies, all three Plaintiffs had their claims wrongfully denied by CNA.

19.     These denials breached the contract of insurance and were all made in bad faith to save money on costly assisted-living facility claims in the Class States.

### Contrary to CNA's Repeated Assertions, the Policies are
### Not Nursing Home Only Policies

20.     CNA repeatedly claimed in correspondence with insureds that the policies at issue here are nursing home[6] only policies:

---

[5] Class members' policies that contain the APC Benefit, which is not the subject of this litigation, also go on to note "However, care or services provided in these facilities may be covered subject to the conditions of the Alternate Plan of Care Benefit provision."
[6] CNA uses the terms "nursing home" or "nursing facility" to mean skilled nursing facility. For the sake of consistency, Plaintiffs here do the same.

- "[]Ms. Daluge's [LTC1] policy was marketed and sold as financial protection against a nursing home confinement, not for care rendered in CBRF's or other types of assisted living facilities." May 6, 2014 letter to Gwen Daluge;

- "*The policy does not cover care provided in an assisted living facility*." (emphasis in original). October 7, 2011 letter to LTC1 class member/Georgia Department of Insurance;

- "The policy does not cover care provided in an assisted living facility." October 17, 2011 letter to LTC1 class member/Kentucky Department of Insurance;

- "Second, we must emphasize that the policy purchased by Ms. [LTC1 policyholder] provides benefits for services rendered in a 'Long Term Care Facility.' This is a specifically defined term in the contract, which requires that services be rendered to the policyholder in a state licensed facility providing continual nursing services, not an 'assisted living facility.' By its plain terms, Ms. [LTC1 policyholder]'s policy does not afford coverage for an 'assisted living facility' or an 'assisted living' level of care." July 28, 2010 letter to LTC1 class member/Indiana Department of Insurance.

- "The Policy was written on a form that was designed exclusively to cover nursing facilities, not assisted living facilities." July 21, 2011 letter and May 3, 2012 letter to policyholders in Connecticut/Connecticut Insurance Department;

- "The LTCF Benefit is designed to cover nursing facilities, not assisted living facilities." October 24, 2012 letter to policyholders in Connecticut/ Connecticut Insurance Department.

21.    In a letter to the State of Washington's Office of the Insurance Commissioner, CNA went to great lengths to explain why it was so important that the LTC1 policies, as well as those written previously by CNA including the "Con Care B" policy forms also covered by this litigation, needed to be treated as nursing home only policies.  Indeed, that is how CNA priced the policies, and allowing for coverage at assisted-living facilities would be very expensive for CNA:

### A.    The Policy's Cost-Basis, As Approved By The States, Was Skilled Nursing Facilities.

The 15203 Policy was designed in 1989-90 and sold between 1991 and 1994  At the time the Policy was designed, skilled nursing facilities were the predominant form of long term care. Skilled nursing facilities ("SNFs") are required to have a licensed nurse onsite at all times. *See* 42 U.S.C. § 1395i-3; 42 C.F.R. § 483.30 (a)(2); *and* Department of Health and Human Services, *Center For Medicare & Medicaid Services. Guide to Choosing a Nursing Home*, at 20. The 24-hour-a-day onsite nursing requirement was crucial to the development, pricing, and approval of the Policy.

Thus, in the actuarial memorandum submitted to all the states asking that the Policy be approved for sale, the estimates and pricing assumptions were based on claims experience under a prior skilled nursing facility policy (the "P1-52212").  *See* Memo Regarding Method of *Premium Calculation policy form 15203-Series*, enclosed herewith as Attachment A.  For example, the pricing memo bases its calculation of claim frequency on "actual claim experience of skilled nursing facility policy P1-52212 for years 1979 through 1986." *Id.* Further, the calculation of average length of stay was based on the Continental's experience under the same skilled nursing facility policy. *Id*  Projected costs for were also adjusted to reflect the claims experience under the P1-52212 policy. *Id.*

This was the cost and pricing analysis that the states had when they approved the 15203 Policy for sale – including for sale in the State of Washington.  Such skilled nursing facilities had nurses onsite 24-hours-a-day.

*See* Exhibit C.

22.    CNA used loss ratios for nursing home only policies, but sold policies that afforded coverage beyond traditional nursing homes.  How CNA decided to price the loss ratios on the policies has absolutely nothing to do with the language CNA used to trigger coverage under the policies.

23.     When the policies were written, the long-term care insurance industry knew that change in the delivery of long-term care was on the horizon, and given that claims under the policies were still decades away, CNA chose a broad definition to stay competitive with products sold by other carriers, choosing to cover more than traditional nursing homes. Actuarial Standard of Practice ("ASOP") No. 18 Long-Term Care Insurance, effective as of July 1991,[7] specifically noted that actuaries should be aware that new services may be developed and the fear and stigma associated with confinement could erode:

> Actuaries are accustomed to using current and past morbidity and other data as a basis for projecting future costs. Currently for LTC, such data come from a variety of sources and tend to be incomplete; great care and careful interpretation are needed in using such LTC data. Furthermore, there are a number of factors that could affect the reliability of projections based on currently available LTC morbidity data. For example:…e. The current stigma and fear associated with nursing home confinement might erode if improved funding made these more attractive places for care…i. New LTC services may be developed.

24.     Simply because CNA mispriced these policies by relying on loss ratios associated with a skilled nursing facility form does not give CNA license to change the policies' terms to comport with the financial results that CNA needs to achieve.  Treating these policies as nursing home only policies – to the exclusion of assisted-living facilities that meet the Long-Term Care Facility definition – breaches the insurance policy contract and is done in bad faith to achieve financial targets.

25.     After CNA denies an insured's claim for a stay at an assisted-living facility, CNA provides the insured with a list of Medicare certified skilled nursing homes where coverage would be afforded.  However, these nursing facilities are often twice the cost of an assisted-living facility, so the daily benefit amount under the CNA policy often does not come close to

---

[7] ASOP No. 18 (July 1991) was later superseded, but was in effect when most, if not all, of the policies at issue here were first written: http://www.actuarialstandardsboard.org/pdf/superseded/asop18_032.PDF at 5-6.

covering the full cost of the expensive nursing facility. In addition, skilled-nursing facilities provide a level of institutionalized medical care that far exceeds the needs of a claimant suffering from a cognitive impairment, such as Alzheimer's disease, or physical impairments that necessitate assistance with activities of daily living.

26.     For these reasons and others, after CNA denies an assisted-living facility claim, most insureds stay in the assisted-living facility and pay out-of-pocket, rather than move to a skilled nursing facility that CNA will agree to cover, thus drastically reducing CNA's claim liability on the policies in the Class States.

27.     As noted by CNA's former Actuarial Director during a March 2011 presentation discussing the advent of assisted-living facilities and the effect on the pricing of long-term care insurance policies in general:

> …I think a lot of us really failed to appreciate that here we have places where people actually wanted to live. And that points back to that first ASOP where they talk about stigma of the nursing facilities. And people use these [assisted living] facilities fairly frequently. On our CNA individual block [of long term care insurance], for the open claims on the policy forms where the assisted living facility benefits are available, ***about a third of the open claims now are assisted living facility claims, so they are pretty prevalent***. ***And you get really long continuance because they get into these facilities and that's where they stay until they die or until they get kicked out because the facility can't keep them any longer***. (Emphasis added).

28.     Accordingly, CNA attempts to avoid payment of assisted-living facility claims on the Class policies in the Class States.  Indeed, the financial exposure is massive, and if the insured dies while residing at an assisted-living facility and never moves to a nursing home, CNA escapes payment of the claims entirely.

29.     CNA, for many years, wrote policies that expressly covered only skilled-nursing facilities.  When CNA wants to use language to cover only skilled nursing homes, it knows how to do that, since it did that very clearly in the past.

30.     While CNA claims that, "[t]he '24-hour-a-day nursing services' language was borrowed from the Medicare Statute's definition of skilled-nursing facilities requiring a nurse always to be present [quoting Medicare statute:]…'a skilled nursing facility must provide 24-hour licensed nursing services,'" (*See* Exhibit C) a review of the actual policy language contained in the class policies does not support this interpretation since the term "licensed nursing" is not found in the policies under the "Long-Term Care Facility" definition.

31.     In older generations of policies, when CNA wanted to cover nursing homes only, this intention was specifically stated. On the other hand, the policies at issue here broadly define the term "Long-Term Care Facility" in such a manner that coverage is not limited to just nursing homes, as CNA now claims.

32.     Furthermore, certain CNA policy applications in use as late as May 1994 reveal "Nursing Home" policies were also available to insureds such as Ms. Daluge, but were not selected:



*See* Exhibit D at 3.

33.     Ms. Daluge's purchase of the LTC1 P1-15203 "Long Term Care" policy in May 1994 was part of a CNA program to "upgrade" and replace a CNA "Nursing Home" policy that she previously owned (see "NH" reference):

| PART VI | | | | | | |
|---|---|---|---|---|---|---|
| 1. Do you now have in force or are you applying for any other long term care or nursing home policy or rider? | | | | | ☑ Yes | ☐ No |
| List details below and indicate whether any health insurance coverage is to be replaced by the policy applied for | | | | | | |
| Name of Company(ies) | Applied or Inforce | | Policy Number(s) | Type & Amount of Benefits | To be Replaced by This Coverage? | |
| CNA (upgrade) | ☐ | ☑ | 076265162 | 60/day NH | ☑ Yes | ☐ No |
| CNA (upgrade) | ☐ | ☑ | 076380124 | 50/1 LTC | ☑ Yes | ☐ No |
| | ☐ | ☐ | | | ☐ Yes | ☐ No |

*See* Exhibit D at 2 ("60/day NH").

34.     If CNA wanted the Long-Term Care Facility definitions in the policies to cover only skilled nursing facilities, it would have drafted them accordingly.

35.     CNA knew how to explicitly limit coverage to nursing homes and it chose not to do that. Instead, knowing that a change in the provision of long-term care services was on the horizon, chose a definition that covers far more facilities than the traditional nursing home.

36.     CNA's attempt to get out of paying for claims at assisted-living facilities in the Class States under the policies at issue here is an improper and unconscionable tactic designed to do one thing – save money by reducing policy and claim reserves.

37.     These actions undertaken by CNA to avoid payment of claims for stays at assisted-living facilities (including assisted-living facilities that care exclusively for Alzheimer's and memory care patients) ***that it was previously covering under the policies*** is causing extreme harm to insureds and their loved ones who depend on these health-care benefits for financial, emotional, and physical survival.

38.     This is not CNA's first attempt to treat these policies as nursing-home only policies. Judge Sandra S. Beckwith in the Southern District of Ohio, in an order granting summary judgment to the plaintiff, specifically told CNA that the policy language in the LTC1

policy form did not allow for coverage of just nursing homes under the Long-Term Care Facility definition:

> "Skilled nursing" for Medicare coverage purposes is not equivalent to the policy's description of a covered facility's nursing care, which includes not only skilled, but also intermediate or custodial nursing care. The Congressional determination that the necessarily higher levels of care provided by skilled nursing requires round the clock licensed nursing staff does not control the determination of coverage provided by Continental's policy.
>
> ***
>
> The policy requires that 24-hour nursing services be provided by **or under the supervision of** a registered nurse. The facility profile completed by Sunrise [] states that Sunrise has an RN or LPN on staff to "direct & supervise care," and has an RN or LPN on call. That is all the policy terms require for provision of "24-hour-a-day nursing services provided by or under the supervision of a registered nurse." The Court agrees that if Continental intended its policy to cover only facilities in which an RN or LPN is physically present onsite 24 hours every day, it was required to plainly state that requirement in its policy.
>
> Plaintiff's motion for summary judgment on this issue is therefore granted, and Defendant's motion is denied. (emphasis in original) (internal citation omitted).
>
> *See Barbara Hoekenga v. Continental Casualty Company*, No. 06-458, Doc. 40 (S.D. Ohio April 18, 2007) ("*Hoekenga*").

39.    CNA later settled a nationwide class action related to whether the presence of licensed nurses on-site was required under the LTC1 policy.[8] Despite having lost on summary judgment and settled a class action both specifically aimed at affording coverage at assisted-living facilities, CNA has gone back to the well – now claiming that only those facilities capable of providing 24-hour continuous licensed nursing care to a particularly sick resident are eligible for coverage in the Class States. This tactic is nothing more than a creatively repackaged attempt to avoid assisted-living facility coverage, yet again, except this time ***CNA is denying claims even when licensed nurses are present on-site 24/7 at an assisted-living facility***.

---

[8] *Dorothea Pavlov, et al. v. Continental Casualty Company*, No. 07-02580, Doc. 107 (N.D. Ohio October 7, 2009) ("*Pavlov*").

### The "has 24-hour-a-day nursing services"
### and "continuous nursing care" Requirements.

40.    The LTC1 policies require that a covered facility "has 24-hour-a-day nursing services[.]"

41.    CNA interprets this provision, and substantially similar provisions in the Con Care B forms, to mean that in order for a facility to be covered, it must be legally capable of admitting a resident in need of 24-hour around-the-clock *licensed* nursing care. This interpretation eliminates assisted-living facilities in the Class States, and is the cornerstone of CNA's claim that the policies only cover nursing homes. CNA conveniently ignores that the policies' use of the terms "nursing care" and "nursing services" includes unlicensed, unskilled custodial-nursing care.

42.    CNA's explanation for this interpretation is as follows, "[t]he '24-hour-a-day nursing services' language was borrowed from the Medicare Statute's definition of skilled nursing facilities requiring a nurse always to be present [quoting Medicare statute:]…'a skilled nursing facility must provide 24-hour *licensed* nursing services[.]'" *See* Exhibit C.

43.    However, noticeably absent from the Class Policies' definition is the term "licensed": "24-hour licensed nursing services" v. "24-hour-a-day nursing services". The difference in choice of language is significant and intentional.

44.    The LTC1 policy expressly covers facilities "primarily providing Long-Term Care" that "provide[] skilled, intermediate **or** custodial nursing care" and defines "Long-Term Care" as "Care or services which are required… Due to the Inability to Perform Two or More Activities of Daily Living [or] Due to Cognitive Impairment." *See* Exhibit B.

45.     The correct interpretation of the policies' "24-hour-a-day" nursing requirement is that a covered facility must at least have the ability to provide unlicensed, custodial-nursing services at any time of day, seven days a week, as needed by residents. In practice, this means, at a minimum, that the facility is staffed by someone 24-hours-a-day who can legally attend to the custodial-nursing needs of a resident at any time of day and who operates under the supervision of a licensed nurse.

46.     CNA's interpretation, that a covered facility must be capable of providing 24-hour licensed nursing care to a particularly sick resident, is designed to eliminate coverage for assisted-living facilities in the Class States – *__facilities that it had previously been covering__* – thereby significantly reducing its claim exposure and associated policy reserves associated with the policies.

47.     A telephone call recording between undersigned counsel and a senior member from CNA's third-party claim administrator documents that claims at assisted-living facilities had been previously paid under the policies, and that assisted-living facilities are being denied based on a misapplication of the "24-hour-a-day" and "continuous" nursing services provisions:

> MR. COLLINS:        Okay.  I think that should be -- I'll speak to my client and communicate all this and try to explain to them.  Like I said, the biggest thing that's hard for them to understand and swallow is that they had their claim paid and then all of a sudden now it won't be paid.  That's something I can imagine is very confusing.
>
> CNA CLAIM ADMINISTRATOR:  Sure.
>
> MR. COLLINS:        Especially when they're getting rate increases.
>
> CNA CLAIM ADMINISTRATOR: Oh, I totally hear you.  I'm -- again, they definitely aren't the first and it's happened before on claims that I personally have worked on.  And I guess the positive thing is that they did get benefits where if they had filed their original claim -- their first claim after 2009, they wouldn't have gotten anything under it so I guess that's the positive slant to it but certainly I can understand why it would be confusing.  Absolutely.

MR. COLLINS:      People have called -- like this is -- they're not the only people from Connecticut who have called with this exact issue, right?  I imagine that this comes up for people in Connecticut because of the licensing problem, right?

CNA CLAIM ADMINISTRATOR:  Yeah, not just Connecticut -- all over the place.  We have a lot of states who have -- different assisted living facilities in most states are regulated as far as the level of -- and whether or not they can provide nursing care services and to the degree that they can provide nursing care services is fairly strictly regulated in most states.  And whether it be that they license the facility separately from the actual care provider itself or whether the facility can provide care but they regulate what type of care can be provided.  Most states have some kind of stipulation that an assisted living cannot provide continuous ongoing nursing care because that's not what they were ever designed to do.  They were designed to provide support of living services not nursing.  So I would say in most cases that I've seen -- most assisted-living facilities are not approved under these type of policies just because of how states have regulated them.

MR. COLLINS:      Most of it's due to (inaudible) –

CNA CLAIM ADMINISTRATOR:  Nursing services.   Yeah, nursing services.  Eight hours a day, seven days a week -- I mean five hours a day, seven days a week, 24 hours a day nursing services.  And most states their assisted living level licenses does not permit a facility to provide 24 hour a day continuous nursing services whether the nurse is present or on call because they are designed to provide support of care not nursing.

48.      While it is true that assisted-living facility statutes typically prohibit the facilities from admitting patients in need of 24-hour around-the-clock skilled nursing care – people in need of this intense level of licensed nursing-care should generally reside in a skilled nursing facility – *no assisted-living facility statute in the Class States prohibits a facility from making unlicensed custodial-nursing care available to residents 24/7*.

49.      To be sure, custodial-nursing care can be provided by unlicensed nursing aides.  The federal government's Centers for Medicare & Medicaid Services ("CMMS") defines custodial-nursing care as follows:

16

Custodial Care – Nonskilled personal care, like help with activities of daily living like bathing, dressing, eating, getting in or out of a bed or chair, moving around, and using the bathroom. It may also include the kind of health-related care that most people do themselves, like using eye drops. In most cases, Medicare doesn't pay for custodial care.[9]

50.     Additionally, Actuarial Standard of Practice ("ASOP") No. 18 Long-Term Care Insurance, effective as of July 1991,[10] notes that custodial-nursing care is:

Custodial Care – Care that is primarily for the purpose of meeting personal needs such as help in walking, bathing, dressing, eating, prevention of bed sores, etc. Unlike acute care, its purpose is not to restore or stabilize health or the ability to function. Custodial care can be provided by someone with-out professional medical skills or training, under the supervision of a licensed health practitioner.

51.     The policies' use of the terms "nursing services" and "nursing care" is clearly intended to broadly cover all levels of nursing care, both skilled-licensed nursing care and unskilled, unlicensed custodial-nursing care: "skilled, intermediate **or** custodial nursing care[.]"

52.     In its claim denial decisions, CNA cites various state statutes that generally prohibit assisted-living facilities from accepting residents who need the type of around-the-clock skilled-nursing care that only skilled-nursing facilities are capable of providing. CNA ignores that the policies do not require the Long-Term Care Facility to be capable of providing 24-hour licensed-nursing services to a particular resident.  On the contrary, the policies merely require that nursing services, at a minimum unskilled custodial nursing care, are available at the facility on a 24-hour basis.

53.     Contrary to the positions taken in CNA's claim denial letters, no assisted-living statute in the Class States prohibits an assisted-living facility from making custodial-nursing care available to residents on a 24/7 basis; in fact most assisted-living statutes *require* it.  This

---

[9] *See* http://www.medicare.gov/Pubs/pdf/10153.pdf at 47. Also note that "custodial care" is referred to as "custodial nursing care." Id. at 29.

[10] ASOP No. 18 (July 1991) was later superseded , but was in effect when most, if not all, of the policies at issue here were first written: http://www.actuarialstandardsboard.org/pdf/superseded/asop18_032.PDF at 3.

requirement is the very purpose for the development of assisted-living facilities all over the country.  Individuals did not need the level of skilled-nursing care offered at Medicare-certified skilled-nursing facilities, but did need significant help with custodial-nursing care – including monitoring due to Alzheimer's disease – available to them on a 24/7 basis.

54.    Custodial-nursing care in the form of assistance with the activities of daily living, such as eating, dressing, bathing, toileting and walking, ***is the very type of care that these long-term care policies are designed to cover through the activities of daily living benefit trigger***. Unskilled-nursing services such as this do not require the assistance of a licensed nurse, yet are still clearly considered nursing services under the policies.

55.    CNA's attempt to confuse policyholders by citing statutes that prevent assisted-living facilities from admitting patients who are in need of 24-hour-a-day, around-the-clock licensed nursing, ***but that do not prevent the assisted-living facility from offering unskilled custodial-nursing care on a 24-hour basis***, is merely an attempt by CNA to avoid payment of claims where liability is clear.

56.    In Wisconsin, CNA claims that assisted-living facilities, termed Community-Based Residential Facilities ("CBRF's"), "cannot, per Wisconsin law, provide 24 hour a day nursing services to residents.  A CBRF may not provide more than 3 hours of nursing care per week to any individual resident." (citing Wis. Stat. § 50.01(1g)). *See* Exhibit E.

57.    Contrary to CNA's position, however, Wis. Stat. § 50.01(1g) merely prohibits a CBRF from accepting residents who require skilled nursing care and/or more than three hours-per-week of intermediate nursing care, unless an exception has been granted. There is no limitation whatsoever placed on the amount of custodial-nursing care (termed "personal care" in the statute) that a CBRF may offer, and Wisconsin Department of Health Services Regulation

83.36 which addresses the staffing requirements at all Wisconsin CBRF's specifically notes that "[t]he CBRF shall provide employees in sufficient numbers on a 24-hour basis to meet the needs of the residents."

58.     When denying claims in Massachusetts, CNA cites to various assisted-living regulations and comes to the conclusion that:

> A certified Assistance (sic) Living Residence may not provide skilled or other nursing care under the supervision of a physician, and may not provide nursing services or nursing care by or under the direction of a registered or licensed nurse…Assisted Living Residences may provide or arrange for services such as supervision and assistance with Activities of Daily Living, Instrumental Activities of Daily Living, Self-Administered Medication Management, timely assistance and response in emergencies, and three meals per day (*see* 651 CMR 12.04). However, none of the services rendered to residents by an Assisted Living Residence constitute nursing services or nursing care, as they are performed by non-licensed, paraprofessional personal care staff whose competency to provide care is evaluated only semi-annually by a nurse. (citing 651 CMR 12.07). *See* Exhibit F.

59.     CNA ignores that the policies' use of the terms "nursing services" and "nursing care" were clearly intended to cover all levels of nursing care, including unskilled custodial care (*i.e.* "assistance with Activities of Daily Living").  Assisted-living facilities in Massachusetts, therefore, are perfectly capable of offering custodial-nursing care to residents as needed 24-hours-a-day.

60.     Similarly, in Florida, CNA claims that only nursing homes, and only certain assisted-living facilities holding certain special licensing designations, can meet the 24-hour-a-day nursing services requirement in the policies. This interpretation eliminates the majority of Florida's assisted-living facilities from eligibility for coverage:

> [Assisted Living Facility – Standard] level of license permits an assisted living facility to provide supportive services including assistance in performing activities of daily living, medication management, supervision, health monitoring, social and leisure activities, and transportation. It also allows the facility to employ or contract with a nurse to take vital signs, give medications and

prepackaged enemas, and keep nursing progress notes. However, residents who require ongoing nursing and other health care services must contract with a licensed home health care provider to provide such care, as it may not be provided by the facility. *See* Exhibit G.

61.    CNA clarifies in later correspondence that facilities licensed as Assisted Living Facility – Standard are "not licensed to provide 24-hour-a-day nursing services[.]" *See* Exhibit H.

62.    This lockstep conduct on the part of CNA to avoid assisted-living facility coverage is not limited to the home states of the named Plaintiffs – Wisconsin, Massachusetts, and Florida – but is also occurring in the Class States.

63.    For example, in Georgia, CNA claims that assisted-living facilities, termed "Personal Care Homes" in Georgia, are incapable of legally providing "24-hour-a-day nursing services." *See* Exhibit I.

64.    However, Personal Care Homes in Georgia are ***required*** to make custodial-nursing care (termed "personal services" in the statute) available to residents 24-hours-a-day. *See* Georgia's Rules And Regulations For Personal Care Homes, Staffing 111-8-62-.10(1)(b) ("At least one administrator, on-site manager, or a responsible staff person must be on the premises 24 hours per day and available to respond to residents' needs.")

65.    CNA's goal is made explicitly clear – to avoid covering assisted-living facilities under the policies: "The fact that Ms. [redacted]'s treatment providers have recommended that she reside in an assisted living facility does not alter the terms and provisions of coverage. By its express terms, the policy affords coverage for care provided in a Long Term Care Facility. *The policy does not cover care provided in an assisted living facility*." (Emphasis in original). *See* Exhibit I at 3.

66. In Kentucky, CNA states to policyholders that "coverage for care rendered by a facility that is certified in Kentucky as an Assisted Living Community" will not be provided since,

> Assisted Living Communities in Kentucky are specifically precluded by statute from providing health services such as diagnostic, treatment or rehabilitative services…Therefore, an Assisted Living Community does not provide 'skilled, intermediate, or custodial nursing care under the supervision of a physician' and may not employ nurses to provide 24 hour a day nursing services, also in compliance with state statutes. *See* Exhibit J.

CNA ignores that Assisted-Living Communities in Kentucky ***must*** provide custodial-nursing care to residents ("[a]ssistance with activities of daily living") on a 24-hour-a-day basis in order to "meet the twenty-hour (24) hour scheduled needs of each client[.]" *See* Kentucky Revised Statutes 194A.705 and 194A.717. [11]

67. While the assisted-living statutes cited by CNA in each Class State differ, CNA's consistent policy interpretation that the Class Policies' should be read as only covering facilities capable of providing around the clock 24-hour-a-day licensed skilled nursing services to a particularly sick patient. This is the common root of the wrongful claim denials in the Class States.

### The "Licensed By The State" Requirement

68. In addition to denying claims based on a facility not having 24-hour-a-day or nursing services, in certain states, CNA is denying claims on the additional basis that assisted-living facilities in said state are not "licensed by the state."

---

[11] Mr. Young had a claim denied for a stay at an assisted living facility in Florida, Fountainview Assisted Living, over the phone with no written record of this decision provided by CNA. The Kentucky insured who is the subject of Exhibit J also apparently had her claim verbally denied without a proper explanation of the denial set forth in writing by CNA. *See* Exhibit J at 1-2. ("…a representative in our Claim Intake Department spoke with Ms. REDACTED via telephone regarding the benefits available under Ms. REDACTED's policy as well as claim filing procedures. However, to date, CCC has no record of a claim filed under Ms. REDACTED's policy…She also states that CCC has informed her that benefits are not payable under Ms. REDACTED's policy for assisted living in the state (sic) of Kentucky."

69.     In Massachusetts for example, CNA claims that assisted-living facilities that receive a "certificate" to operate as an Assisted Living Residence from the Massachusetts Executive Office of Elder Affairs are nonetheless not licensed by the Commonwealth of Massachusetts, "As an initial matter, Newbridge on the Charles has obtained a certificate to operate an Assisted Living Residence from the Massachusetts Executive Office of Elder Affairs. It is not licensed by the state." *See* Exhibit F.

70.     CNA's strict reading of the "licensed by the state" requirement in the policies to mean that a facility actually has to have a purported document called a "license" rather than a "certificate" or some other similar approval from the state granting permission to operate the facility, is unsupported by the policies' language.

71.     If a facility has been given permission by its home state to operate an assisted-living facility, whether it is provided with a purported document that says "license" on it or not, the facility is "licensed by the state" since the state is permitting it to operate in accordance with the state's applicable assisted-living statutes and regulations.

## CLASS ALLEGATIONS

72.     This class action is brought on behalf of the Plaintiffs and all others similarly situated to recover for the harm caused by Defendant's breaches of the policies' terms.

73.     There is no dispute that all Plaintiffs are eligible medically for coverage.

74.     All Plaintiffs filed claims for stays at assisted-living facilities that met the policies' respective Long-Term Care Facility definitions, and all Plaintiffs had their claims denied in violation of the terms of their respective policies.

75.     All Plaintiffs fully performed their obligations under their respective policies, and yet Defendant failed to pay their claims in violation of the terms of the policies.

76.    All Plaintiffs have suffered damages as a result.

77.    Defendant is uniformly and systematically breaching the terms of the policies by only covering facilities that are legally capable of admitting patients in need of 24/7 licensed nursing care, when the policies place no such requirement on covered facilities.

78.    In fact, Defendant repeatedly states in denial letters to insureds that "We must adjudicate all policies in a consistent manner under the terms of the contract."

79.    Defendant is uniformly and systematically breaching the terms of the policies by denying coverage and claiming that assisted-living facilities in certain states are not licensed, even though these facilities' operate with permission of their home state and comply with all applicable assisted-living facility statutes and regulations.

80.    Defendant is denying claims that Defendant knows should be paid under the terms of the policies.  Rather than abide by the terms of the policies, Defendant, affirmatively and deliberately, is engaged in a scheme to categorically exclude claims for stays at assisted-living facilities in the Class States.

81.    The acts, practices, and conduct of which Plaintiffs complain commonly affect the Class.

82.    All current policyholders in the Class seek injunctive relief that would prevent CNA from categorically excluding assisted living facilities in the Class States from coverage under the policies.

83.    All members of the Class seek declaratory relief that the policies' "licensed by the state" requirement is met when a facility is operating with permission from their home state and pursuant to the applicable statutes and regulations governing assisted-living facilities.

84.     All members of the Class seek declaratory relief confirming that the policies do not require a facility to be capable of providing 24/7 licensed nursing care to a particularly sick individual in order to comply with the "has 24-hour-a-day nursing services" and "continuous nursing care" requirements in the policies.

85.     Members of the Class who had a claim(s) for a stay(s) at an assisted-living facility in one of the Class States denied based on the conduct described above seek monetary damages.

86.     The proposed Classes consist of:

> **Rule 23(b)(2) Class**: All current CNA long term care insurance policyholders of the following policy forms - "LTC1" (Forms 15203/16356/17931) or "Con Care B" (Forms 59433/59806) ("Class Policies") who (1)  reside in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee or Wisconsin ("Class States"), and/or, (2) whose policy was issued in a Class State.

> **Rule 23(b)(3) Class**: All current and former CNA long term care insurance policyholders of the Class Policies: (1) who were residing in an assisted living facility[12] in one of the Class States (2) who were medically eligible for benefits (3) but who were not afforded coverage for the costs of the facility (4) on the grounds that the facility (a) was not licensed by the state and/or (b) could not legally provide 24-hour-a-day, or continuous, nursing services/care, and (5) who suffered ascertainable damages as a result of being denied coverage.

> Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

87.     If the Court determines that certification of the above eleven state Class definitions is not appropriate, in the alternative, Plaintiffs will seek certification of sub-classes utilizing the same Class definitions but only for claims filed for stays at assisted-living facilities

---

[12] The term "assisted living facility" refers to these specific facility types in each of the Class States: "Assisted Living Center" or "Assisted Living Home" (Arizona), "Assisted Living Facility-Standard" (Florida), "Personal Care Home" or "Community Living Arrangements" (Georgia), "Residential Care Facility" (Indiana), "Assisted Living Programs" or "Residential Care Facilities" (Iowa), "Assisted Living Community" (Kentucky), "Assisted Living Residence" (Massachusetts), "Housing with Services Establishment" (Minnesota), "Adult Care Homes," "Enriched Housing Programs," or "Assisted Living Residence" (New York), "Assisted-Care Living Facilities" (Tennessee) or "Community-Based Residential Facility," "Adult Family Home," or "Residential Care Apartment Complex" (Wisconsin).

in Massachusetts ("MA Alternative Sub-Class"), Florida ("FL Alternative Sub-Class") and Wisconsin ("WI Alternative Sub-Class").

88.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed prior and up to the time when the Court determines whether class certification is appropriate.

89.     **Numerosity:**  The individual class members are so numerous that joinder of all members is impracticable.  Based upon CNA rate filing information published by the State of Connecticut, as of December 31, 2010, there were 39,631 individuals nationwide who own either a LTC1 or Con Care B policy, therefore the number of members in the eleven state Classes here are certainly in the thousands.

90.     Although the precise number of Class members cannot be ascertained until the parties conduct discovery, the number is certainly in excess of that required to satisfy the numerosity requirement.

91.     Moreover, the identities of the individual Class members, including their names and addresses, are readily ascertainable through Defendant's records.

92.     **Commonality:**  There are questions of law and fact that are common to Plaintiffs' and the Class Members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Classes.  Among such common questions of law and fact are the following:

        a.   Whether Defendant issued long-term care policies of insurance to Plaintiffs and the Classes;

b.   Whether a facility must be legally capable of providing 24/7 licensed nursing care to a particular resident in order for the facility to ever qualify for coverage as a Long-Term Care Facility;

c.   Whether assisted living facilities in the Class States are legally prohibited from ever meeting the Long-Term Care Facility requirements in the policies;

d.   Whether the policies' "licensed by the state" requirement is met when a facility is legally permitted to operate as an assisted-living facility according to the applicable statutes and regulations in its home state;

e.   Whether Defendant breached its policies of insurance with Plaintiffs and the Classes; and

f.   Whether Defendant's failure to pay claims under the policies was in bad faith.

93.   **Typicality:**  Plaintiffs' claims are typical of the claims of the Classes because of the similarity, uniformity, and common purpose of Defendant's unlawful conduct.  Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendant's wrongful conduct.

94.   **Adequacy of Representation:**  Plaintiffs are adequate representatives for the Classes and will fairly and adequately protect the interests of the Classes.  Plaintiffs are committed to vigorous prosecution of this action, and have retained competent counsel who are experienced in class action litigation, and, in particular, consumer-related class actions.

95.   Plaintiffs have retained law firms that are experienced in both class action and health insurance litigation to prosecute this action.  The firms are highly experienced in handling class action litigation matters and have the financial and other resources to meet the substantial costs and complex litigation issues inherent in this matter.

96.     **Requirements of Fed. R. Civ. Proc. 23(b)(3):**  The questions of fact and law in Plaintiffs' and the Classes' claims predominate over any questions of fact and law applicable to any individual member of the Class.  Due to the nature of the common questions of fact and law, a class action is the superior method for resolving these issues.

97.     Specifically, a class action is superior because the issues relating to the Defendant's liability can be resolved on a class-wide basis, leaving only the issues of calculation of each Class member's individual damages.

98.     **Superiority:**   A class action is superior to individual actions because of the following non-exhaustive factors:

    a.     Joinder of the Class members would be impracticable due to the number of anticipated Class members and would create a hardship in the management of the case;

    b.     The Class consists of elderly individuals, many of whom suffer from serious health problems including Alzheimer's disease and similar cognitive impairments, who are incapable of pursuing these matters on their own or even aware of their rights under the Class Policies;

    c.     Resolution of the Class members' claims on an individual basis would run the risk of inconsistent legal rulings and judgments;

    d.     The interests of justice would be best served by resolution of all of the Class' claims in one judicial forum; and

    e.     There are no anticipated management problems in handling this matter as a class action.

99.   **Requirements of Fed. R. Civ. Proc. 23(b)(1) & (2):**   Prosecuting each Class member's claims separately would result in a significant risk of inconsistent legal rulings and/or judgments that would create incompatible standards of conduct for the Defendant.

100.   Furthermore, Defendant has acted in a similar manner, employing consistent business practices, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

**COUNT I**
**(BREACH OF CONTRACT)**

101.   Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

102.   Defendant formed an agreement and entered into a contract with Plaintiffs and the Class including offer, acceptance, and consideration (hereinafter called the "Contract").

103.   Pursuant to that Contract, Plaintiffs and the Class paid money to Defendant in exchange for Defendant providing a long-term care insurance policy to Plaintiffs and the Class. Defendant received premiums in exchange for the issuance of a policy of long-term care insurance.

104.   The Contract included, without limitation, Defendant's right to charge a premium in exchange for its promise to pay all claims promptly and justly when all requirements under the policies have been met.

105.   Plaintiffs and the Class performed all of their obligations under the contract.

106.   Defendant is obligated pursuant to the Contract, without limitation, to "pay [Plaintiff's and the Class'] claim[s] immediately after [CNA] receive[s] due written proof of loss."

107.    Defendant is also obligated to honor the Waiver of Premium Benefit in the policies when an insured qualifies for coverage, which Defendant has not.

108.    Defendant breached the Contract by, without limitation, denying claims for stays at assisted-living facilities that should have been afforded coverage and thereby denying all associated Waiver of Premium Benefit claims as well.

109.    Defendant further breached the Contract by refusing to send out claim forms or open a claim when a Class member requested coverage for stays at a facility determined by CNA as not covered, resulting in certain claims being denied without any written basis for CNA's coverage position.

110.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs and the Class have suffered damages in an amount to be proved at trial.

## COUNT II
## (BAD FAITH/ BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING)

111.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

112.    Defendant, acting through its officers, agents, servants and/or employees, acted unreasonably and in bad faith in refusing to pay claims for policyholders' stays at assisted-living facilities in the Class States.

113.    Defendant, acting through its officers, agents, servants and/or employees, acted unreasonably and in bad faith in refusing to open a claim, send out claims forms and issue written claim denials for stays at facilities determined by CNA as not covered.

114.    Plaintiff Mr. Young had a claim denied verbally by CNA, a sharp and unconscionable tactic designed to discourage follow up and make it difficult for an insured to pursue their benefits.

115.    In addition to all of the reasons stated above, CNA's bad faith is further exemplified by its self-serving and unsupported change in policy interpretation after paying claims for years at assisted-living facilities in order to reduce its claim exposure while simultaneously seeking approval for rate increases.

116.    CNA's bad faith is also demonstrated by its misrepresentation of the terms of the policy and assisted-living facility regulatory schemes in the Class States.

117.    Lastly, CNA's failure to act in a timely manner with respect to the adjudication of Plaintiffs' claims, and its inability to provide a clear statement as to the basis for its claim denials, is additional evidence of bad faith.

118.    In addition to liability in other states, CNA's bad faith entitles Wisconsin insureds to prejudgment interest on all benefits that have accrued prior to the date of judgment at a rate of 12% annum pursuant to Wis. Stat. § 628.46.

## COUNT III
### (EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF)

119.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

120.    Plaintiffs seek a declaration that the policies' "24-hour-a-day nursing services" provision is met if a facility in a Class State offers to residents, at a minimum, unlicensed custodial-nursing care as needed at any time of day, seven days a week.

121.    Plaintiffs seek a declaration that the policies' "licensed by the state" provisions are met if a facility in a Class State operates with the permission of the state in which it is located and is in compliance with all statutes and regulations applicable to the facility.

122.    Plaintiffs seek a declaration that the assisted living facility statutes and regulations in the Class States do not legally prevent assisted living facilities operating in said states from meeting the Long-Term Care Facility definition in the policies.

123.    Plaintiffs seek an injunction prohibiting Defendant from engaging in the conduct described above, including but not limited to, the denial of claims based on misapplication of the "has 24-hour-a-day nursing services," and "licensed by the state" provisions in the policy, and issuing verbal claim denials.

124.    There is a bona fide, actual, and present practical need for declaration.

125.    The declaration concerns a present, ascertained, and ascertainable state of facts.

126.    An immunity, power, privilege or right of Plaintiffs and the Class is dependent upon the facts or the law applicable to the facts.

127.    Plaintiffs and Defendant have an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law.

128.    The antagonistic and adverse interest(s) are all before the Court by proper process or class representation.

129.    The relief sought is not merely giving of legal advice or the answer to questions propounded for curiosity.

## COUNT IV
## (VIOLATION OF M.G.L. C. 93A AND C. 176D
## - MA ALTERNATIVE SUB-CLASS ONLY)

130.   On August 7, 2015, Plaintiffs mailed a demand letter to Defendant seeking relief under M.G.L c. 93A and c. 176D. Plaintiffs were not offered adequate relief by Defendant.

131.   Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

132.   At all times relevant hereto, Defendant has been engaged in trade or commerce as those terms are defined under M.G.L c. 93A.

133.   Defendant has committed acts and followed practices substantially within the Commonwealth of Massachusetts, with respect to its denial of claims at Massachusetts assisted-living facilities, which constitute unfair and deceptive acts and practices in the conduct of a trade or commerce as prohibited by M.G.L. c. 93A and c. 176D.

134.   Defendant has committed acts and followed practices with respect to Ms. Birnbaum and the MA Alternative Sub-Class which constitute unfair and deceptive acts and practices in the conduct of trade or commerce and violated M.G.L. c. 93A by its oppressive acts and omissions.

135.   Defendant has committed numerous unfair, oppressive, and deceptive acts, practice and omissions in the business of insurance against Ms. Birnbaum and the MA Alternative Sub-Class, in violation of M.G.L. c. 176D.

136.   Defendant's violations of M.G.L. c. 176D constitute violations of M.G.L. c. 93A.

137.   Defendant materially violated M.G.L. c. 93A and 176D by its oppressive acts and omissions.

138.    The unfair and deceptive acts and practices of Defendant were performed willingly and knowingly.

139.    As a direct and proximate result of the acts and omission of Defendant, particularly its refusal to afford coverage for stays at qualified Massachusetts assisted-living facilities, Ms. Birnbaum and the MA Alternative Sub-Class suffered damages.

## APPLICATION FOR A PERMANENT INJUNCTION

140.    Because Defendant has engaged in the unlawful acts and practices described above, Defendant has violated and will continue to violate the law as alleged in this Complaint. Unless restrained by this Honorable Court, Defendant will continue to violate the laws of the State of Wisconsin and the Class States, and cause immediate, irreparable injury, loss and damage to the Plaintiffs and the Class - which is composed of many vulnerable elderly individuals seeking coverage for stays at assisted-living facilities. Therefore, in addition to monetary damages, Plaintiffs request a Permanent Injunction as indicated below.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs pray for judgment and relief in their favor and against Defendant as follows:

A.    Certifying this action as a class action as set forth herein and designating Plaintiffs as the Class Representatives of, and their attorneys' as class counsel for, the Classes described above;

B.    Plaintiff prays that a PERMANENT INJUNCTION be issued, restraining and enjoining Defendants, Defendants' successors, assigns, officers, agents, servants, employees and attorneys and any other person in active concert or participation with Defendants, from engaging in the acts or practices complained of herein;

C.  Declaring that: (a) Plaintiffs and the Class members can qualify for benefits under the policies' Long-Term Care Facility language, for stays at assisted-living facilities in the Class States; (b) Defendant was obligated to pay claims of Plaintiffs and Class members made for qualifying stays at assisted-living facilities in the Class States; and (c) Defendants' targeted denial of claims for stays at assisted-living facilities in the Class States was in bad faith;

D.  Issuing a permanent injunction requiring Defendant to identify and notify in writing all Class members that their claims for qualified stays at assisted-living facilities will once again be considered for coverage in the Class States;

E.  Awarding compensatory damages with interest on behalf of Plaintiffs and the Class members in an amount to be proved at trial;

F.  Awarding punitive damages;

G.  Ordering Defendants to pay Plaintiff and the Class prejudgment interest on all benefits that have accrued prior to the date of judgment, at a rate of 12% annum pursuant to Wis. Stat. § 628.46, and at applicable rates according to similar statutes in other states;

H.  Ordering Defendant to disgorge all ill-gotten profits and gains related to their scheme;

I.  Ordering Defendant to provide Plaintiff and the Class with all available relief under M.G.L c. 93A and c. 176D including but not limited to treble damages, interest and attorneys' fees;

J.  Awarding Plaintiffs and the Classes all expenses, costs and disbursements incident to the prosecution of this action, including reasonable attorneys' fees; and

K.    For such other and further relief as allowed by law and/or as is equitable under the

circumstances.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 23, 2016                          THE PLAINTIFFS,
                                             GWEN B. DALUGE, MURRAY YOUNG, AND
                                             HELENE K. BIRNBAUM BY THEIR
                                             ATTORNEYS


                                             /s/ *Sean K. Collins*
                                             Sean K. Collins

                                             SEAN K. COLLINS
                                             Sean K. Collins, Attorney at Law
                                             184 High Street, Suite 503
                                             Boston, MA 02110
                                             Telephone: 617-320-8485
                                             Fax: 617-227-2843
                                             sean@neinsurancelaw.com

                                             LIONEL Z. GLANCY
                                             EX KANO S. SAMS II
                                             KARA WOLKE
                                             Glancy Prongay & Murray LLP
                                             1925 Century Park East, Suite 2100
                                             Los Angeles, CA 90067
                                             Telephone: 310-201-9150
                                             Fax: 310-201-9160
                                             lglancy@glancylaw.com
                                             esams@glancylaw.com
                                             kwolke@glancylaw.com

                                             PATRICK V. DAHLSTROM
                                             Pomerantz LLP
                                             10 South LaSalle Street, Suite 3505
                                             Chicago, IL 60603
                                             Telephone: 312-377-1181
                                             Fax: 312-377-1184
                                             pdahlstrom@pomlaw.com

MARK D. DEBOFSKY
DeBofsky & Associates, P.C.
200 West Madison Street, Suite 2670
Chicago, IL 60606
Telephone: 312-702-1842
Fax: 312-929-0309
mdebofsky@debofsky.com

JEFFREY GOLDENBERG
Goldenberg Schneider, LPA
One West Fourth Street, 18th Floor
Cincinnati, Ohio 45202
Telephone: 513-345-8291
Fax: 513-345-8294
jgoldenberg@gs-legal.com

JANET PECQUET
PETER CASSADY
Beckman Weil Shepardson, LLC
American Book Building
300 Pike Street, Suite 400
Cincinnati, OH 45202
Telephone: 513-621-2100
Fax: (513) 621-0106
jpecquet@beckman-weil.com
petercassady@beckman-weil.com

PATRICK SHEEHAN
Whatley Kallas, LLP
60 State Street Seventh Floor
Boston, MA 02109
Telephone: 617-573-5118
Fax: 617-371-2950
psheehan@whatleykallas.com

Attorneys for Plaintiffs and the Class

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2016, a copy of the foregoing Second Amended Class Action Complaint was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*s/ Sean K. Collins*
SEAN K. COLLINS

# Mailing Information for a Case 3:15-cv-00297-wmc Daluge, Gwen v. Continental Casualty Company

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Brent Austin**
  baustin@eimerstahl.com

- **Sean K. Collins**
  sean@neinsurancelaw.com

- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com

- **Mark D. DeBofsky**
  mdebofsky@debofsky.com,scottrell@debofsky.com

- **Jeffrey Goldenberg**
  jgoldenberg@gs-legal.com,svaaler@gs-legal.com,cpence@gs-legal.com

- **James W. Joseph**
  jjoseph@eimerstahl.com,shargadon@eimerstahl.com,fharvey@eimerstahl.com,nnowacki@eimerstahl.com,jwiltscheck@eimerstahl.com

- **Ameri Klafeta**
  aklafeta@eimerstahl.com

- **Janet Eileen Pecquet**
  jpecquet@beckman-weil.com

- **Ex Kano Sams II**
  esams@glancylaw.com

- **John Street**
  jstreet@eimerstahl.com,llawes@eimerstahl.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`