# EXHIBIT B

## STIPULATION OF SETTLEMENT

IT IS HEREBY STIPULATED AND AGREED, by, between, and among Gwen B. Daluge ("Daluge"), Murray Young ("Young"), Helene K. Birnbaum ("Birnbaum"), and Continental Casualty Company ("CNA" or "the Company"), through their counsel, that the lawsuit captioned *Gwen B. Daluge et al. v. Continental Casualty Company*, Civil Action No. 3:15-cv-00297-WMC, pending in the United States District Court for the Western District of Wisconsin (the "Action"), and the matters raised by the Action, are settled, compromised, and dismissed with prejudice on the terms and conditions set forth in this Stipulation of Settlement ("Settlement Agreement" or "Agreement") and the Releases set forth in this Settlement Agreement, subject to the approval of the Court.

## I.  INTRODUCTION

### A.  Background of the Action

1.     On or about May 18, 2015, Daluge brought a class action complaint for damages and injunctive relief in the United States District Court for the Western District of Wisconsin against CNA ("the Daluge Complaint").  On or about May 18, 2015, Young brought a class action complaint for damages and injunctive relief in the United States District Court for the Southern District of Florida against CNA ("the Young Complaint").  On or about August 7, 2015, the Daluge Complaint was amended to add Young and Birnbaum as plaintiffs, and to expand the scope of relief sought.  Shortly thereafter, the Young Complaint was voluntarily dismissed.

2.     In the Action, Daluge, Young and Birnbaum disputed coverage decisions under policy Long Term Care Facility definitions for stays in certain Wisconsin, Florida and Massachusetts assisted-living facilities, contending such facilities were properly licensed to, and did, provide sufficient nursing and other required services to satisfy the policies.  The Class

Action Complaint concerned, among other things, CNA's denial of claims for stays in assisted-living facilities and the handling of claims for stays in assisted-living facilities, and asserted multiple theories of recovery. The Action was filed individually and on behalf of all current and former CNA long term care policyholders with "the same and/or similar policy language" as used in certain policy forms to define "Long Term Care Facility."

      3.     The Daluge Complaint was amended twice during the course of the Action. The Second Amended Class Action Complaint ("Current Complaint"), is brought for damages and injunctive relief by Daluge, Young and Birnbaum. The Current Complaint concerns, among other things, CNA's denial of claims for stays in assisted-living facilities in various states and the handling of claims for stays in assisted living facilities, and asserts multiple theories of recovery.

      4.     Plaintiffs purport to have sought coverage under the Long-Term Care Facility Benefit, which pays a fixed daily indemnity amount for stays at long term care facilities that meet specified policy requirements. Plaintiffs generally allege they were improperly denied coverage on grounds that the facilities in which they resided, or reside, did not meet the policy requirements concerning the types of facilities that are covered under the policy.

      5.     In general, Plaintiffs have pursued claims for damages based on past claim denials, and have also pursued injunctive or declaratory claims challenging CNA's interpretation of the policies going forward.

      6.     Plaintiffs brought a motion for class certification in the Action on May 5, 2016. Plaintiffs sought certification of a Rule 23(b)(2) class of all CNA long term care insurance policyholders of the "LTC1" policy form (Forms 15203/16356/17931) who: (1) reside in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York,

Tennessee or Wisconsin (the "Class States"); and (2) whose policy contains a particular definition of "Long Term Care Facility" ("the class policies"). Plaintiffs also sought certification of a Rule 23(b)(3) sub-class of all CNA long term care insurance policyholders of the policies encompassed in the putative Rule 23(b)(2) class: (1) who were residing in an assisted-living facility in one of the Class States; (2) who were receiving Long Term Care as defined by the class policies; (3) but who were not afforded coverage for the costs of the facility; (4) on the grounds that the facility (a) was not licensed by the state and/or (b) could not legally provide 24-hour-a-day nursing care; and (5) who suffered ascertainable damages as a result of being denied coverage. CNA opposed the Plaintiffs' motion for class certification. The Court has not ruled on Plaintiffs' motion.

       7.     CNA admits no liability or wrongdoing whatsoever in connection with this litigation or any of the allegations therein. CNA also specifically denies any allegations of bad faith. CNA specifically denies Plaintiffs' class allegations. Except where stated otherwise in this Settlement, CNA reserves all of its rights, allegations, theories and defenses both as to the merits of Plaintiffs' claims and to the certification of any class.

       8.     CNA disputes Plaintiffs' claims and denies the material allegations of the Current Complaint and has asserted (or would assert) numerous defenses to such claims, including without limitation the following:

          a.    The claims at issue should not be adjudicated on a class-wide basis for myriad reasons set forth in CNA's class certification briefing;

          b.    Regardless of the class definition no claim could be properly certified in the matter;

c.   The facilities at issue did not fall within the definitions contained in the policies at issue concerning the types of facilities for which coverage is extended;

d.   The facilities at issue did not hold a license which permitted them to perform the services required by the policy facility definitions;

e.   The facilities at issue did not provide sufficient nursing services to meet the policy definitions of the types of facilities for which coverage is extended;

f.   The facilities at issue did not provide sufficient nurse or physician supervision to meet the policy definitions of the types of facilities for which coverage is extended;

g.   The facilities at issue did not maintain sufficient medical records to meet the policy definitions of the types of facilities for which coverage is extended;

h.   The facilities at issue were types that the Policy or Policies specifically listed as examples of ineligible facilities;

i.   Plaintiffs and other potential class members' coverage claims were properly denied;

j.   Plaintiffs and other class members suffered no compensable damages; and

k.   Plaintiffs and other class members failed to properly mitigate their damages.

9.      During the pendency of this litigation, Plaintiffs' counsel conducted their own investigation and discovery in the matter, including the review and analysis of thousands of documents produced by CNA in this and other matters and gathered from third party sources and briefed numerous questions of law.

10.      The parties agree that this litigation, including the class certification motion and the merits of the matter, were adversarial, hard fought and conducted at arm's length by experienced and able counsel on both sides.

**B.      The Settlement Discussions.**

1.      Class Counsel believe the allegations in the Action and the Class Claims, as defined herein, have merit and are supported by evidence.  Class Counsel, however, recognize the risks and uncertainties of prosecuting any action and the expense and length of proceedings necessary to prosecute this Action through trial and appeals.  Class Counsel is mindful of the age and circumstances of Class Members, which supports this reasonable compromise.  Class Counsel believe this proposed Settlement Agreement confers significant benefits to the Class Members.  Based upon their evaluations, and as a result of lengthy and difficult arm's-length negotiations with CNA (most of which were conducted under the direction of an experienced mediator), Class Counsel believe that the terms and conditions of this Settlement Agreement are fair, reasonable, adequate, and in the best interests of the Class Members.

2.      CNA believes the allegations in the Action and the Class Claims are without merit.  CNA has agreed to enter into this Settlement Agreement solely to reduce further litigation expense and inconvenience and to remove the distraction of burdensome and protracted litigation.  CNA has denied and continues to deny each and every claim and contention alleged by Plaintiffs.  It has asserted and continues to assert many defenses to such claims and has

expressly denied and continues to deny any wrongdoing or legal liability arising out of the conduct alleged in the Action. CNA does not propose or endorse the certification of any class, and reserves all objections to the class certification, including those already presented in its briefing in opposition to Plaintiffs' motion for class certification. This Settlement Agreement shall not be construed or deemed to be evidence or an admission or concession by CNA of any fault or liability for damages whatsoever, or that any class certification is appropriate, and Plaintiffs and Class Counsel acknowledge it would be a material breach of this Agreement if they seek to use this Settlement Agreement for any other purpose, except to show the reasonableness of settlement benefits. CNA recognizes, however, the risk, expense, and length of continued proceedings necessary to defend the Action through trial and any appeals, and CNA desires to avoid continued litigation with its valued policyholders. CNA has determined, therefore, that it is desirable that the Action and any future actions arising from CNA's conduct as alleged in the Action be settled in the manner and upon the terms and conditions set forth in this Settlement Agreement to avoid the further expense and burden of protracted litigation, to put to rest further controversy with the Class Members, and to provide the significant benefits set forth in this Agreement.

**3.** Accordingly, the undersigned Parties have reached this Agreement to resolve controversies regarding the Policies issued to the Class Representatives and the Class Members, subject to the conditions and terms of this Agreement.

NOW THEREFORE, IT IS HEREBY AGREED by the undersigned Parties that, subject to final approval by the Court and entry of the Final Order, the Class Claims, as defined in this Agreement, of the Class Members shall be settled and dismissed with prejudice, subject to the following terms and conditions:

## II.      CERTAIN DEFINITIONS

For purpose of this Stipulation of Settlement and the Exhibits to this Stipulation of Settlement, the following terms have the meanings specified below.

A.      "Action" means the case or claim now pending as:  *Gwen B. Daluge et al. v. Continental Casualty Company*, Civil Action No. 3:15-cv-00297-WMC, pending in the United States District Court for the Western District of Wisconsin as described in the Complaint.

B.      "Agreement" or "Settlement Agreement" or "Settlement" means this Stipulation of Settlement and the Exhibits attached to this Stipulation of Settlement, which are incorporated by reference.

C.      "Alternate Plan of Care Benefit" or "APC" means the benefit so-described in the Policies or Policy riders.  *See* Exhibits A-C for examples of the APC.

D.      "Approvable Damages Claim" means a claim from a member of Class I that satisfies the terms and conditions of the Class I Settlement Benefit set forth in Section IV.A below.  Approvable Damages Claims are subject to the Payment Cap as defined below.

E.      "Assisted Living Facility" or "Assisted Living Facilities" means a place, building, portion or wing of a building, or institution that provides housing, care, and services in a Class State that is registered with, licensed or certified by the appropriate regulatory authority in one of the Class States, but provides a lesser level of care than skilled nursing facilities or hospitals.  Such facilities may include, *inter alia*, the following facilities in the following states:

      1.      Arizona:  Residential Care Institutions;

      2.      Florida:  Assisted Living Facilities;

      3.      Georgia:  Personal Care Homes, Assisted Living Communities, and Community Living Arrangements;

4.      Indiana:  Housing With Services Establishments and Residential Care Facilities;

5.      Iowa:  Residential Care Facilities and Assisted Living Programs;

6.      Kentucky:  Assisted Living Communities and Personal Care Homes;

7.      Massachusetts:  Assisted Living Residences;

8.      Minnesota:  Housing With Services Establishments;

9.      New York:  Adult Homes, Enriched Housing Programs, and Assisted Living Residences;

10.     Tennessee:  Assisted-Care Living Facilities, Adult Care Homes and Homes for the Aged;

11.     Wisconsin:  Community-Based Residential Facilities, Residential Care Apartment Complexes, and Adult Family Homes.

"Assisted Living Facility" or "Assisted Living Facilities" does not include a place, building, portion of a building or institution licensed as a skilled nursing facility (or similarly licensed institution), hospital, or a facility solely licensed as a hospice.   "Assisted Living Facility" or "Assisted Living Facilities" does not include independent living arrangements.

F.      "Claims Administrator" means the Person or organization responsible for administering the Class I Settlement Benefit as described in Section IV.A below.  The Parties agree that CNA (working with its counsel and with its third-party claims administrator, Long Term Care Group, Inc.) shall serve as Claims Administrator.

G.      "Claim Form" means the document substantially in the form as attached hereto as Exhibit D and which shall be sent to potential members of Class I, and shall be completed and

submitted by such individuals or an appropriate representative, pursuant to this Agreement, as one condition of obtaining the Class I Settlement Benefit described in Section IV.A below.

   **H.** "Class I" means all current or former CNA policyholders issued a Policy (1) who made claims under a Policy for the Long Term Care Facility Benefit for a facility in one of the 11 Class States on or after the start of the Period of Payment; (2) who were medically eligible for benefits; (3) but were not afforded coverage for the costs and expenses relating to their stays; (4) on grounds that included that the facility or facilities did not provide the requisite 24-hour-a-day nursing services by or under the supervision of a registered nurse, licensed practical nurse, or licensed vocational nurse; and (5) who suffered ascertainable damages as a result of being denied coverage.  A list of the individuals who are currently believed to be members of Class I as identified by the Parties through this litigation and the settlement process will be provided to the Settlement Administrator, Notice Administrator and Class Counsel prior to issuing notice. A member of Class I may also be a member of Class II.

   **I.** "Class I Member" means a member of Class I.

   **J.** "Class I Settlement Benefit" shall have the meaning set forth in Section IV.A below.

   **K.** "Class II" means all CNA policyholders with Policies that are In-Force Policies as of July 1, 2017.  A list of the individuals who are members of Class II as identified by the Parties through this litigation and the settlement process will be provided to the Settlement Administrator, Notice Administrator and Class Counsel prior to issuing notice.  A member of Class II may also be a member of Class I.

   **L.** "Class II Member" means a member of Class II.

**M.**  "Class Claims" means all claims that the Plaintiffs and the Class Members or any of them ever had or now have, can have, or may hereafter have against CNA or Releasees related to, arising out of or stemming from: (1) claims relating to or arising out of any acts, failures to act, omissions, oral or written representations, facts, events, transactions, or occurrences set forth or alleged in the Action; (2) claims for breach of contract, bad faith denial of claims, fraud, non-disclosure, deceptive trade practices, abuse of the elderly, violations of any federal or state statutory scheme, or other claims related to the denial of coverage claims which are set forth or alleged in Action; (3) claims relating to acts, omissions, facts, matters, transactions, occurrences, or oral or written statements or representations made or allegedly made in connection with or directly or indirectly relating to the Settlement Agreement or the settlement of the Action, except nothing in the Settlement Agreement or the Releases included herein shall preclude any action to enforce the terms of the Settlement; (4) claims for attorneys' fees, costs, incentive awards, or disbursements incurred by Counsel for Plaintiffs or by Plaintiffs or the Class Members, or any of them, in connection with or related in any manner to the Action, the settlement of the Action, or the administration of such settlement, except to the extent otherwise specified in this Settlement Agreement; (5) the matters addressed in the Releases; and (6) claims relating to the susceptibility of the Action for class certification.

**N.**  "Class Counsel" means: (1) Sean K. Collins, of the Law Offices of Sean K. Collins, (2) Lionel Z. Glancy and Ex Kano S. Sams II of Glancy Prongay & Murray LLP, (3) Jeffrey S. Goldenberg of Goldenberg Schneider LPA, (4) Janet E. Pecquet of Burke & Pecquet, LLC.

O.      "Class Members" or "Class" means all persons (and their respective representatives such as a legally appointed guardian, attorney-in-fact, executor/trix, or estate administrator) who are members of Class I or Class II, or both.

P.      "Class Notice" or "Notice" means the notices substantially in the form of attached Exhibits E and F, which will be mailed to the potential members of Class I and Class II, respectively, and which will be posted on the Settlement Website, pursuant to the Order of Preliminary Approval of Proposed Settlement, as set forth in Section V below.

Q.      "Class Representatives" means Daluge, Young and Birnbaum, and their respective representatives.

R.      "Class States" means the states of Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee and Wisconsin.

S.      "Company" or "CNA" means Continental Casualty Company, and all its intermediate and ultimate parents, subsidiaries, affiliates, and sister or related companies.

T.      "Complaint" or "Current Complaint" means the Second Amended Class Action Complaint filed in *Gwen B. Daluge et al. v. Continental Casualty Company*, Civil Action No. 3:15-cv-00297-WMC, pending in the United States District Court for the Western District of Wisconsin.  A copy of the Complaint is attached hereto as Exhibit G.

U.      "Court" means the United States District Court for the Western District of Wisconsin presiding over *Gwen B. Daluge et al. v. Continental Casualty Company*, Civil Action No. 3:15-cv-00297-WMC.

V.      "CNA's Counsel" means:  Brent Austin, Eimer Stahl LLP, 224 S. Michigan Ave, Chicago IL 60604.

11

**W.**      "Damages Claim" means a claim submitted by a Class I Member on a Claim Form.

**X.**      "Effective Date" or "Effective Date of the Settlement" means the first date by which <u>all</u> of the following events have occurred: (1) this Stipulation is fully executed by all the parties (*i.e.*, the Settlement Date); (2) the Court enters the Order of Preliminary Approval as set forth in Section VIII below; (3) the Court enters the Final Order as set forth in Section XII below; and (4) the Final Order becomes Final.

**Y.**      "Final" means:

**1.**      If no timely appeal has been taken from the Court or from any other order by the Court in this Action and no timely motion to reconsider or similar motion has been filed before the Court, when all periods of time for any person to seek any form of appeal, reconsideration or other form of review has expired; or

**2.**      If any such appeal, reconsideration or other form of review is undertaken, when any such appeal, reconsideration or other form of review shall have been fully resolved, the Final Order shall have been affirmed in all respects, and the time for any further appeal, reconsideration or other form of review shall have expired.

**3.**      A motion for relief from judgment under Rule 60 of the Federal Rules of Civil Procedure or other collateral attack on the judgment in another lawsuit shall not be considered to be "reconsideration or other form of review" for the purposes of determining whether the Final Order in this case has become "Final."  However, a motion for relief from judgment under Rule 60 filed within 30 days of the date the Court enters the Final Order shall be considered to be "reconsideration or other form or review" for the purposes of determining whether the Final Order is this case has become "Final."

**Z.** "Final Fairness Hearing" means the hearing before the Court at which the Court considers:

**1.** Whether this Settlement Agreement, including the Exhibits to this Agreement, should be approved as fair, adequate, and reasonable;

**2.** Whether a Final Order as set forth in Section XII below should be entered;

**3.** Whether the application of Class Counsel for payment of attorneys' fees, costs and expenses should be approved;

**4.** Whether any application for payment of a contribution award to the Class Representatives should be approved; and,

**5.** Any other matters addressed by the Court.

**AA.** "Final Order" or "Final Order and Judgment" or "Final Order and Judgment Approving Settlement" means the Final Order, Judgment of Dismissal with Prejudice, and Release as set forth in Section XII, below.

**BB.** "In-Force Policy or Policies" means, as of July 1, 2017, an active Policy that a Class Member has maintained and that is accurately shown on CNA records not to be lapsed, canceled, expired, at or beyond policy limits, or otherwise no longer subject to the right to make coverage claims. A Class Member with an In-Force Policy may either be On Claim, or not be On Claim but continuing to make premium payments under the Policies if so required by the terms of the Policy.

**CC.** "Lapsed Policies" mean Policies which are not currently In-Force.

**DD.** "Lead Class Counsel" means Sean K. Collins, of the Law Offices of Sean K. Collins, 184 High Street, Suite 503, Boston MA 02110 and Ex Kano S. Sams II of Glancy Prongay & Murray LLP, 1925 Century Park E #2100, Los Angeles, CA 90067.

**EE.**   "Long Term Care Facility" or "LTCF" means a facility which meets the requirements for coverage under the Long-Term Care Facility definition of the Policies.

**FF.**   "Long Term Care Facility Benefit" or "LTCF Benefit" means the benefit payable for stays at a Long-Term Care Facility under a Policy.

**GG.**   "Long Term Care Facility Daily Benefit" or "LTCF Daily Benefit" means the daily benefit payable for stays at a Long-Term Care Facility under a Policy.

**HH.**   "Notice Administrator" means the firm responsible for administering the notice process under the settlement.  The Parties agree that CNA or an organization designated by CNA shall be the Notice Administrator, subject to Lead Class Counsel's consent which shall not be unreasonably withheld.

**II.**   "Notice Program" shall have the meaning set forth in Section V below.

**JJ.**   "On Claim" means the period during which an Owner of a Policy has submitted a valid and timely claim for benefits under his or her Policy that was approved.

**KK.**   "Opt-Out Claimant" means a Class 1 Class Member who submits a timely and valid Opt-Out Notice before the Opt-Out Date, as specified in the Class Notice.

**LL.**   "Opt-Out Claims" means Claims that belong to Opt-Out Claimants.

**MM.**   "Opt-Out Date" means the post mark date specified in the Class Notice by which Class 1 Members must mail a valid notice requesting to be excluded from this Settlement pursuant to the terms of the Notice Program.

**NN.**   "Order of Preliminary Approval of Settlement" means the Order as set forth in Section VIII below.

**OO.**   "Owner" or "Policyholder" means any insured under a Policy.

**PP.**   "Parties" means CNA and the Class Representatives.

**QQ.**    "Payment Cap" shall mean the $4.85 million cap on all payments to be made pursuant to Parts IV.A.3.b.i – IV.A.3.b.iv.

**RR.**    "*Pavlov*" shall mean the lawsuit captioned *Dorothea Pavlov v. Continental Casualty Co.*, Case No. 5:07-2580 (United States District Court for the Northern District of Ohio), and the final settlement approved by the District Court on October 7, 2009.

**SS.**    "Period of Payment" shall have the meaning set forth in Section IV.A.1.a below.

**TT.**    "Plaintiffs" or "Class Representatives" means Daluge, Young and Birnbaum, and their respective representatives.

**UU.**    "Policy" or "Policies" means any individual LTC 1 series policy on a form numbered 15203, 16356, or 17931 purchased from CNA whose policy contains the following language:

LONG TERM CARE FACILITY         A place primarily providing Long-Term Care and related services on an inpatient basis, which:

1.  is licensed by the state where it is located; and

2.  provides skilled, intermediate, or custodial nursing care under the supervision of a physician; and

3.  has 24-hour-a-day nursing services provided by or under the supervision of a registered nurse (R.N.), licensed vocational nurse (L.V.N.), or licensed practical nurse (L.P.N.), and

4.  keeps a daily medical record of each patient; and

5.  may be either a freestanding facility or a distinct part of a facility such as a ward, wing, unit, or swing-bed of a hospital or other institution.

An example of a 15203 policy form is attached as Exhibit A.  An example of a 16356 policy form is attached as Exhibit B.  An example of a 17931 policy form is attached as Exhibit C.

**VV.**   "Preliminary Certification and Approval Date" means the date the Court enters the Order of Preliminary Approval as set forth in Section VIII below.

**WW.**   "Premium Waiver Initiation Date" means the period beginning with the earliest date premiums owed by a member of Class I or Class II would have been waived had his or her original claim been approved when submitted.

**XX.**   For purposes of the Class I Settlement Benefit and the process by which it may be awarded, "Qualified Care" means: (1)  Skilled nursing or intermediate nursing care – which is medical care above the level of assistance with the activities of daily living – at least 3 times a week; or (2) One of the following activities of daily living, with the frequency as indicated: Bathing (at least 3 times a week), dressing (at least 5 times a week), transferring (at least once a day), eating (at least once a day), incontinence care (at least once a day), medication (at least 3 times a week), mobility (at least once a day), or toileting (at least once a day); or (3) Confinement in a locked or lockable memory care or dementia unit serving patients who are elopement risks with regular assistance. Care provided by friends or family members of any degree or kind shall not constitute "Qualified Care."

**YY.**   For purposes of the Class I Settlement Benefit and the process by which it may be awarded, "Qualified Facility" or "Qualified Facilities" requires that a facility must meet each of the following:

(1)   the facility must be registered with, licensed or certified by the state; and

(2)    the facility must be legally able to provide at least the following care: (a) skilled nursing or intermediate nursing care – which is medical care above the level of assistance with ADLs – at least 3 times a week; or (b)  two or more of the following activities of daily living, with the frequency as indicated:  bathing (at least 3 times a week), dressing (at least 5 times a week), transferring (at least once a day), eating (at least once a day), incontinence care (at least once a day), medication (at least 3 times a week), mobility (at least once a day), and toileting (at least once a day); or (c) confinement in a locked or lockable memory care or dementia unit serving patients who are elopement risks with regular assistance with at least one of the activities of daily living identified in subpart (b) above; and

(3)    an RN, LPN or LVN must be on-site at the facility at least 5 hours a day, 7 days a week, and on call the remainder of the time; and

(4)    the facility must confirm in writing that an RN, LPN or LVN is responsible for the implementation or delegation of responsibility for providing at minimum the care set forth in Section YY.(2) above to its residents on a twenty-four (24) hour basis.  The facility must further confirm in writing that sufficient numbers of facility personnel are available to provide at minimum the care set forth in Section YY.(2) above to its residents on a twenty-four (24) hour basis and to meet the needs of residents at all times based on the residents' service programs; and

(5)     the facility must maintain a record or records documenting the daily care and/or treatment provided to the policyholder.

**ZZ.**   "Release" or "Releases" means the releases and waivers as set forth in Section III below.

**AAA.**   "Releasee" or "Releasees" means the Company and other entities as set forth in Section III below.

**BBB.**   "Settlement" means the resolution of the Action by this Settlement Agreement.

**CCC.**   "Settlement Agreement" or "Proposed Settlement" refers to this Stipulation of Settlement and all Exhibits to this Stipulation of Settlement, which are incorporated by reference.

**DDD.**   "Settlement Class Claims" means Class Claims that belong to Class Members.

**EEE.**   "Settlement Date" means the date on which this Agreement is fully executed by all the Parties.

**FFF.**   "Settlement Parties" means the Parties and all Class I and Class II Members.

**GGG.**   "Settlement Website" means the Internet website described in Section V.A.1 below.

**HHH.**   "Waiver of Premium Benefit" means the benefit so-described in the Policies. *See* pages 10-11 of Exhibit A, pages 10-11 of Exhibit B, and page 12 of Exhibit C for examples of the waiver of premium benefit.

**III.**   Capitalized terms used in this Settlement Agreement and Exhibits shall have the meaning ascribed to them in this Settlement Agreement.

## III.   RELEASE PROVISIONS

**A.**   <u>**Class I Release**</u>:  Upon the Court's entry of a Final Order and Judgment approving the Proposed Settlement, and by operation of such judgment entered by the Court, the

Class Representatives and the members of Class I, for themselves and for all of their respective heirs, executors, and administrators, and for their respective representatives, predecessors, successors and assigns, shall release and forever discharge CNA and its past, present, and future parents (including intermediate and ultimate parents), subsidiaries, affiliates, predecessors, successors, assigns, and shareholders, and all of their respective past, present, and future officers, directors, employees, general agents, agents, producers, brokers, solicitors, representatives, attorneys, accountants, heirs, administrators, executors, insurers, co-insurers and reinsurers, and assigns of any of the foregoing, including any persons or entities acting on their behalf or at the direction of any of them (collectively, "Releasees") from any and all actual or potential claims, complaints, actions, suits, obligations, demands, promises, liabilities, costs, expenses, and attorneys' fees (whether class, mass, collective, joint, or individual in nature), whether based on any federal or state law or a right of action, whether filed or threatened to be filed in state or federal court or in any other venue of any type, in law or in equity or otherwise, which the Plaintiffs and the Class Members or any of them ever had or now have, or can have, or shall hereafter have against CNA or Releasees, related to or deriving from any and all:

1.      claims relating to the Policies, or any coverage or benefits thereunder, that were the subject of this Action or in any way related to the subject matter of the Action;

2.      claims relating to or arising out of any acts, failures to act, omissions, oral or written representations, facts, events, transactions, or occurrences set forth or alleged in the Action or in any way related to the subject matter of the Action;

3.      claims for breach of contract, bad faith denial of claims, fraud, non-disclosure, deceptive trade practices, abuse of the elderly, violation of any federal or state statutory or regulatory scheme, or other claims related to any benefit or potential coverage,

19

including the LTCF Benefit, the Waiver of Premium Benefit or APC Benefit, of the Policies that were the subject of this Action or in any way related to the subject matter of the Action;

      4.     claims relating to acts, omissions, facts, matters, transactions, occurrences, or oral or written statements or representations made or allegedly made in connection with or relating to the Settlement Agreement or the settlement of the Action, except nothing in this Release shall preclude any action to enforce the terms of the Settlement;

      5.     the Class Claims; and,

      6.     claims for attorneys' fees, costs, or disbursements incurred by Class Counsel or by Plaintiffs or the Class Members, or any of them, in connection with or related in any manner to the Action, the settlement of the Action, or the administration of such Settlement, except to the extent otherwise specified in this Settlement Agreement;

      7.     Notwithstanding the broad scope of this release, future claims to enforce the terms of this Settlement are not released.  Furthermore, this Release is not intended to impact claims under the Policies not hereby released, which are potentially held by Class I Members, such as, for example, for stays in skilled nursing facilities or for home health care.  The parties recognize, however, that claims for future stays in Assisted Living Facilities in the Class States shall be governed by the terms of this Settlement as described below in the Class II Settlement Benefit.

      B.     **Class II Release**:  Upon the Court's entry of a Final Order and Judgment approving the Proposed Settlement, and by operation of such judgment entered by the Court, the Class Representatives and the members of Class II, for themselves and for all of their respective heirs, executors, and administrators, and for their respective representatives, predecessors, successors and assigns, shall release and forever discharge CNA and its past, present, and future

parents (including intermediate and ultimate parents), subsidiaries, affiliates, predecessors, successors, assigns, and shareholders, and all of their respective past, present, and future officers, directors, employees, general agents, agents, producers, brokers, solicitors, representatives, attorneys, accountants, heirs, administrators, executors, insurers, co-insurers and reinsurers, and assigns of any of the foregoing, including any persons or entities acting on their behalf or at the direction of any of them (collectively, "Releasees") from any and all actual or potential claims, complaints, actions, suits, obligations, demands, promises, liabilities, costs, expenses, and attorneys' fees (whether class, mass, collective, joint, or individual in nature), whether based on any federal or state law or a right of action, whether filed or threatened to be filed in state or federal court or in any other venue of any type, in law or in equity or otherwise, which the Plaintiffs and the Class Members or any of them ever had or now have, or can have, or shall or may hereafter have against CNA or Releasees relating to the interpretation, application or implementation of the LTCF Benefit of the Policies as applied to claims for stays in Assisted Living Facilities in the Class States that were the subject of this Action or related to the subject matter of the Action, or any claim that was made relating to a stay in an Assisted Living Facility in a Class State but was not approved under the APC Benefit and was the subject of this Action or related to the subject matter of the Action.

C. **Unknown Claims, Scope of Releases:**  In connection with the Class I release and the Class II release, Plaintiffs and the Class Members acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected or facts in addition to or different from those which they now know or believe to be true with respect to the matters released.  Nevertheless, it is the intention of Plaintiffs and the Class Members in executing these Releases to fully, finally, and forever settle and release all such matters encompassed by the

Class I Release and/or the Class II Release, and all claims relating to such matters, which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action).  Notwithstanding the broad scope of the Releases, future claims to enforce the terms of this Settlement are not released and all policy provisions not the subject of this Action remain in force and are not impacted by the Settlement.

        **D.**      <u>**CNA Release of the Class Representatives**</u>: Upon the Effective Date, CNA shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged the Class Representatives and Class Counsel from all claims arising out of, relating to, or in connection with, the institution, prosecution, assertion, settlement, or resolution of the Action or the released claims except to enforce the Releases and other terms and conditions contained in this Stipulation or any Court order (including, but not limited to, the Judgment) entered pursuant thereto.

## IV.    CONSIDERATION

        **A.**    **Class I Settlement Benefit**

        **1.**    Class I Members may be eligible to receive monetary relief through the following process.

        **a.**    Class I Members may obtain the Class I Settlement Benefit for stays at Qualified Facilities in the following states  only during the time period designated below for that state (the "Period of Payment"):

        i.   Arizona:  May 18, 2009 to June 30, 2017 for Arizona-issued Policies, and May 18, 2011 to June 30, 2017 for Policies issued outside Arizona.

        ii.   Florida:  May 18, 2010 to June 30, 2017.

iii.  Georgia:  May 18, 2009 to June 30, 2017.

iv.  Indiana: May 18, 2005 to June 30, 2017.

v.  Iowa:  May 18, 2005 to June 30, 2017.

vi.  Kentucky:  May 18, 2000 to June 30, 2017.

vii.  Massachusetts:  May 18, 2009 to June 30, 2017.

viii.  Minnesota:  May 18, 2009 to June 30, 2017.

ix.  New York:  May 18, 2009 to June 30, 2017.

x.  Tennessee:  May 18, 2009 to June 30, 2017.

xi.  Wisconsin:  May 18, 2009 to June 30, 2017.

A claim for coverage of a Qualified Facility must have been made on or after the start of the Period of Payment.

**b.**    The $4.85 million Payment Cap applies to the Periods of Payment, and to all payments made to Class I pursuant to Parts IV.A.3.b.i – IV.A.3.b.iv.

**c.**    Only the LTCF Policy definition is impacted by this Settlement, and payments are subject to all other terms and conditions of the Policy.   For example, medical eligibility, lapse and cancellation provisions, elimination periods, benefit periods, benefit maximums and other policy provisions not the subject of this Action are not impacted by this Settlement and settlement claims process.  Should CNA determine through the settlement claim procedure that there were other or additional bases for a claim denial, no Class I Settlement Benefit will be paid for that claim.  However, during the settlement claim procedure, Class I Members will have the ability to provide support for their claim as a whole under all policy provisions, including support for their medical eligibility if such eligibility is disputed by CNA.

23

Payments shall be made for only those days during the Period of Payment in which the Class I Member's policy was active and in-force.

      **d.**    Claims must be supported by documents evidencing days and types of, as well as payments for, services.  Specific documentation requirements are described below.  Such documentation may be provided by Class I Members, their representatives, care providers, facility or other third-party providers, and shall include relevant documents already in possession of Defendant or Defendant's agents.  Payments will be offset by any other payments made to the Class I Member under his or her policy for the same claim for which a Class I Settlement Benefit is sought, such as, by way of example, for home health care or pursuant to an Alternate Plan of Care benefit.  All Class I Settlement Benefit payments shall be included in the calculation of the Policy's maximum.  Policyholders must satisfy the parameters described in Section IV.A.1 through IV.A.3 to be eligible for any payment.

      **e.**    There shall be no payment of interest or any late claim payment interest or penalties of any kind that may exist in different state statutes or regulations. The Parties will operate in good faith in adjudicating Class I claims.  Any disputes are to be resolved as provided in Section IV.A.4 below.

      **f.**    Subject to Sections IV.A.1.a-c above, Class I Members who had a claim for coverage denied and who received Qualified Care will receive up to 60% of their Policy's LTCF Daily Benefit, and up to 60% of Waiver of Premium Benefit.  The Class I Member must have made a written claim for coverage of a Qualified Facility, and/or such claim must have been denied in writing by CNA.  For purposes of calculation of the inflation protection benefit where applicable, the LTCF Daily Benefit will be calculated as provided in the Policy.

      **g.**      No Class Member is entitled to any monetary payments under this Settlement except as set forth in Section IV.A, except this does not include Class Members that qualify for prospective relief starting July 1, 2017.

      **2.**      To be eligible to receive any money under this process, a Class I Member must submit a Claim Form in accordance with the requirements set forth in this Section and in Section V. The claims process will consist of a reevaluation of the policyholder's denied claims by the Claims Administrator.  The Claims Administrator shall use the information submitted on the Claim Form to identify a Class Member's original claim.  The Claims Administrator will evaluate the information contained within the Class Member's original file, as well as any additional information the claimant or Class Counsel choose to submit, and any publicly available information which the Claims Administrator deems relevant in determining whether the claim is an Approvable Damages Claim.  The Claims Administrator will then determine whether claims are Approvable Damages Claims.

      **3.**      $4.85 Million Cap on Payments

      **a.**      The total of all payments to be made pursuant to Parts IV.A.3.b.i – IV.A.3.b.iv below shall be capped at $4.85 million. CNA's total liability for payments made pursuant to Parts IV.A.3.b.i – IV.A.3.b.iv below shall not, under any circumstances, exceed the $4.85 million Payment Cap.

      **b.**      The Payment Cap shall apply to the following:

        i.    Settlement payments to Class I members who submit valid claims;

        ii.    Settlement administration and notice costs, not to exceed $75,000;

      iii.   Attorneys' fees and expense reimbursements, as approved by the Court; and

      iv.   Any contribution awards to the named plaintiffs, as approved by the Court.

    **c.**   Should total payments pursuant to Parts IV.A.3.b.i – IV.A.3.b.iv immediately above exceed the $4.85 million Payment Cap, the Approvable Damage Claims submitted by the Class I Members shall be proportionately reduced by the percentage necessary to bring the total of all payments within the $4.85 million Payment Cap. The parties agree that the Payment Cap cannot be increased. To the extent that the payments made pursuant to Parts IV.A.3.b.i – IV.A.3.b.iv are beneath the $4.85 million Payment Cap, such funds shall be retained by CNA.

    **d.**   Any amounts expended in connection with the notice program, the class notice, the settlement website, and any other cost and expense related to the administration of this Settlement that exceed $75,000 shall be borne by CNA and shall not be included in the $4.85 million Payment Cap.

    **e.**   CNA will make such payments from its own accounts, and no separate common fund or account will be created, and no separate administrator will be retained to manage payments. Claims administration invoices will be provided to Class Counsel, but Class Counsel will have no discretion over administration tasks or expenses however CNA agrees to act in good faith and diligently monitor the claims administration process.

    **4.**   Class I Settlement Benefit Claim Process, the Dispute Resolution Process, and Claim Payments.

       **a.**     Class Notice and the related Claim Form shall be sent within 90 days of the date of the Preliminary Certification and Approval Date, as provided herein.

       **b.**     All claims for the Class I Settlement Benefit must be postmarked within 45 days after the Class Notice and the related Claim Form has been sent, as provided herein.

       **c.**     A determination of whether a claim is an Approvable Damages Claim shall be made by the Claims Administrator within 45 days from the date of receipt of the claim.  Upon making findings regarding all timely submitted claims, the Claims Administrator shall submit the findings to Class Counsel.

       **d.**     Class Counsel and CNA shall identify all claims decisions that are disputed, confer regarding any disputes over the claim findings, and attempt to resolve any dispute.  This meet and confer process must be completed within 30 days after the Claims Administrator has submitted its findings regarding all timely submitted claims.  Any agreements reached between Class Counsel and CNA over disputed claims shall be final.  If Class Counsel and CNA are unable to resolve the dispute, the Class I Member who submitted the disputed claim shall be advised of the Claims Administrator's decision and the right to appeal the decision, as provided herein.

       **e.**     Within 30 days of the completion of the meet and confer process described above, a letter from the Claims Administrator shall be sent to each claimant explaining whether the claim was approved or denied ("benefit determination letter").  If approved, the benefit determination letter shall explain how the monetary amount to be paid to the claimant was derived.  If denied, the benefit determination letter shall explain the basis for the denial.  The benefit determination letter shall explain the process to submit an appeal.

**f.**     Claimants shall have 30 days from the date that the Claims Administrator mailed the benefit determination letter to appeal by mailing a notice of appeal to the Claims Administrator, explaining the basis for their objection or disagreement. All such timely submitted appeals will be submitted to the neutral evaluator agreed upon by the Parties, who will issue a binding, non-appealable decision within 30 days of receiving a notice of appeal and all relevant information related thereto. The decision by the neutral evaluator is final and binding, and not subject to further appeal or review. Claimants shall be promptly notified by the Claims Administrator of the neutral evaluator's decision.

**g.**     It is the Parties' intention that Michael Young serve as the sole neutral evaluator as long as he is willing and able. If Michael Young is not willing or able, disputes will be resolved by a neutral mutually agreeable to Lead Counsel and CNA Counsel. If no agreement can be reached, then the neutral shall be appointed by JAMS. CNA shall bear the costs of the first three submitted appeals, and the costs of all other appeals will be shared equally by CNA and Class Counsel unless the neutral determines that one party's appeal position was unreasonable and that costs of the appeal should be shifted to the unreasonable party. If a Class I Member pursues an appeal with the neutral without the assistance of Class Counsel, CNA shall bear the costs of the appeal. Upon request, Class Counsel will advise whether any Class Counsel assisted the Class I Member with their appeal.

**h.**     Payments shall be sent by CNA to the Class I Members whose claims were approved. Such payments shall be made only after (a) the Settlement has become Final, (b) all claims for the Class I Settlement Benefit have been finally resolved, and (c) the operation of the Payment Cap has been calculated and that calculation has been agreed upon by Class Counsel and CNA.

### B.     Class II Settlement Benefit

**1.**     Class II Members shall receive the benefit of certain claim handling standards with regard to claims for facility stays under the LTCF Benefit in the Class States on or after July 1, 2017.  The standards shall be as follows:

**a.**     The policyholder must  reside in the facility and receive care from personnel of that facility as set forth in Part d, below.   Facility personnel must be employed by, contracted with, or work for the facility.  Home health care providers or outside third-party care providers not contracted with the facility, or care provided by friends or family members of any degree or kind, shall not qualify.  The facility personnel must be present 24-hours-a-day, and be able to provide the care described in Part d below.

**b.**     The facility must be registered with, licensed or certified by the state and is legally able to provide at least the care set forth in Part d (i),(ii) or (iii) below.

**c.**     An RN, LPN or LVN must be on-site at least 5 hours a day, 7 days a week, and on call the remainder of the time.  The facility must confirm in writing that an RN, LPN or LVN is responsible for the implementation or delegation of responsibility for providing at minimum the care set forth in Part d (i),(ii) or (iii) to its residents on a twenty four (24) hour basis.  The facility must further confirm in writing that sufficient numbers of facility personnel are available to provide at minimum the care set forth in Part d (i),(ii) or (iii) below to its residents on a twenty-four (24) hour basis and to meet the needs of residents at all times based on the residents' service programs.

**d.**     The policyholder must receive assistance from facility personnel, per Part a above, with any of the following:

(i)      skilled nursing or intermediate nursing care – which is medical care above the level of assistance with activities of daily living – at least 3 times a week; or

(ii)     two or more of the following activities of daily living, with the frequency as indicated:  bathing (at least 3 times a week), dressing (at least 5 times a week), transferring (at least once a day), eating (at least once a day), incontinence care (at least once a day), medication (at least 3 times a week), mobility (at least once a day), and toileting (at least once a day); or

(iii)    confinement in a locked or lockable memory care or dementia unit serving patients who are elopement risks with regular assistance with at least one of the activities of daily living identified in Part d(ii) above.

e.      Every six months, a physician associated with the facility, or the Class II member's personal physician, must certify that their care needs, as described in Part d. above, are being met by the facility (this is independent of any recertification requirement which may appear in the policies).

f.      The facility must verify in writing that it maintains a record or records documenting the daily care and/or treatment provided to the policyholder.

g.      If the criteria set forth above in Part B.1.a-f are met, the policyholder will qualify for the Long Term Care Facility Benefit and the Waiver of Premium Benefit so long as these criteria continue to be met.  These criteria will be documented and

established through CNA's regular claims evaluation process, together with any applicable provisions of the Policy.

**h.**     These provisions are in the form of a compromise between the parties on their dispute regarding their respective interpretations of the terms of the Long Term Care Facility definitions under the Policies and how they apply to coverage of Assisted Living Facilities.  This is not meant to modify, nor does it modify, the actual terms of the policies as written.  It instead is a compromise agreement as to the going-forward interpretation of discrete disputed terms that appear expressly and unmodified in the policies.  These provisions apply exclusively to the Long Term Care Facility definitions under the policies, and do not affect any other policy provision in any way.  Similarly, these provisions do not change or modify the terms of the *Pavlov* settlement.  It is agreed that this new compromised interpretation constitutes valuable and enforceable consideration, and is binding on the parties as a specific interpretation of existing policy language.  This compromise interpretation will be binding on the parties by way of contract (i.e., a settlement agreement) and not an injunction.

**i.**     Policyholders who are currently receiving the LTCF Benefit amount (whether through an administrative decision, Alternate Plan of Care or otherwise) for their stay at a facility as of the date of finality of this settlement will not have their claim reevaluated under the prospective relief protocol but instead will remain on claim so long as they satisfy the Long Term Care eligibility criteria of the Policy. If a policyholder qualifies for the Class II benefit, but is already receiving a different policy benefit (whether through an administrative decision, Alternate Plan of Care or otherwise) (hereafter called a "Different Benefit"), the policyholder will receive the greater of the benefits during the Class II benefit period of July 1, 2017 forward.  Payments made to the policyholder under a Different Benefit

during the Class II benefit period of July 1, 2017 forward will be deducted from any payments made under the Class II benefit.

        **j.** Policyholders who qualify for the LTCF Benefit under these criteria shall also be entitled to any applicable waiver of premium benefit, subject to any relevant terms or conditions of their Policy.

        **k.** Policyholders who are denied the LTCF Benefit under these criteria shall be sent a written denial letter that explains the basis for the denial, that their policy is subject to the terms of this Settlement, and that they can get more information on the Settlement from the Settlement Website.

        **2.** These criteria shall be binding on CNA and any Class II Member to whom class notice is mailed.  Such notice will be sent to all Owners of In-Force Policies

        **3.** Plaintiffs shall not ask for, and the Court Orders discussed in paragraphs VIII and XII below shall not contain, an injunction requiring the implementation of the terms in this section.  Claims of CNA's noncompliance with these terms shall be treated as breach of contract claims and not claims of violation of a court order.

        **4.** On or about the first, second, and third anniversary date of this Settlement becoming Final, CNA will provide Lead Class Counsel with a written statement describing any claim denied, in whole or part, for failure to satisfy the Class II Benefit standards set forth in Sections IV.B.1.a-k above.  The statement shall not identify the name of any policyholder or provide any personally identifiable information of any kind. The written statement shall contain sufficient information to understand the basis for the claim decision.  Upon Lead Class Counsel's request, CNA shall also provide any written claim denial letter, which shall be redacted so as to not reveal the name of any policyholder or any personally identifiable information of any kind.

CNA and Lead Class Counsel shall thereafter meet and confer concerning any disputes over any claim denials.  Any claim challenging compliance or noncompliance with this Section IV.B.4 shall have no effect as to any other term, right or obligation in this Stipulation of Settlement, nor create any claim, cause of action or other legal right for Lead Class Counsel or any member of Class I or Class II except as it may relate to any rights of a Class II Member to enforce the terms of this Settlement.

## V.      NOTICE TO AND COMMUNICATIONS WITH CLASS MEMBERS

### A.      The Notice Program and the Class Notice

1.      The Notice Program will consist of the following:  (i) the Class Notice and Claim Form (see Exhibits D, E, and F); (ii) service of a notice of the Proposed Settlement to the Attorney General of the United States and to the State Insurance Commissioners and to any other state or federal official, if necessary, in accordance with the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715; (iii) establishment of a national toll free number and post office box by the Settlement Administrator; (iv) mailing of the Class Notice by first-class mail, pursuant to requirements set forth in Section V.A.2 below; and (v) establishment of a Settlement Website which contains copies of the Complaint, the Class Notices, the Claim Form, the Stipulation of Settlement, and the preliminary and final relevant court orders regarding settlement approval, and which shall be maintained until at least one year from the date of final approval of the settlement by the court.

2.      Subject to the requirements of the Order of Preliminary Approval as set forth in Section VIII below, CNA shall send the Class Notice and Claim Form substantially in the form of Exhibits D-F by first-class mail, postage prepaid, to each person whom CNA and Class Counsel have determined with reasonable effort to be potential Class Members. Specifically, Class I notice (Exhibit E) will be sent to all current or former Owners of Policies

with an address on file whose policy was active or inactive as of July 1, 2017, but not (1) terminated prior to 2000, (2) policies for which no claim has ever been filed, or (3) policies with claims filed pre-2000.  Class II notice (Exhibit F) will be sent to all Owners of an In-Force Policy.  The Class Notices and Claim Form shall be sent within 90 days after the date of the Preliminary Certification and Approval.

   **3.** For Owners of Lapsed Policies in Class I, notice shall be made by first-class mail to the last known addresses of the owners of those Policies as reflected in CNA's records and to the most recent designated representative of the owner of the Policy, as long as an address can be identified with reasonable effort through a review of CNA's records.  As necessary, the Notice Administrator shall update all addresses for Class Members and designated representatives, utilizing an industry accepted address updating service.  CNA shall also re-mail any Class Notices returned with a forwarding address.  CNA shall notice Lead Counsel upon service of the CAFA Notice.

   **4.** CNA may rely on the Notice Administrator to perform some or all of the tasks described above.  Specifically, the Notice Administrator may assist with various administrative tasks, including, without limitation: (1) mailing or arranging for the mailing or other distribution of the Class Notice to Class Members, and to appropriate federal and state officials, in accordance with the Class Action Fairness Act, 28 U.S.C. § 1715; (2) handling returned mail not delivered to Class Members; (3) making any additional mailings required under the terms of this Settlement Agreement; (4) answering written inquiries from Class Members and forwarding such inquiries to Lead Class Counsel or their designee(s); (5) receiving and maintaining on behalf of the Court any Class Member correspondence regarding requests for exclusion; (6) responding to Class Member inquiries concerning the Settlement Agreement and

forwarding all such inquires to Lead Class Counsel; (7) staffing a telephone number to respond to policy owner inquiries concerning the Settlement and to refer such policy owners to Lead Class Counsel as necessary; (8) assisting with the creation and maintenance of the settlement website; and (9) otherwise assisting CNA with administration of the notice aspects of the Settlement Agreement.

5.      Each individual Notice sent to potential Class I Members shall be accompanied by a Claim Form, substantially in the form of the Claim Form attached at Exhibit D.  Except as otherwise stated in this paragraph, all Class I Members who wish to claim any portion of the monetary recovery under this Agreement to which they are entitled must mail the Claim Form to the address set forth on that Claim Form postmarked within 45 days after the Notice was sent.  Any Class I Member who does not mail a Claim Form postmarked within 45 days after the Notice was sent, will not receive any Class I benefits under this Agreement.

## VI.   REQUESTS FOR EXCLUSION OR OPT-OUT

A.      Any Class I Member who wishes to be excluded from Class I must mail or deliver a written request for exclusion, in care of the address to be provided in the Class Notice, postmarked by the date specified in the Class Notice, which will be no later than 30 days before the Final Fairness Hearing, or as the Court otherwise may direct.  Either the Class Member, or a representative who has legal authority to sign for the Class Member, must sign the written request for exclusion.  CNA shall make available to Class Counsel a confidential list of all persons who requested exclusion.

B.      Any Class I Member who does not file a timely written request for exclusion as provided in this Section shall be bound by all subsequent proceedings, orders, and judgments in this Action relating to the Settlement Agreement, even if such Class Member has pending, or

subsequently initiates, litigation, arbitration or any other proceeding against CNA relating to the claims released in this Action.

C.      Class II Members shall not have any right to opt out or be excluded from Class II.

## VII.    OBJECTIONS TO THE SETTLEMENT

A.      Any Class Member who has not filed a valid written request for exclusion and who wishes to object to the fairness, reasonableness or adequacy of this Settlement Agreement or the proposed Settlement, or to the award of attorneys' fees and expenses, must, by the date specified in the Class Notice, which will be no later than 30 days before the Fairness Hearing, or as the Court otherwise may direct, deliver to Lead Class Counsel and CNA's Counsel and file with the Court a statement of the objection, as well as the specific reason(s), if any, for the objection, including any legal support the Class Member wishes to bring to the Court's attention and any evidence the Class Member wishes to introduce in support of the objection.  A Class I Member who is also a Class II Member can opt-out of Class I but still object to Class II. Class Members may so object either on their own or through an attorney hired at their own expense.

B.      If a Class Member hires an attorney to represent him or her as to any objection, the attorney must, by the date specified in the Class Notice, which will be no later than 30 days before the Final Fairness Hearing, or as the Court otherwise may direct: (1) file a notice of appearance with the Court; and (2) deliver to Lead Class Counsel and CNA's Counsel a copy of such notice.

C.      Any Class Member who files and serves a written objection, as described in this Section, may appear at the Final Fairness Hearing, either in person or through personal counsel hired at that Class Member's expense, to object to the fairness, reasonableness or adequacy of this Settlement Agreement or the proposed Settlement, or to the award of attorneys' fees and expenses.  Class Members or their attorneys intending to make an appearance at the Final

Fairness Hearing must by the date specified in the Class Notice, which will be no later than 30 days before the Final Fairness Hearing, or as the Court otherwise may direct: (1) file a notice of intention to appear with the Court; (2) deliver to Lead Class Counsel and CNA's Counsel a copy of such notice of intention; and (3) identify any documents they will seek to introduce or witnesses they intend to call at the Final Fairness Hearing.

     **D.**     Any Class Member who fails to comply with this Section shall waive and forfeit any and all rights that Class Member may have to appear separately or object, or to take any appeal of the orders of judgments in this action, and shall be bound by all the terms of this Settlement Agreement and by all proceedings, orders, and judgments in this Action.

**VIII.   ORDER OF NOTICE, FAIRNESS HEARING AND ADMINISTRATION**

     On or before March 9, 2018, an application will be made to the Court for an Order of Preliminary Approval that will, among other things:

     **A.**     Preliminarily approve this Settlement Agreement as sufficiently fair and reasonable to warrant sending Class Notice;

     **B.**     Schedule the Final Fairness Hearing to consider the fairness, reasonableness, and adequacy of the proposed Settlement and whether it should be approved by the Court;

     **C.**     Approve the notice methodology described in this Settlement Agreement and the proposed Class Notices and Claim Form for mailing;

     **D.**     Direct CNA to mail or to cause the appropriate Class Notice to be mailed as described at Section V above no later than 90 days after the date of the Preliminary Certification and Approval Date;

     **E.**     Direct CNA to cause the Class Notice to be published on the Settlement Website no later than 90 days after the date of the Preliminary Certification and Approval Date;

**F.**     Find that the notice to be provided to Class Members in this case, including both the Class Notice and the methodology by which the Class Notice will be disseminated:  (1) is the best practicable notice; (2) is reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action and of their right to object or to exclude themselves (in the case of Class I Members) from the proposed Settlement; (3) is reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and (4) meets all applicable requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act, the United States Constitution (including the Due Process Clauses), the Rules of the Court, and any other applicable law;

**G.**     Authorize the Settlement Parties to: (1) establish the means necessary to administer the Proposed Settlement and Claim Forms in accordance with this Settlement Agreement; and (2) retain or specially employ one or more Administrators to help administer the proposed Settlement, including the Notice provisions, in accordance with this Settlement Agreement;

**H.**     Provide that: (1) Class I Members who wish to participate in the Settlement shall complete and submit a Claim Form postmarked within 45 days after the Class Notice and the related claim form was sent; (2) Class I Members who do not submit a Claim Form postmarked within 45 days after the Class Notice and the related claim form was sent shall receive no benefit.

**I.**     Require each Class I Member who wishes to exclude himself or herself from the Class to submit a valid and timely written request for exclusion, postmarked by the date specified on the Class Notice, which will be no later than 30 days before the Fairness Hearing, to the address provided in the Class Notice;

**J.**      Rule that all Class II Members, as well as any Class I Member who does not submit a valid and timely written request for exclusion from Class I, will be bound by all proceedings, orders, and judgments in this Action relating to this Settlement Agreement, even if such Class Member has previously initiated or subsequently initiates individual litigation against CNA or Releasees or other proceedings involving the released claims;

**K.**      Require each Class Member who wishes to object to the fairness, reasonableness or adequacy of this Settlement Agreement, to any terms of the proposed Settlement, or to the proposed attorneys' fees and expenses, to deliver to Lead Class Counsel and CNA's Counsel and to file with the Court by the date specified on the Class Notice, which will be no later than 30 days before the Final Fairness Hearing, or at such other time as the Court may direct, a statement of each such objection, as well as the specific reasons, if any, for each objection, including any legal support the Class Member wishes to bring to the Court's attention and any evidence the Class Member wishes to introduce in support of each such objection, or be forever barred from objecting;

**L.**      Require any attorney hired by a Class Member at that Class Member's expense for the purpose of objecting to the fairness, reasonableness or adequacy of this Settlement Agreement, to any terms of the proposed Settlement, or to the proposed attorneys' fees and expenses to file with the Court and deliver to Lead Class Counsel and CNA's Counsel a notice of appearance by the date specified on the Class Notice, which will be no later than 30 days before the Final Fairness Hearing, or as the Court otherwise may direct;

**M.**      Require any Class Member who files and serves a written objection and who intends to make an appearance at the Final Fairness Hearing, either in person or through counsel hired at that Class Member's expense, to deliver to Lead Class Counsel and CNA's Counsel and

file with the Court by the date specified in the Class Notice, which will be no later than 30 days before the Final Fairness Hearing, or as the Court otherwise may direct, a notice of intention to appear and a statement identifying any documents the Class Member will seek to introduce or witnesses the Class Member will seek to call at the Final Fairness Hearing;

**N.**     Direct CNA or the Notice Administrator to rent one or more post-office boxes or to otherwise make arrangements to receive requests for exclusion and any other communications;

**O.**     Direct CNA's Counsel and Lead Class Counsel, and any other counsel for Plaintiffs or the Class, promptly to furnish each other with copies of any and all objections or written requests for exclusion that might come into their possession;

**P.**     Provide a means for those filing objections to obtain access, at their own expense, at Lead Class Counsel's office, to materials produced pursuant to discovery requests in this Action, provided that such individuals shall not be given access to these materials unless and until they enter into a Stipulation and Order of Confidentiality entered by the Court and agreed upon by Class Counsel and CNA;

**Q.**     Authorize the Company, including its agents or other representatives and any other retained personnel, to communicate with Class Members and other present or former policyholders about the terms of the proposed Settlement, and to engage in any other communications within the normal course of the Company's business; and authorize Class Counsel to communicate with Class Members about the terms of the proposed Settlement.

**R.**     Preliminarily enjoin (i) all Class II Members, as well as any Class I Members who have not timely excluded themselves from the Class, from filing, commencing, prosecuting, intervening in, or participating (as Class Members or otherwise) in any lawsuit in any jurisdiction based on or relating to the claims and causes of action, or the facts and circumstances

relating to such claims and causes of action, in the Action or to the released claims related to coverage under the LTCF benefit which are at issue in this litigation; and (ii) all persons from filing, commencing or prosecuting a lawsuit as a class action on behalf of class members who have not timely excluded themselves (including by seeking to amend a pending complaint to include class allegations or seeking class certification in a pending action), based on or relating to the claims and causes of action, or the facts and circumstances relating to such claims and causes of action, in the Action related to coverage for stays or to the released claims which are at issue in this litigation; and

**S.**     Contain any additional provisions that might be necessary to implement and administer the terms of this Settlement Agreement and the proposed Settlement.

## IX.     DISMISSAL WITH PREJUDICE

As soon as is practicable following the Effective Date of the Settlement, the Settling Parties will jointly move for, and use their best efforts to obtain, the dismissal with prejudice of the Action.  This will in no way limit Class members' ability to enforce the terms of the Settlement.

## X.     ATTORNEYS' FEES AND EXPENSES

**A.**     The Parties engaged in extensive negotiation under the direction of the mediator regarding attorneys' fees and expenses.  All of these discussions regarding attorneys' fees and expenses did not commence until the Parties had reached agreement on the substantive terms of the Settlement under the direction of the mediator.  Accordingly, the Parties have agreed that Class Counsel will seek attorneys' fees and expenses totaling no more than $1,300,000.  CNA agrees not to oppose such application up to $1,300,000, which shall be the maximum CNA shall pay to anyone for attorneys' fees and expenses.

**B.**     Class Counsel may thereafter allocate the attorneys' fees among other Plaintiffs'
counsel in a manner in which they in good faith believe reflects the contributions of such counsel
to the initiation, prosecution, and resolution of the Litigation.  Each such Plaintiffs' counsel's
law firm receiving fees and expenses, as a condition of receiving such fees and expenses, on
behalf of itself and each partner and/or shareholder of it, agrees that the law firm and its partners
and/or shareholders are subject to the jurisdiction of the Court for the purpose of enforcing the
provisions of this paragraph.  Class Counsel and the Class Representatives agree to seek no
greater or additional amounts.  The terms of this Section X.B imposes no duty or obligation on
CNA, nor affects in any way CNA's payment of attorneys' fees and expenses.  This however in
no way limits Class members' rights when seeking enforcement of the Settlement, if CNA
breaches its terms, to pursue claims for attorneys' fees, costs, and all other remedies available in
equity or law.  This agreement, however, creates no independent rights to any fees, costs or other
remedies that do not otherwise exist in equity or law.

**C.**     CNA acknowledges that its agreement not to oppose such application was made
after the negotiation for the Settlement terms on behalf of the Class.  The Parties include this
provision in part to avoid the costs and risks of litigation of this issue in a separate proceeding
before the Court.  Class Counsel's application to the Court for an award of attorneys' fees and
costs shall be made at least 45 days before the date of the Final Fairness Hearing and considered
at the Final Fairness Hearing.  CNA shall not be required to compensate Class Counsel or Class
Representatives for any legal or administrative services or as reimbursement for any costs,
including any costs incurred by Class Counsel in the implementation of this Settlement, except
as provided in this Section and in connection with the potential future engagement of Mr. Young,
or another neutral, to resolve disputes as discussed above. This however in no way limits Class

members' rights when seeking enforcement of the Settlement, if CNA breaches its terms, to pursue claims, if any, for attorneys' fees, costs, and all other remedies available in equity or law. This agreement, however, creates no independent rights to any fees, costs, or other remedies that do not otherwise exist in equity or law.

      **D.**     Any attorneys' fees and expenses award ordered by the Court will be paid within 21 days of the Settlement becoming Final by wire transfer to an account designated by Sean Collins. Sean Collins shall bear sole responsibility for allocating and distributing the award of attorneys' fees and expenses among other Class Counsel.  Sean Collins shall provide all necessary account information to Counsel for Defendant to effectuate the wire transfer.

      **E.**     Neither CNA nor the Releasees shall be liable for or obligated to pay any fees, expenses, costs or disbursements to, or incur any expense on behalf of, any person, either directly or indirectly, in connection with this Action, this Settlement Agreement, or the proposed Settlement, other than the amount or amounts expressly provided for in this Settlement Agreement. This however in no way limits Class members' rights when seeking enforcement of the Settlement, if CNA breaches its terms, to pursue claims for attorneys' fees, costs, and all other remedies available in equity or law.

      **F.**     Other than the fees and expenses discussed above, the undersigned Class Counsel and the Class Representatives each waive and release CNA and the Releasees from any and all additional claims for attorneys' fees, by lien or otherwise, consultant or expert fees, or any other costs or expenses of any kind whatsoever related to this Action.  The undersigned Class Counsel further certify and represent that they are aware of no other person who is entitled to any sum for attorneys' fees or expenses for services performed in this Action.

## XI.   CLASS REPRESENTATIVE CONTRIBUTION AWARDS

**A.**     The Parties also engaged in extensive negotiation under the direction of the mediator regarding possible contribution awards to the Class Representatives ("Class Representative Contribution Awards").  All of these discussions regarding possible Class Representative Contribution Awards did not commence until the Parties had reached agreement on the substantive terms of the Settlement under the direction of the mediator.  Accordingly, the Parties have agreed that Class Counsel will seek Class Representative Contribution Awards totaling no more than $17,500 for Daluge, $17,500 for Young, and $17,500 for Birnbaum.  CNA agrees not to oppose such application up to $17,500 for Daluge, $17,500 for Young, and $17,500 for Birnbaum, which shall be the maximum CNA shall pay to anyone for Class Representative Contribution Awards.  Class Counsel and the Class Representatives agree to seek no greater or additional amounts.

**B.**     CNA acknowledges that its agreement not to oppose such application was made after the negotiation for the Settlement terms on behalf of the Class.  The Parties include this provision in part to avoid the costs and risks of litigation of this issue in a separate proceeding before the Court.  Class Counsel's application to the Court for Class Representative Contribution Awards shall be made at least 45 days before the date of the Final Fairness Hearing and considered at the Final Fairness Hearing.  CNA shall not be required to compensate the Class Representatives for any legal or administrative services or as reimbursement for any costs, including any costs incurred by Class Counsel in the implementation of this Settlement, except as provided in this Section. This however in no way limits Class members' rights when seeking enforcement of the Settlement, if CNA breaches its terms, to pursue claims, if any, for attorneys' fees, costs, and all other remedies available in equity or law.  This agreement, however, creates

no independent rights to any fees, costs, or other remedies that do not otherwise exist in equity or law.

  **C.**  Any Class Representative Contribution Awards ordered by the Court will be paid within 21 days of the Settlement becoming Final by wire transfer to an account designated by Sean Collins. Sean Collins shall bear sole responsibility for distributing any Class Representative Contribution Awards to the Class Representatives.  Sean Collins shall provide all necessary account information to Counsel for Defendant to effectuate the wire transfer.

  **D.**  Neither CNA nor the Releasees shall be liable for or obligated to pay any fees, expenses, costs or disbursements to, or incur any expense on behalf of, any person, either directly or indirectly, in connection with this Action, this Settlement Agreement, or the proposed Settlement, other than the amount or amounts expressly provided for in this Settlement Agreement.  This however in no way limits Class members' rights when seeking enforcement of the Settlement, if CNA breaches its terms, to pursue claims for attorneys' fees, costs, and all other remedies available in equity or law.

  **E.**  Other than the Class Representative Contribution Awards discussed above, the undersigned Class Counsel and the Class Representatives each waive and release CNA and the Releasees from any and all additional claims for Class Representative Contribution Awards of any kind whatsoever related to this Action.  The undersigned Class Counsel further certify and represent that they are aware of no other person who is entitled to any sum for Class Representative Contribution Awards for services performed in this Action.

## XII.   FINAL ORDER AND JUDGMENT APPROVING SETTLEMENT

After the Final Fairness Hearing, and upon the Court's approval of this Settlement Agreement, the Parties shall seek and obtain from the Court a Final Order and Judgment Approving the Settlement which shall, among other things:

A.      Find that the Settlement Parties have submitted to the jurisdiction of the Court for purposes of the Proposed Settlement, that the Court has personal jurisdiction over the Settlement Parties, and the Court has subject matter jurisdiction to approve the Settlement Agreement, including all Exhibits to the Settlement Agreement;

B.      Approve this Settlement Agreement and the proposed Settlement as fair, reasonable, and adequate, consistent and in compliance with all applicable requirements of the Federal Rules of Civil Procedure, CAFA, the United States Constitution (including the Due Process Clauses), the Rules of the Court, and any other applicable law, and in the best interests of the Class Members; direct the Parties and their counsel to implement and consummate this Settlement Agreement according to its terms and provisions; declare this Settlement Agreement to be binding on all Class Members and preclusive in all pending and future lawsuits or other proceedings; declare this Settlement Agreement to be binding as to all the released claims and issues that have been raised in this Action on behalf of Plaintiffs and all other Class Members, as well as their heirs, executors, administrators, successors, and assigns; declare that the Defendant may file the Settlement Agreement to support any defense or claim that it is binding on and has res judicata and preclusive effect in all pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiffs or any other Class Members, as well as their heirs, executors, administrators, successors, and assigns related to payment of the facility stays as alleged in the Action;

**C.**     Find that the Class Notice and the notice methodology implemented pursuant to this Settlement Agreement:  (1) constituted the best practicable notice; (2) constituted notice that was reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action, the terms of the Proposed Settlement, their right to object to or, in the case of Class I, exclude themselves from the proposed Settlement, and their right to appear at the Fairness Hearing; (3) were reasonable and constitute due, adequate, and sufficient notice to all persons entitled to receive notice; and (4) met all applicable requirements of the Federal Rules of Civil Procedure, the Class Action Fairness Act, the United States Constitution (including the Due Process Clauses), the Rules of the Court, and any other applicable law;

**D.**     Find that Class Counsel and the Class Representatives adequately represented the Class for purposes of entering into and implementing the Settlement;

**E.**     Dismiss the Action (including all individual claims and Class Claims presented thereby) on the merits and with prejudice, without fees or costs to any Party except as provided in this Settlement Agreement;

**F.**     Incorporate the Releases set forth above in Section III, make the Releases effective as of the Effective Date, forever discharge CNA, the Releasees and the Class Representatives from any claims or liabilities arising from or related to the released claims, and permanently bar and enjoin all Class Members who have not been timely excluded from (1) filing, commencing, prosecuting, intervening in, participating in (as Class Members or otherwise), or receiving any benefits or other relief from, any other lawsuit, arbitration, or administrative, regulatory or other proceeding or order in any jurisdiction based on or relating to the released claims or the facts and circumstances relating to the released claims at issue in this Action; and from (2) organizing such non-excluded Class Members into a separate class for

47

purposes of pursuing a purported class action (including by seeking to amend a pending complaint to include class allegations, or by seeking class certification in a pending action) based on or relating to the released claims or the facts and circumstances relating to the released claims at issue in this Action; and

G.      Without affecting the finality of the Final Judgment and Order Approving Settlement for purposes of appeal, retain jurisdiction as to all matters relating to the administration, consummation, enforcement, and interpretation of this Settlement Agreement and the Final Order and Judgment Approving Settlement, and for any other necessary purpose.

## XIII.   MODIFICATION OR TERMINATION OF THIS AGREEMENT

A.      The terms and provisions of this Settlement Agreement may be amended, modified or expanded by agreement of the Parties and approval of the Court; *provided however*, that after entry of the Final Order and Judgment Approving Settlement, the Settling Parties may by agreement put into effect such amendments, modifications or expansions of this Settlement Agreement and its implementing documents (including all exhibits to the Settlement Agreement) without notice to or approval by the Court if such changes are not materially inconsistent with the Court's Final Order and Judgment Approving Settlement and do not limit the rights of Class Members under the Settlement Agreement.

B.      This Settlement Agreement will terminate at the sole option and discretion of CNA or Plaintiffs if: (1) the Court, or any appellate court(s), rejects, modifies or denies approval of any portion of this Settlement Agreement or the proposed Settlement, including without limitation the terms of relief, the findings of the Court, the provisions relating to notice, the definition of the Classes or the terms of the Release; or (2) the Court, or any appellate court(s), does not enter or completely affirm, or alters or expands, any portion of the Final Order and Judgment Approving Settlement, or the findings of fact or conclusions of law as proposed by

CNA's Counsel and Lead Class Counsel.  The terminating Party must exercise the option to withdraw from and terminate this Settlement Agreement, as provided in this Section, no later than 30 days after receiving notice of the event prompting the termination.

C.      Notwithstanding the preceding Section, Plaintiffs may not terminate this Settlement Agreement solely because of the amount of attorneys' fees and expenses awarded by the Court or any appellate court(s).  CNA, however, may elect to terminate this Settlement Agreement if the amount of attorneys' fees and expenses awarded exceeds the maximum amount which they have agreed in this Settlement Agreement not to oppose, as set forth in Section X above.

D.      The Parties recognize that Class I Members may attempt to opt out of the settlement.  In the event that such opt outs equal or exceed twenty Class I Members, either Party may void the entire Settlement at its sole and exclusive discretion or may seek to modify the terms of the Settlement, if possible, in a mutually agreeable fashion.

E.      Either Party may withdraw from and terminate the Settlement Agreement if any federal or state regulator, attorney general, or other official (1) submits a formal objection in the Action with respect to any aspect or term of the Settlement Agreement, or (2) threatens to institute or institutes any proceeding against the Company arising out of or related to this matter or the subjects at issue in this matter before entry by the Court of the Final Order and Judgment, or (3) requires any modification to the Settlement Agreement, including without limitation any modification of the contemplated relief.  Prior to taking this step, for 30 days following actual notice of such objection, threat or requirement, the Parties will together and with the interested federal or state regulator or attorney general, and the Court (if the Court chooses to get involved) attempt to negotiate and resolve the concern(s) raised.  If the good faith efforts to address any

such issues raised by interested federal or state regulators or attorneys general are not successful within that 30-day period, then either Party has the option at its discretion to withdraw from and terminate the Settlement Agreement.

**F.**     If an option to withdraw from and terminate this Settlement Agreement arises under this Section, neither CNA nor Plaintiffs will be required for any reason or under any circumstance to exercise that option.

**G.**     If this Settlement Agreement is terminated pursuant to this Section, then:

**1.**     This Settlement Agreement shall be null and void and shall have no force or effect, and no Party to this Settlement Agreement shall be bound by any of its terms, except Sections XIV.A, .D, and .R and the terms of the Protective Order governing the Action.  A copy of the Protective Order governing the Action is attached hereto as Exhibit H.

**2.**     This Settlement Agreement, all of its provisions, and all negotiations, statements, and proceedings relating to it shall be without prejudice to the rights of CNA, Plaintiffs or any other Class Member, all of whom shall be restored to their respective positions existing immediately before the execution of this Settlement Agreement;

**3.**     CNA and their attorneys expressly and affirmatively reserve all defenses, arguments, and motions as to all claims that have been or might later be asserted in the Action, including (without limitation) the argument that Plaintiffs' claims lack legal and factual merit and that the Action may not be litigated as a class action;

**4.**     Plaintiffs and their heirs, agents, attorneys, representatives or assigns expressly and affirmatively reserve all claims, arguments, and motions as to, and arguments in support of, all claims that have been or might later be asserted in the Action, including (without limitation) any argument concerning class certification;

5.      Neither this Settlement Agreement, nor the fact of its having been made, shall be admissible or entered into evidence in this Action or in any other case for any purpose whatsoever, other than an action to enforce the terms of the Settlement; and

6.      Neither this Settlement Agreement, nor the fact of its having been made, shall be construed or deemed to be evidence or an admission or concession by CNA of any fault or liability for damages whatsoever or that any class certification is appropriate, and Plaintiffs and Class Counsel acknowledge it would be a material breach of this Agreement if they seek to use this Settlement Agreement for any such purpose.

## XIV.  GENERAL MATTERS AND RESERVATIONS

A.      This Settlement Agreement and the Settlement, whether or not consummated, and any proceedings taken under the Settlement Agreement, including settlement meetings and confirmatory discovery, are not and shall not, in any event, be construed as or deemed to be evidence of a presumption, concession or an admission by CNA or the Class Representatives or Plaintiffs with respect to any issue of fact or law in the Action, the truth or falsity of any fact alleged, or the validity or lack of validity of any claim which has been, or ever could have been, or ever could be asserted in the Action, or any liability, fault, wrongdoing, or otherwise of CNA, or lack thereof.

B.      It is agreed that no portion of this Settlement shall be used to argue, or be offered as evidence, that any class was properly certified, is susceptible to certification, that CNA has ever breached its contractual obligations or engaged in bad faith, or in support of any argument about the scope, interpretation, benefits, coverage, claims-handling standards, or other provisions or requirements of any CNA insurance policy, except in an action to enforce the terms of the Settlement.

**C.**     The obligation, although not the ability, of the Settlement Parties to conclude the proposed Settlement is and will be contingent upon each of the following:

**1.**     Obtaining any necessary regulatory approvals to provide the settlement relief provided by this Settlement Agreement;

**2.**     The absence of any circumstance impairing the capacity of the members of Class I or Class II to provide the Releases set forth in this Agreement;

**3.**     Entry by the Court of the Final Order and Judgment, from which order the time to appeal has expired or which has remained materially unmodified after any appeal(s); and

**4.**     Any other conditions stated in this Settlement Agreement.

**D.**     The Parties and their counsel agree to keep the existence and contents of this Settlement Agreement and all related negotiations confidential until the date on which the Settlement Agreement is filed with the Court; *provided however*, that this Section shall not prevent earlier disclosure of such information to regulators, to third-parties as necessary to comply with SEC or other state or federal regulations, or to any other person (such as experts, Class Members, courts or administrators) to whom the Parties agree disclosure must be made to effectuate the terms and conditions of this Settlement Agreement.

**E.**     If contacted by the media, Class Counsel may, in response to the inquiry, provide the press release attached as Exhibit I.  Apart from referring to this press release, neither Plaintiffs, Class Counsel, nor any Class Member shall make any statements to the media or the public (via press release, advertisement, internet, interview, or otherwise) about this Action or the proposed Settlement Agreement, unless mutually agreed upon by the parties. This however does not limit Plaintiffs, Class Counsel, or any Class Member's ability to refer to this Action in connection with filings or proceedings in any other litigation in a manner consistent with the

terms and conditions of this Settlement, or in the case of Class Counsel, to discuss non-confidential elements of this Action with current or prospective clients.

**F.**     Plaintiffs and Class Counsel agree that the information made available to them through the settlement process was made available on the conditions that neither Plaintiffs nor Class Counsel disclose it to third parties (other than experts or consultants retained by Plaintiffs in connection with this case), that it not be the subject of public comment, and that it not be used by Plaintiffs or their counsel in connection with any pending motion for class certification or in any other way in this litigation should this Action not settle, or in any other litigated proceeding unless already agreed to by Class Counsel and CNA; *provided however*, that nothing contained in this Settlement Agreement shall prohibit Plaintiffs from seeking such information through formal discovery.

**G.**     One month after the Effective Date of the Settlement, Plaintiffs and CNA will cause their experts, consultants, and anyone else they provided documents and information for purposes of the Action to destroy, using a commercially reasonable manner (at the providing party's sole expense), all documents and electronically stored information (and all copies of such documents and information in whatever form made or maintained) produced by the opposing party or third parties during discovery in connection with the Action.  Notwithstanding the foregoing, all filings and exhibits in this Action can be maintained in counsel's files indefinitely provided that confidential documents that were redacted or filed under seal remain confidential pursuant to the Protective Order governing this Action. In the meantime, the parties' obligations under the Protective Order governing this Action shall continue to the full extent described in the Protective Order and the confidentiality of such documents shall continue to be maintained.  In addition, the parties and their counsel, experts, consultants, and anyone else provided documents

and information produced in discovery (whether in confirmatory discovery or otherwise) will, upon reasonable request, provide affidavits attesting that they have timely complied with their obligations under this paragraph.  Lead Class Counsel may retain lists for three years from the Effective Date of the members of Class I and Class II, after which Lead Class Counsel will destroy the lists and any related documents or information and confirm that destruction to CNA in writing, unless a court of competent jurisdiction orders otherwise.  Such lists must be kept confidential pursuant to the protective order governing this Action.

**H.**    By execution of this Settlement Agreement, CNA does not intend to release any claim against any insurer for any cost or expense under this Settlement, including attorneys' fees and costs.

**I.**    Lead Class Counsel represents that they are authorized to enter into this Settlement Agreement on behalf of Plaintiffs and any other attorneys who have represented or who now represent Plaintiffs in this Action with respect to the claims in this Action.  Lead Class Counsel further represents that they are not presently aware of another person who is considering filing suit against CNA as to any Policy with respect to claims for stays in the Class States related to this Action.

**J.**    The Class Representatives represent and certify that (1) they have agreed to serve as representatives of Class I and Class II; (2) they are willing, able and ready to perform the duties and obligations of representatives of Class I and Class II , including, but not limited to, being available for, and involved in, discovery and fact finding; (3) they have read the pleadings in this Action, including the Complaint, and have had the contents of such pleadings described to them; (4) they have been kept informed of the progress of the Action and the settlement negotiations among the Parties, and they have either read this Settlement Agreement or have

received a description of it from Lead Class Counsel, and have agreed to the terms of the Settlement Agreement; (5) they have consulted with Lead Class Counsel – and Class Counsel – about the Action, this Settlement Agreement and the obligations of a representative of the Classes; (6) they have authorized Lead Class Counsel to execute this Settlement Agreement on their behalf; and (7) they will remain and serve as representatives of the Classes until the terms of this Settlement Agreement are effectuated, this Settlement Agreement is terminated in accordance with its terms, or the Court at any time determines that said Plaintiffs cannot represent the Classes.

**K.** The Class Representatives affirmatively support this Settlement and will not request exclusion from the Classes, or file an appeal from or otherwise seek review of any order approving the proposed Settlement.

**L.** The undersigned on behalf of Continental Casualty Company represents that he/she is authorized to enter into this Settlement Agreement on behalf of CNA and any attorneys who have represented or who now represent CNA in the Action.

**M.** This Settlement Agreement sets forth the entire agreement among the Parties with respect to its subject matter, and it may not be altered or modified except by written instrument executed by Lead Class Counsel and CNA's Counsel. The Parties expressly acknowledge that no other agreements, arrangements or understandings not expressed in this Settlement Agreement exist among or between them. All the Exhibits attached to this Settlement Agreement are hereby incorporated by reference as if fully set forth in this Agreement.

**N.** This Settlement Agreement and any ancillary agreements shall be governed by and interpreted according to the laws of the State of Wisconsin, excluding its conflict of laws provisions.

**O.**     Any action to enforce this Settlement Agreement shall be commenced and maintained only in the United States District Court for the Western District of Wisconsin.  The administration and consummation of the Settlement as embodied in this Agreement shall be under the authority of the same Court, and the Court shall retain jurisdiction for the purposes of enforcing the terms of this Settlement Agreement.

**P.**     The waiver of one party of any breach of this Settlement Agreement by any other party shall not be deemed a waiver of any other prior or subsequent breach of this Agreement.

**Q.**     Whenever this Settlement Agreement requires or contemplates that one Party shall or may give notice to the other, notice shall be provided by facsimile or next-day (excluding Sunday) express delivery service as follows:

(1)     If to CNA, then to:

Brent R. Austin
Eimer Stahl LLP
224 South Michigan Ave.
Chicago, Illinois 60604
Telephone:  (312) 660-7684

(2)     If to Plaintiffs or Class Members, then to:

Sean K. Collins
Law Offices of Sean K. Collins
184 High Street, Suite 503
Boston, Massachusetts 02110
Telephone:  (855) 693-9256

**R.**     All time periods set forth in this Settlement Agreement shall be computed in calendar days unless otherwise expressly provided.  In computing any period of time prescribed or allowed by this Settlement Agreement or by order of court, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, a Sunday or a legal holiday, or when the act to be done is the filing of a paper in court, a day on which weather or other

conditions have made the office of the clerk of the court inaccessible, in which event the period shall run until the end of the next day that is not one of the aforementioned days.  As used in this Section, "legal holiday" includes New Year's Day, the birthday of Martin Luther King, Jr., Washington's Birthday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, Christmas Day, and any other day appointed as a holiday by the Congress of the United States or by the State of Wisconsin.

**S.**     The Parties reserve the right, subject to the Court's approval, to make any reasonable extensions of time that might be necessary to carry out any of the provisions of this Settlement Agreement.

**T.**     All Parties agree that this Settlement Agreement was drafted by counsel for the Parties at arm's length, and that no parol or other evidence may be offered to explain, construe, contradict or clarify its terms, the intent of the Parties or their counsel, or the circumstances under which the Settlement Agreement was made or executed.

**U.**     In no event shall this Settlement Agreement, any of its provisions or any negotiations, statement or proceedings relating to its provisions in any way be construed as, offered as, received as, used as or deemed to be evidence of any kind in this Action, any other action, or any judicial, administrative, regulatory or other proceeding, except a proceeding to enforce this Settlement Agreement.  Without limiting the foregoing, neither this Settlement Agreement nor any related negotiations, statements or court proceeding shall be construed as, offered as, received as, used as or deemed to be evidence or an admission or concession of any liability or wrongdoing whatsoever on the part of any person, including but not limited to CNA, or as a waiver by CNA of any applicable defense to the merits or to any class certification in a

contested proceeding, or as a waiver by Plaintiffs or the Classes of any claims, causes of action or remedies.

**V.**     No opinion concerning the tax consequences of the proposed Settlement to individual Class Members is being given or will be given by CNA, CNA's Counsel or Class Counsel; nor is any representation or warranty in this regard made by virtue of this Settlement Agreement.  The Class Notice will direct potential Class Members to consult their own tax advisors regarding the tax consequences of the proposed Settlement, including any payments, contributions or credits provided under the terms and conditions of this Settlement Agreement, and any tax reporting obligations they may have with respect to such payments, contributions or credits.  Each Class Member's tax obligations, and the determination of those obligations, are the sole responsibility of the Class Member, and it is understood that the tax consequences may vary depending on the particular circumstances of each individual Class Member.

**W.**     Plaintiffs' claims in this litigation did not involve premium rate changes.  Neither this Agreement nor any agreed-upon modification of it pursuant to Section XIII shall have any effect on CNA's ability to seek premium rate increases in the future.  However, Plaintiffs entering into this Agreement shall not be construed as an admission by Plaintiffs that CNA is entitled to seek rate increases nor shall it limit the ability of any person impacted by rate increases to challenge such increases by any means available.

**X.**     The Class Representatives and the Class Members claiming a monetary benefit under this Settlement Agreement, and those claiming a monetary benefit under this Settlement Agreement as a representative or assignee of a Class Member represent and warrant that they are legally entitled to claim the monetary benefit, and that there has not been any and there is not any assignment of, sale of, lien against, encumbrance of, transfer of or reimbursement obligation

concerning, by operation of law or otherwise, of the amounts to be claimed by them or paid to them under this Settlement Agreement.

      **Y.**     This Settlement Agreement may be signed in counterparts, each of which shall constitute a duplicate original.

Agreed to this ___<sup>th</sup> day of _____, 2018.

Continental Casualty Company

By: Scott Louis Weber

Its: Executive Vice President and General Counsel

Date: March 8, 2018

Gwen B. Daluge, individually
and on behalf of all others similarly situated

By:_____

Her:_____

Date:_____

Murray Young, individually
and on behalf of all others similarly situated

By:_____

His:_____

Date:_____

such increases by any means available.

**X.** The Class Representatives and the Class Members claiming a monetary benefit under this Settlement Agreement, and those claiming a monetary benefit under this Settlement Agreement as a representative or assignee of a Class Member represent and warrant that they are legally entitled to claim the monetary benefit, and that there has not been any and there is not any assignment of, sale of, lien against, encumbrance of, transfer of or reimbursement obligation concerning, by operation of law or otherwise, of the amounts to be claimed by them or paid to them under this Settlement Agreement.

**Y.** This Settlement Agreement may be signed in counterparts, each of which shall constitute a duplicate original.

Agreed to this ___<sup>th</sup> day of _____, 2018.

Continental Casualty Company

By:_____

Its:_____

Date:_____

Gwen B. Daluge, individually
and on behalf of all others similarly situated

By: _____

Her: _Power of Attorney_____

Date: _3/8/18_____

Murray Young, individually
and on behalf of all others similarly situated

By:_____

His:_____

Date:_____

Evan Gorman, as Power of Attorney for Helene K. Birnbaum, individually
and on behalf of all others similarly situated

By:_____

Her:_____

Date:_____

Law Offices of Sean K. Collins, individually
and on behalf of his partners and attorneys

By:_____

concerning, by operation of law or otherwise, of the amounts to be claimed by them or paid to them under this Settlement Agreement.

     **Y.**     This Settlement Agreement may be signed in counterparts, each of which shall constitute a duplicate original.

Agreed to this 9ᵗʰ day of _MARCH_, 2018.

Continental Casualty Company

By:_____

Its:_____

Date:_____

Gwen B. Daluge, individually
and on behalf of all others similarly situated

By:_____

Her:_____

Date:_____

Murray Young, individually
and on behalf of all others similarly situated

By:_____Murray Young_____

His:_____

Date:_____

Evan Gorman, as Power of Attorney for Helene K. Birnbaum, individually
and on behalf of all others similarly situated

By: _____

Her: POWER OF ATTORNEY

Date: MARCH 9TH 2018

Law Offices of Sean K. Collins, individually
and on behalf of his partners and attorneys

By: _____

Its: _____

Date: _____

Glancy Prongay & Murray LLP, individually
and on behalf of its partners and attorneys

By: _____

Its: _____

Date: _____

Goldenberg Schneider LPA, individually
and on behalf of its partners and attorneys

By: _____

Its: _____

Date: _____

60

Evan Gorman, as Power of Attorney for Helene K. Birnbaum, individually
and on behalf of all others similarly situated

By:_____

Her:_____

Date:_____


Law Offices of Sean K. Collins, individually
and on behalf of his partners and attorneys

By:_____

Its:_____ Owner_____

Date: 3/8/18


Glancy Prongay & Murray LLP, individually
and on behalf of its partners and attorneys

By:_____

Its: PARTNER

Date: 3/8/2018


Goldenberg Schneider LPA, individually
and on behalf of its partners and attorneys

By:_____

Its:_____ President_____

Date: March 8, 2018

Burke & Pecquet, LLC, individually
and on behalf of its partners and attorneys

By: _____

Its: _____Partner_____

Date: ____March 8, 2018_____

# EXHIBIT A

# Continental Casualty Company


For All the Commitments You Make®

CNA Plaza
Chicago, Illinois 60685

A Stock Company

We are pleased to issue this Long-Term Care Insurance Policy to You. It was issued in consideration of Your application and payment of the required premium. We suggest You carefully read it.

## GUARANTEED RENEWABLE FOR LIFE
## PREMIUMS SUBJECT TO CHANGE

Your policy will remain in effect during Your lifetime as long as each premium is paid on time. We cannot cancel or refuse to renew Your policy. We cannot change Your policy without Your consent. However, We may change the premium rates. Any change will apply to all policies in the same class as Yours in the state where the policy was issued. We will notify You in writing 31 days before Your premium changes. Coverage begins and ends at 12:01 A.M. Standard Time at Your residence.

Your policy provides a refund of unearned premium when We are notified of Your death. A refund of unearned premium will not be made for any other reason.

## 30-DAY REVIEW PERIOD

If You feel this policy does not meet Your insurance needs, return it to Us or Your agent within 30 days after You have received it. We will return Your premium and consider the policy never to have been issued.

## CHECK YOUR APPLICATION

**Please read the attached application. Check to see if the information is correct and if any medical history has been left out. If there is an error, please notify Us immediately. We issued this policy based on the information You provided. Now is the time to correct any errors or to provide any missing information. Incorrect information may cause Your policy to be voided or a claim to be denied. This policy is a legal contract between You and Us.**

**SIGNED FOR THE CONTINENTAL CASUALTY COMPANY**

D. H. Chookaszian
Chairman of the Board

D. M. Lowry
Secretary

COUNTERSIGNED _____
                LICENSED RESIDENT AGENT (WHERE REQUIRED BY LAW)

P1-15203-A               LONG-TERM CARE INSURANCE POLICY

(THIS PAGE LEFT INTENTIONALLY BLANK)

P1-15203-A                              -2-

# GUIDE TO YOUR LONG-TERM CARE POLICY

**The following is a Guide to Your Long-Term Care Policy. It tells You what is included in Your policy and on what page(s) You can find it.**

Page(s)

Guaranteed Renewable; Premiums Subject to Change . . . . . . . . . . . . . . . 1
30-Day Review Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Check Your Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Policy Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SECTION 1:   DEFINITIONS OF IMPORTANT TERMS . . . . . . . . . . . . . . . . 6-9

• Activities of Daily Living (ADLs) . . . . . . . . . . . . . . . . . . . . . . . 7
• Acute Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
• Benefit Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
• Chronic Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
• Cognitive Impairment . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
• Effective Date of Coverage . . . . . . . . . . . . . . . . . . . . . . . . . 9
• Eligible Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
• Elimination Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
• Inability to Perform Two or More Activities of Daily Living . . . . . . . . . . 7
• Long-Term Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
• Long-Term Care Facility . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
• Medically Necessary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
• Period of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-9
    - Restoration of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . 9
• Pre-existing Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
• We, Our, Us . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
• You, Your, Yourself . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SECTION 2:   BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-12

General Benefit Information . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

• What is in the Policy Schedule . . . . . . . . . . . . . . . . . . . . . . . . 10
• Eligibility for Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
• What Happens If You Terminate Your Policy . . . . . . . . . . . . . . . . . . 10
• Coverage for Alzheimer's Disease . . . . . . . . . . . . . . . . . . . . . . . 10
• No Need for Hospitalization . . . . . . . . . . . . . . . . . . . . . . . . . 10

Long-Term Care Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

• What is the Long-Term Care Benefit and How Does it Work . . . . . . . . . . 10

Waiver of Premium Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

• What is the Waiver of Premium Benefit and How Does it Work . . . . . . . 10-11

Alternate Plan of Care Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

• What is the Alternate Plan of Care Benefit and How Does It Work . . . . . 11
• Examples of an Alternate Plan of Care . . . . . . . . . . . . . . . . . . . . 11-12

P1-15203-A                        -4-

Bed Reservation Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

• What is the Bed Reservation Benefit and How Does it Work . . . . . . . . .   12

SECTION 3:   EXCLUSIONS AND LIMITATIONS . . . . . . . . . . . . . . . . . . .   12

• When this Policy Will Not Provide Benefits . . . . . . . . . . . . . . . . . .   12
• Pre-existing Condition Limitation . . . . . . . . . . . . . . . . . . . . . . .   12

SECTION 4:   CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13-14

• Notifying Us of a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
• How to File a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
• When to File a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
• When Your Claim is Paid . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
• How Claims are Paid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
• Our Rights in Investigating a Claim . . . . . . . . . . . . . . . . . . . . . .   13-14
• Misstatement of Your Age . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
• Limitations on Legal Actions . . . . . . . . . . . . . . . . . . . . . . . . . .   14

SECTION 5:   PREMIUM PAYMENT AND REINSTATEMENT OF YOUR POLICY .   14-15

• Paying Premiums . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
• What Happens When Premiums Are Not Paid . . . . . . . . . . . . . . . . . .   14
• What Happens To Your Premiums if You Die . . . . . . . . . . . . . . . . . .   14
• Putting the Policy Back in Force . . . . . . . . . . . . . . . . . . . . . . . .   15

SECTION 6:   THE CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . .   15-16

• What Makes Up the Contract . . . . . . . . . . . . . . . . . . . . . . . . . .   15-16
• Importance of Information on the Application/Time Limit on Certain Defenses   16
• Conforming with State Laws . . . . . . . . . . . . . . . . . . . . . . . . . .   16

## SECTION 1:   DEFINITIONS OF IMPORTANT TERMS

**This section provides the meaning of special terms used throughout this policy.  The first letter of each word or words in a phrase is capitalized to help You easily recognize them wherever they appear in the policy.**

===============================================

### THE FOLLOWING DEFINITIONS REFER TO THOSE INVOLVED IN THE CONTRACT

===============================================

**WE, OUR, US**

The Continental Casualty Company, CNA Plaza, Chicago, Illinois  60685.

===============================================

**YOU, YOUR, YOURSELF**

The insured named in the Policy Schedule.

===============================================

### THE FOLLOWING DEFINITIONS RELATE TO THE ELIGIBILITY FOR LONG-TERM CARE BENEFITS

===============================================

**ELIGIBLE CONFINEMENT**

Your confinement for Long-Term Care in a Long-Term Care Facility.

===============================================

**LONG-TERM CARE**

Care required and provided in a Long-Term Care Facility which is:

1.   Medically Necessary; or

2.   Due to the Inability to Perform Two or More Activities of Daily Living; or

3.   Due to Cognitive Impairment.

===============================================

**MEDICALLY NECESSARY**

Care or services which are:

1.   Provided for Acute or Chronic Conditions; and

2.   Consistent with accepted medical standards for Your condition; and

3.   Not designed primarily for the convenience of You or Your family; and

4.   Recommended by a physician who has no ownership in the Long-Term Care Facility in which You are receiving care.

===============================================

P1-15203-A                                    -6-

**ACUTE CONDITION**

A medically unstable condition. It requires frequent monitoring by medical professionals, such as physicians or nurses, in order to maintain Your health status.

============================================

**CHRONIC CONDITION**

A continuing or recurring medical condition.

============================================

**INABILITY TO PERFORM TWO OR MORE ACTIVITIES OF DAILY LIVING**

Dependence on someone else because of the need for continued one-on-one assistance in performing Two or More Activities of Daily Living.

**ACTIVITIES OF DAILY LIVING - (ADLS)**

The Activities of Daily Living are:

1. Eating. Eating or consuming nourishment.

2. Dressing. Putting on and taking off all necessary items of clothing including Medically Necessary braces or artificial limbs.

3. Taking Medication. Taking medication in the prescribed amounts and at the prescribed times.

4. Toileting. Getting to and from the toilet, getting on and off the toilet and maintaining a reasonable level of associated personal hygiene.

5. Mobility. Walking with or without the assistance of a mechanical device, such as a wheelchair, braces, a walker, a cane or other walking aid device, and moving between bed and chair.

============================================

**COGNITIVE IMPAIRMENT**

Deterioration in Your intellectual capacity which:

1. Requires continual supervision to protect Yourself and others; and

2. Must be determined by clinical diagnosis or tests; and

3. May be the result of Alzheimer's Disease, senile dementia, or other nervous or mental disorders of organic origin.

============================================

P1-15203-A                    -7-

**LONG-TERM CARE FACILITY**

A place primarily providing Long-Term Care and related services on an inpatient basis, which:

1. is licensed by the state where it is located; and

2. provides skilled, intermediate, or custodial nursing care under the supervision of a physician; and

3. has 24-hour-a-day nursing services provided by or under the supervision of a registered nurse (R.N.), licensed vocational nurse (L.V.N.), or licensed practical nurse (L.P.N.), and

4. keeps a daily medical record of each patient; and

5. may be either a freestanding facility or a distinct part of a facility such as a ward, wing, unit, or swing-bed of a hospital or other institution.

A Long-Term Care Facility does not mean a hospital or clinic, boarding home, home for the aged or mentally ill, rest home, community living center, place that provides domiciliary, residential, or retirement care, place which operates primarily for the treatment of alcoholics or drug addicts, or a hospice. However, care or services provided in these facilities may be covered subject to the conditions of the Alternate Plan of Care Benefit provision.

======================================================

## THE FOLLOWING DEFINITIONS RELATE TO THE TIME PERIOD YOU RECEIVE BENEFITS

======================================================

**PERIOD OF CARE**

A continuous period in which You receive Long-Term Care or services provided by a nurse or home health care agency or services provided under an Alternate Plan of Care for the same or related condition. It begins with the first day You receive such care or services and ends when You no longer require such care or services for the condition.

P1-15203-A                              -8-

**RESTORATION OF BENEFITS**

If one Period of Care ends, a new Period of Care may begin if:

1.  You receive Long-Term Care or services provided by a nurse or home health care agency or services provided under an Alternate Plan of Care for a new condition; or

2.  You have not received Long-Term Care or services provided by a nurse or home health care agency or services provided under an Alternate Plan of Care for the same or related condition for at least 180 consecutive days.

A new Period of Care fully restores Your Benefit Period and is subject to a new Elimination Period.

==========================================================

**BENEFIT PERIOD**

The length of time You are eligible to receive Long-Term Care benefits in a Period of Care as shown on the Policy Schedule page.

==========================================================

**ELIMINATION PERIOD**

The days at the beginning of the Eligible Confinement in a Period of Care for which You do not receive benefits.  It is shown on the Policy Schedule page.

==========================================================

**EFFECTIVE DATE OF COVERAGE**

The date when coverage starts under Your policy.  It is shown on the Policy Schedule page.

==========================================================

**PRE-EXISTING CONDITION**

A health condition for which You received medical advice or treatment within the 6 months before Your Effective Date of Coverage.

==========================================================

## SECTION 2:   BENEFITS

**This section provides the following information about Your policy:**

1. **Your benefits under this policy;**
2. **The conditions under which You will receive benefits;**
3. **How long You will receive benefits.**

**You can refer back to Section 1 for definitions of terms found below.**

========================================================
### GENERAL BENEFIT INFORMATION

**WHAT IS IN THE POLICY SCHEDULE**

The Policy Schedule shows You the Long-Term Care Daily Benefit Amount, Elimination Period, and Benefit Period. It also includes optional benefit information, if applicable, premium, and general policy information.

**ELIGIBILITY FOR BENEFITS**

To receive benefits, Your Period of Care must begin while Your policy is in effect.

**WHAT HAPPENS IF YOU TERMINATE YOUR POLICY**

If You terminate Your policy, it will not affect any claim for an Eligible Confinement beginning before such termination.

**COVERAGE FOR ALZHEIMER'S DISEASE**

Your policy provides benefits, subject to all the provisions of this policy, for nervous or mental disorders of organic origin, including Alzheimer's Disease or senile dementia, which are determined by clinical diagnosis or tests.

**NO NEED FOR HOSPITALIZATION**

You are not required to be hospitalized before receiving benefits under this policy.

========================================================
### LONG-TERM CARE BENEFIT

**WHAT IS THE LONG-TERM CARE BENEFIT AND HOW DOES IT WORK**

We will pay You the Long-Term Care Daily Benefit Amount, as scheduled in Your policy, for each day of Your Eligible Confinement during a Period of Care which:

1. occurs after the Elimination Period, and
2. occurs during the Benefit Period.

========================================================
### WAIVER OF PREMIUM BENEFIT

**WHAT IS THE WAIVER OF PREMIUM BENEFIT AND HOW DOES IT WORK**

After an Eligible Confinement of 90 consecutive days (including the days used to satisfy the Elimination Period), You do not have to pay any future premiums that become due during any further Eligible

P1-15203-A                                    -10-

Confinement in that Period of Care. Premiums that become due will be waived until You leave the Long-Term Care Facility or until the end of the Benefit Period, whichever occurs first. After that, You must pay the premiums when due.

========================================================

## ALTERNATE PLAN OF CARE BENEFIT

**WHAT IS THE ALTERNATE PLAN OF CARE BENEFIT AND HOW DOES IT WORK**

If You would otherwise require an Eligible Confinement, We may pay for services under a written Alternate Plan of Care, if such plan is a medically acceptable option. This Alternate Plan of Care:

1. must be agreed to by You, Your physician, and Us;

2. can be initiated by You or Us; and

3. will be developed by or with health care professionals.

Any plan, including the benefit levels to be payable, which is mutually agreeable to You, Your physician and Us will be adopted.

Your agreement to participate in an Alternate Plan of Care will not waive any of Your or Our rights under the policy.

The maximum dollar benefit, if any, otherwise payable due to the same or related causes within a Period of Care, will apply to the total of all benefits payable under the Long-Term Care Benefit and the Alternate Plan of Care Benefit.

**EXAMPLES OF AN ALTERNATE PLAN OF CARE**

This plan may specify special treatments or different sites or levels of care. Some of the services You may receive may differ from those otherwise covered by Your policy. In this situation, such services will be paid at the levels specified in the Alternate Plan of Care.

Examples include, but are not limited to:

1. building a ramp for wheelchair access; or

2. modifying a kitchen or bathroom; or

P1-15203-A

-11-

3.   care provided in Alzheimer's Centers or similar arrangements.

========================================================

## BED RESERVATION BENEFIT

**WHAT IS THE BED RESERVATION BENEFIT AND HOW DOES IT WORK**

We will pay a Bed Reservation Benefit when You are charged for Your room in a Long-Term Care Facility if You are temporarily hospitalized during the course of an Eligible Confinement. This benefit will be equal to the Long-Term Care Daily Benefit Amount. The benefit will be limited to 14 days per calendar year. Unused visits cannot be carried over into the next calendar year. Such days may be used to satisfy the Elimination Period and will count against the maximum Benefit Period.

========================================================

## SECTION 3:   EXCLUSIONS AND LIMITATIONS

**This section tells You under what circumstances benefits are not payable even if You would otherwise qualify for benefits under another section of this policy.**

**WHEN THIS POLICY WILL NOT PROVIDE BENEFITS**

This policy will not pay benefits for any loss which is:

1.   due to a condition for which You can receive benefits under Workers' Compensation or the Occupational Disease Act or Law; or

2.   due to mental, psychoneurotic, or personality disorders without evidence of organic disease; or

3.   the result of war or any act of war.

**PRE-EXISTING CONDITION LIMITATION**

Losses due to Pre-existing Conditions shown on the application are covered immediately.

We will not pay for a loss due to a Pre-existing Condition which You did not disclose in the application unless the loss begins more than 6 months after the Effective Date of Coverage. However, providing incorrect information may cause Your policy to be voided.

P1-15203-A                                              -12-

===========================================

## SECTION 4:   CLAIMS

**This section tells You:**

1.      **How to notify Us of a claim;**
2.      **How to file a claim;**
3.      **When to file a claim;**
4.      **When and how claims are paid;**
5.      **Our rights in investigating a claim;**
6.      **What happens to a claim if Your age is stated incorrectly on the application; and**
7.      **Your legal rights regarding claims.**

===========================================

**NOTIFYING US OF A CLAIM**

You must notify Us in writing of a claim within 30 days after a covered loss begins, or as soon as reasonably possible.

The notice must identify You and be sent to Us at Our Home Office, CNA Plaza, Chicago, Illinois 60685 or Your agent.

**HOW TO FILE A CLAIM**

We will send You a claim form within 15 days after We receive notice of Your claim. If We do not, You can meet the requirements of providing Us with a written proof of loss by sending Us a written statement describing the type and nature of Your loss.

**WHEN TO FILE A CLAIM**

You must send Us written proof of loss within 90 days after the end of the period for which You are claiming benefits.

If this is not possible, Your claim will not be affected. However, unless You are legally incapable, You must notify Us within one year from the time proof is otherwise required.

**WHEN YOUR CLAIM IS PAID**

We will pay Your claim immediately after We receive due written proof of loss.

**HOW CLAIMS ARE PAID**

We will pay benefits to You, or Your estate, unless You have requested in writing that payment be made otherwise.

If benefits are payable to Your estate, We may pay up to $1,000 to any relative of Yours We feel is entitled to the benefits. Any payment made in good faith will discharge Us to the extent of the payment.

**OUR RIGHTS IN INVESTIGATING A CLAIM**

At Our expense, We have the right to have a physician or other qualified medical

P1-15203-A                              -13-

personnel examine You as often as reasonably necessary while You are receiving benefits.

**MISSTATEMENT OF YOUR AGE**

If Your age has been misstated on the application, Your policy benefits will be based on the amount Your premium would have purchased at Your correct age. If We would not have issued a policy, We will refund the premium You paid.

**LIMITATIONS ON LEGAL ACTIONS**

You cannot sue or bring legal action against Us:

1. before 60 days after We receive written proof of loss; or

2. more than three years after written proof of loss is required.

==============================================================
## SECTION 5:   PREMIUM PAYMENT AND REINSTATEMENT OF YOUR POLICY

**This section tells you:**

1. **When Your premium should be paid;**
2. **What happens if Your premium is not paid within a certain time period;**
3. **What happens to Your premium at Your death; and**
4. **How to reinstate Your policy if it is terminated.**

==============================================================
**PAYING PREMIUMS**

Premiums are to be paid with United States currency. They are due at the beginning of each policy term. Payment may be made to Us at Our Home Office at CNA Plaza, Chicago, Illinois 60685, or to Your agent. You can change the policy term if You notify Us in writing.

**WHAT HAPPENS WHEN PREMIUMS ARE NOT PAID**

You are allowed a 31-day grace period for late payment of each premium due after the first premium. Your policy will remain in force during this period.

If You do not pay Your premium by the end of the grace period, the policy will terminate (Refer to Section 2 - What Happens If You Terminate Your Policy - for effect on claims).

**WHAT HAPPENS TO YOUR PREMIUMS IF YOU DIE**

When We are notified of Your death, We will make a refund of any unearned premium paid for the period beyond Your death.

P1-15203-A                                    -14-

**PUTTING THE POLICY BACK IN FORCE**

If Your policy is terminated, a subsequent acceptance of premium by Us or by Our agent without requiring an application for reinstatement will reinstate Your policy.

If We do require an application for reinstatement and accept Your premium, We may issue a conditional premium receipt. If We approve Your application, Your policy will be reinstated as of the date of Our approval.   If We do not approve Your application, We will notify You in writing within 45 days after the date of Your application.

If We do not notify You within 45 days, the policy will be reinstated on the 45th day after the date of the conditional premium receipt.

The reinstated policy will cover only losses due to conditions that begin after the date of reinstatement.  In all other aspects, Your rights and Ours will be the same as before the policy terminated, unless there are new provisions added due to the reinstatement. The premium We accept for reinstatement may be used for the period for which premiums had not been paid.   We can apply the premium back for as many as 60 days before the date of reinstatement.

Any Return of Premium Benefit You receive must be returned to Us before Your policy can be reinstated.

===============================================================

## SECTION 6:   THE CONTRACT

**This section tells You:**

1.   **What makes up the contract;**
2.   **Situations where time limits apply to claims; and**
3.   **How the contract complies with state laws.**

===============================================================

**WHAT MAKES UP THE CONTRACT**

This policy is a legal, binding contract between You and Us.   The contract is made up of:

1.   the policy;
2.   the application; and
3.   any attached papers.

No one can change any part of this policy or waive any of its provisions unless the

P1-15203-A                                            -15-

change is approved in writing on the policy by one of Our officers.

**IMPORTANCE OF INFORMATION ON THE APPLICATION/TIME LIMIT ON CERTAIN DEFENSES**

We issued this policy based on the information You provided. Any incorrect or omitted information known to You at the time of application may cause Your policy to be voided or a claim to be denied.

After Your policy has been in force for 2 years, only fraudulent misstatements in the application can be used to void the policy or deny a claim for loss incurred after the 2 year period.

If You have a claim for a loss which begins more than 6 months after the Effective Date of Coverage, Your claim will not be reduced or denied because a disease or physical condition existed prior to the Effective Date of Coverage.

**CONFORMING WITH STATE LAWS**

If any provision of this policy conflicts with the laws of the state where You live on the Effective Date of Coverage, the provision is automatically changed so as to comply with the minimum requirements of the state.

P1-15203-A                              -16-

EXHIBIT B

## Continental Casualty Company



CNA Plaza
Chicago, Illinois 60685          A Stock Company

We are pleased to issue this Long-Term Care Insurance Policy to You.   It was issued in consideration of Your application and payment of the required premium.   We suggest You carefully read it.

### GUARANTEED RENEWABLE FOR LIFE
### PREMIUMS SUBJECT TO CHANGE

Your policy will remain in effect during Your lifetime as long as each premium is paid on time.   We cannot cancel or refuse to renew Your policy.   We cannot change Your policy without Your consent.   However, We may change the premium rates.   Any change will apply to all policies in the same class as Yours in the state where the policy was issued.   We will notify You in writing 31 days before Your premium changes.   Coverage begins and ends on 12:01 a.m. Standard Time at Your residence.

Your policy provides a refund of unearned premium when We are notified of Your death.   A refund of unearned premium will not be made for any other reason.

### 30-DAY REVIEW PERIOD

If You feel this policy does not meet Your insurance needs, return it to Us or Your agent within 30 days after You have received it.   We will return Your premium and consider the policy never to have been issued.

### CHECK YOUR APPLICATION

Please read the attached application.   Check to see if the information is correct and if any medical history has been left out.   If there is an error, please notify Us immediately.   We issued this policy based on the information You provided.   Now is the time to correct any errors or to provide any missing information.   Incorrect information may cause Your policy to be voided or a claim to be denied.   This policy is a legal contract between You and Us.

SIGNED FOR THE CONTINENTAL CASUALTY COMPANY

Corporate Secretary                                        Chairman of the Board

COUNTERSIGNED _____
                    LICENSED RESIDENT AGENT (WHERE REQUIRED BY LAW)

P1-16356-A               LONG-TERM CARE INSURANCE POLICY

## GUIDE TO YOUR LONG-TERM CARE POLICY

The following is a Guide to Your Long-Term Care Policy. It tells You what is included in Your policy and on what page(s) You can find it.

| | Page(s) |
|---|---|
| Guaranteed Renewable; Premiums Subject to Change | 1 |
| 30-Day Review Period | 1 |
| Check Your Application | 1 |
| Policy Schedule | 3 |
| | |
| SECTION 1: DEFINITIONS OF IMPORTANT TERMS | 6-9 |
| | |
| • Activities of Daily Living (ADLs) | 7 |
| • Acute Condition | 7 |
| • Benefit Period | 9 |
| • Chronic Condition | 7 |
| • Cognitive Impairment | 7 |
| • Effective Date of Coverage | 9 |
| • Eligible Confinement | 6 |
| • Elimination Period | 9 |
| • Inability to Perform Two or More Activities of Daily Living | 7 |
| • Long-Term Care | 6 |
| • Long-Term Care Facility | 8 |
| • Medically Necessary | 6 |
| • Period of Care | 8-9 |
| - Restoration of Benefits | 9 |
| • Pre-existing Condition | 9 |
| • We, Our, Us | 6 |
| • You, Your, Yourself | 6 |
| | |
| SECTION 2: BENEFITS | 10-13 |
| | |
| General Benefit Information | 10 |
| | |
| • What is in the Policy Schedule | 10 |
| • Eligibility for Benefits | 10 |
| • What Happens If You Terminate Your Policy | 10 |
| • Coverage for Alzheimer's Disease | 10 |
| • No Need for Hospitalization | 10 |
| | |
| Long-Term Care Benefit | 10 |
| | |
| • What is the Long-Term Care Benefit and How Does It Work | 10 |
| | |
| Waiver of Premium Benefit | 10-11 |
| | |
| • What is the Waiver of Premium Benefit and How Does It Work | 10-11 |
| | |
| Alternate Plan of Care Benefit | 11-12 |
| | |
| • What is the Alternate Plan of Care Benefit and How Does It Work | 11 |
| • Examples of an Alternate Plan of Care | 11-12 |

P1-16356-A                         -4-

Return of Premium Benefit . . . . . . . . . . . . . . . . . . . . . . . . . .   12

● What is the Return of Premium Benefit and How Does It Work . . . . . . . .   12
● Table of Applicable Percentages . . . . . . . . . . . . . . . . . . . . . . .   12


Bed Reservation Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

● What is the Bed Reservation Benefit and How Does It Work . . . . . . . . .   13

SECTION 3:  EXCLUSIONS AND LIMITATIONS . . . . . . . . . . . . . . . . . .   13

● When this Policy Will Not Provide Benefits . . . . . . . . . . . . . . . . . .   13
● Pre-existing Condition Limitation . . . . . . . . . . . . . . . . . . . . . . .   13

SECTION 4:  CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14-15

● Notifying Us of a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
● How to File a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
● When to File a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
● When Your Claim is Paid . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
● How Claims are Paid . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
● Our Rights in Investigating a Claim . . . . . . . . . . . . . . . . . . . . .   14-15
● Misstatement of Your Age . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
● Limitations on Legal Actions . . . . . . . . . . . . . . . . . . . . . . . . .   15

SECTION 5:  PREMIUM PAYMENT AND REINSTATEMENT OF YOUR POLICY .   15-16

● Paying Premiums . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15
● What Happens When Premiums Are Not Paid . . . . . . . . . . . . . . . . .   15
● What Happens To Your Premiums if You Die . . . . . . . . . . . . . . . . .   15
● Putting the Policy Back in Force . . . . . . . . . . . . . . . . . . . . . . .   16

SECTION 6:  THE CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . .   16-17

● What Makes Up the Contract . . . . . . . . . . . . . . . . . . . . . . . . .   16-17
● Importance of Information on the Application/Time Limit on Certain Defenses   17
● Conforming with State Laws . . . . . . . . . . . . . . . . . . . . . . . . .   17

P1-16356-A

## SECTION 1: DEFINITIONS OF IMPORTANT TERMS

**This section provides the meaning of special terms used throughout this policy. The first letter of each word or words in a phrase is capitalized to help You easily recognize them wherever they appear in the policy.**

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

### THE FOLLOWING DEFINITIONS REFER TO THOSE INVOLVED IN THE CONTRACT

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**WE, OUR, US**

The Continental Casualty Company, CNA Plaza, Chicago, Illinois   60685.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**YOU, YOUR, YOURSELF**

The insured named in the Policy Schedule.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

### THE FOLLOWING DEFINITIONS RELATE TO THE ELIGIBILITY FOR LONG-TERM CARE BENEFITS

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**ELIGIBLE CONFINEMENT**

Your confinement for Long-Term Care in a Long-Term Care Facility.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**LONG-TERM CARE**

Care required and provided in a Long-Term Care Facility which is:

1. Medically Necessary; or

2. Due to the inability to Perform Two or More Activities of Daily Living; or

3. Due to Cognitive Impairment.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**MEDICALLY NECESSARY**

Care or services which are:

1. Provided for Acute or Chronic Conditions; and

2. Consistent with accepted medical standards for Your condition; and

3. Not designed primarily for the convenience of You or Your family; and

4. Recommended by a physician who has no ownership in the Long-Term Care Facility in which You are receiving care.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

P1-16356-A                                    -5-

**ACUTE CONDITION**

A medically unstable condition. It requires frequent monitoring by medical professionals, such as physicians or nurses, in order to maintain Your health status.

**CHRONIC CONDITION**

A continuing or recurring medical condition.

**INABILITY TO PERFORM TWO OR MORE ACTIVITIES OF DAILY LIVING**

Dependence on someone else because of the need for continued one-on-one assistance in performing Two or More Activities of Daily Living.

**ACTIVITIES OF DAILY LIVING - (ADLS)**

The Activities of Daily Living are:

1. Eating. Eating or consuming nourishment.

2. Dressing. Putting on and taking off all necessary items of clothing including Medically Necessary braces or artificial limbs.

3. Taking Medication. Taking medication in the prescribed amounts and at the prescribed times.

4. Toileting. Getting to and from the toilet, getting on and off the toilet and maintaining a reasonable level of associated personal hygiene.

5. Mobility. Walking with or without the assistance of a mechanical device, such as a wheelchair, braces, a walker, a cane or other walking aid device, and moving between bed and chair.

**COGNITIVE IMPAIRMENT**

Deterioration in Your intellectual capacity which:

1. Requires continual supervision to protect Yourself and others; and

2. Must be determined by clinical diagnosis or tests; and

3. May be the result of Alzheimer's Disease, senile dementia, or other nervous or mental disorders of organic origin.

**LONG-TERM CARE FACILITY**

A place primarily providing Long-Term Care and related services on an inpatient basis, which:

1. is licensed by the state where it is located; and

2. provides skilled, intermediate, or custodial nursing care under the supervision of a physician; and

3. has 24-hour-a-day nursing services provided by or under the supervision of a registered nurse (R.N.), licensed vocational nurse (L.V.N.), or licensed practical nurse (L.P.N.), and

4. keeps a daily medical record of each patient; and

5. may be either a freestanding facility or a distinct part of a facility such as a ward, wing, unit, or swing-bed of a hospital or other institution.

A Long-Term Care Facility does not mean a hospital or clinic, boarding home, home for the aged or mentally ill, rest home, community living center, place that provides domiciliary, residential, or retirement care, place which operates primarily for the treatment of alcoholics or drug addicts, or a hospice. However, care or services provided in these facilities may be covered subject to the conditions of the Alternate Plan of Care Benefit provision.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

## THE FOLLOWING DEFINITIONS RELATE TO THE TIME PERIOD YOU RECEIVE BENEFITS

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**PERIOD OF CARE**

A continuous period in which You receive Long-Term Care or services provided by a nurse or home health care agency or services provided under an Alternate Plan of Care for the same or related condition. It begins with the first day You receive such care or services and ends when You no longer require such care or services for the condition.

P1-16356-A                                              -8-

**RESTORATION OF BENEFITS**

If one Period of Care ends, a new Period of Care may begin if:

1. You receive Long-Term Care or services provided by a nurse or home health care agency or services provided under an Alternate Plan of Care for a new condition; or

2. You have not received Long-Term Care or services provided by a nurse or home health care agency or services provided under an Alternate Plan of Care for the same or related condition for at least 180 consecutive days.

A new Period of Care fully restores Your Benefit Period and is subject to a new Elimination Period.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**BENEFIT PERIOD**

The length of time You are eligible to receive Long-Term Care benefits in a Period of Care as shown on the Policy Schedule page.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**ELIMINATION PERIOD**

The days at the beginning of the Eligible Confinement in a Period of Care for which You do not receive benefits. It is shown on the Policy Schedule page.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**EFFECTIVE DATE OF COVERAGE**

The date when coverage starts under Your policy. It is shown on the Policy Schedule page.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**PRE-EXISTING CONDITION**

A health condition for which You received medical advice or treatment within the 6 months before Your Effective Date of Coverage.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

P1-16356-A

-9-

## SECTION 2:   BENEFITS

This section provides the following information about Your policy:

1. **Your benefits under this policy;**
2. **The conditions under which You will receive benefits;**
3. **How long You will receive benefits.**

You can refer back to Section 1 for definitions of terms found below.

==========================================
### GENERAL BENEFIT INFORMATION

**WHAT IS IN THE POLICY SCHEDULE**

The Policy Schedule shows You the Long-Term Care Daily Benefit Amount, Elimination Period, and Benefit Period. It also includes optional benefit information, if applicable, premium, and general policy information.

**ELIGIBILITY FOR BENEFITS**

To receive benefits, Your Period of Care must begin while Your policy is in effect.

**WHAT HAPPENS IF YOU TERMINATE YOUR POLICY**

If You terminate Your policy, it will not affect any claim for an Eligible Confinement beginning before such termination.

**COVERAGE FOR ALZHEIMER'S DISEASE**

Your policy provides benefits, subject to all the provisions of this policy, for nervous or mental disorders of organic origin, including Alzheimer's Disease or senile dementia, which are determined by clinical diagnosis or tests.

**NO NEED FOR HOSPITALIZATION**

You are not required to be hospitalized before receiving benefits under this policy.

==========================================
### LONG-TERM CARE BENEFIT

**WHAT IS THE LONG-TERM CARE BENEFIT AND HOW DOES IT WORK**

We will pay You the Long-Term Care Daily Benefit Amount, as scheduled in Your policy, for each day of Your Eligible Confinement during a Period of Care which:

1. occurs after the Elimination Period, and
2. occurs during the Benefit Period.

==========================================
### WAIVER OF PREMIUM BENEFIT

**WHAT IS THE WAIVER OF PREMIUM BENEFIT AND HOW DOES IT WORK**

After an Eligible Confinement of 90 consecutive days (including the days used to satisfy the Elimination Period), You do not have to pay any future premiums that become due during any further Eligible

P1-16356-A                                            -10-

Confinement in that Period of Care. Premiums that become due will be waived until You leave the Long-Term Care Facility or until the end of the Benefit Period, whichever occurs first. After that, You must pay the premiums when due.

## ALTERNATE PLAN OF CARE BENEFIT

**WHAT IS THE ALTERNATE PLAN OF CARE BENEFIT AND HOW DOES IT WORK**

If You would otherwise require an Eligible Confinement, We may pay for services under a written Alternate Plan of Care, if such plan is a medically acceptable option. This Alternate Plan of Care:

1. must be agreed to by You, Your physician, and Us;

2. can be initiated by You or Us; and

3. will be developed by or with health care professionals.

Any plan, including the benefit levels to be payable, which is mutually agreeable to You, Your physician and Us will be adopted.

Your agreement to participate in an Alternate Plan of Care will not waive any of Your or Our rights under the policy.

The maximum dollar benefit, if any, otherwise payable due to the same or related causes within a Period of Care, will apply to the total of all benefits payable under the Long-Term Care Benefit and the Alternate Plan of Care Benefit.

**EXAMPLES OF AN ALTERNATE PLAN OF CARE**

This plan may specify special treatments or different sites or levels of care. Some of the services You may receive may differ from those otherwise covered by Your policy. In this situation, such services will be paid at the levels specified in the Alternate Plan of Care.

Examples include, but are not limited to:

1. building a ramp for wheelchair access; or

2. modifying a kitchen or bathroom; or

P1-16356-A                    -11-

3.  care provided in Alzheimer's Centers or similar arrangements.

## RETURN OF PREMIUM BENEFIT

**WHAT IS THE RETURN OF PREMIUM BENEFIT AND HOW DOES IT WORK**

We will pay a Return of Premium benefit under the following situations:

1.  when You terminate Your policy at the end of a period for which premium has been paid or waived, or

2.  upon notice of Your death.

The benefit is equal to the total amount of premiums (less any unearned premiums refunded at Your death) You have paid for this policy, multiplied by the applicable percentage shown in the table below, less any benefits You have received or are currently receiving, if any.

If You are receiving benefits when You terminate Your policy during a Period of Care, the Return of Premium Benefit, if any, will be paid after there are no further benefits payable for such Period of Care.

### TABLE OF APPLICABLE PERCENTAGES AT TERMINATION OR DEATH

**IF YOU TERMINATE YOUR POLICY OR DEATH OCCURS DURING:**

| Policy Year | The Applicable Percentage Is: |
|---|---|
| 1-5 | 0% |
| 6 | 5 |
| 7 | 10 |
| 8 | 15 |
| 9 | 20 |
| 10 | 25 |
| 11 | 30 |
| 12 | 35 |
| 13 | 40 |
| 14 | 45 |
| 15 | 50 |
| 16 | 60 |
| 17 | 70 |
| 18 | 80 |
| 19 | 90 |
| 20 or later | 100 |

P1-16356-A

-12-

## BED RESERVATION BENEFIT

**WHAT IS THE BED RESERVATION BENEFIT AND HOW DOES IT WORK**

We will pay a Bed Reservation Benefit when You are charged for Your room in a Long-Term Care Facility if You are temporarily hospitalized during the course of an Eligible Confinement. This benefit will be equal to the Long-Term Care Daily Benefit Amount. The benefit will be limited to 14 days per calendar year. Unused visits cannot be carried over into the next calendar year. Such days may be used to satisfy the Elimination Period and will count against the maximum Benefit Period.

==========================================

## SECTION 3:  EXCLUSIONS AND LIMITATIONS

This section tells You under what circumstances benefits are not payable even if You would otherwise qualify for benefits under another section of this policy.

**WHEN THIS POLICY WILL NOT PROVIDE BENEFITS**

This policy will not pay benefits for any loss which is:

1. due to a condition for which You can receive benefits under Workers' Compensation or the Occupational Disease Act or Law; or

2. due to mental, psychoneurotic, or personality disorders without evidence of organic disease; or

3. the result of war or any act of war.

**PRE-EXISTING CONDITION LIMITATION**

Losses due to Pre-existing Conditions shown on the application are covered immediately.

We will not pay for a loss due to a Pre-existing Condition which You did not disclose in the application unless the loss begins more than 6 months after the Effective Date of Coverage. However, providing incorrect information may cause Your policy to be voided.

===========================================

## SECTION 4:  CLAIMS

This section tells You:

1.      How to notify Us of a claim;
2.      How to file a claim;
3.      When to file a claim;
4.      When and how claims are paid;
5.      Our rights in investigating a claim;
6.      What happens to a claim if Your age is stated incorrectly on the application; and
7.      Your legal rights regarding claims.

===========================================

**NOTIFYING US OF A CLAIM**

You must notify Us in writing of a claim within 30 days after a covered loss begins, or as soon as reasonably possible.

The notice must identify You and be sent to Us at Our Home Office, CNA Plaza, Chicago, Illinois 60685 or Your agent.

**HOW TO FILE A CLAIM**

We will send You a claim form within 15 days after We receive notice of Your claim. If We do not, You can meet the requirements of providing Us with a written proof of loss by sending Us a written statement describing the type and nature of Your loss.

**WHEN TO FILE A CLAIM**

You must send Us written proof of loss within 90 days after the end of the period for which You are claiming benefits.

If this is not possible, Your claim will not be affected. However, unless You are legally incapable, You must notify Us within one year from the time proof is otherwise required.

**WHEN YOUR CLAIM IS PAID**

We will pay Your claim immediately after We receive due written proof of loss.

**HOW CLAIMS ARE PAID**

We will pay benefits to You, or Your estate, unless You have requested in writing that payment be made otherwise.

If benefits are payable to Your estate, We may pay up to $1,000 to any relative of Yours We feel is entitled to the benefits. Any payment made in good faith will discharge Us to the extent of the payment.

P1-16356-A

-14-

**OUR RIGHTS IN INVESTIGATING A CLAIM**

At Our expense, We have the right to have a physician or other qualified medical personnel examine You as often as reasonably necessary while You are receiving benefits.

**MISSTATEMENT OF YOUR AGE**

If Your age has been misstated on the application, Your policy benefits will be based on the amount Your premium would have purchased at Your correct age. If We would not have issued a policy, We will refund the premium You paid.

**LIMITATIONS ON LEGAL ACTIONS**

You cannot sue or bring legal action against Us:

1. before 60 days after We receive written proof of loss; or

2. more than three years after written proof of loss is required.

---

## SECTION 5:  PREMIUM PAYMENT AND REINSTATEMENT OF YOUR POLICY

This section tells you:

1. When Your premium should be paid;
2. What happens if Your premium is not paid within a certain time period;
3. What happens to Your premium at Your death; and
4. How to reinstate Your policy if it is terminated.

---

**PAYING PREMIUMS**

Premiums are to be paid with United States currency. They are due at the beginning of each policy term. Payment may be made to Us at Our Home Office at CNA Plaza, Chicago, Illinois 60685, or to Your agent. You can change the policy term if You notify Us in writing.

**WHAT HAPPENS WHEN PREMIUMS ARE NOT PAID**

You are allowed a 31-day grace period for late payment of each premium due after the first premium. Your policy will remain in force during this period.

If You do not pay Your premium by the end of the grace period, the policy will terminate (Refer to Section 2 - What Happens if You Terminate Your Policy - for effect on claims).

**WHAT HAPPENS TO YOUR PREMIUMS IF YOU DIE**

When We are notified of Your death, We will make a refund of any unearned premium paid for the period beyond Your death.

**PUTTING THE POLICY BACK IN FORCE**

If Your policy is terminated, a subsequent acceptance of premium by Us or by Our agent without requiring an application for reinstatement will reinstate Your policy.

If We do require an application for reinstatement and accept Your premium, We may issue a conditional premium receipt. If We approve Your application, Your policy will be reinstated as of the date of Our approval. If We do not approve Your application, We will notify You in writing within 45 days after the date of Your application.

If We do not notify You within 45 days, the policy will be reinstated on the 45th day after the date of the conditional premium receipt.

The reinstated policy will cover only losses due to conditions that begin after the date of reinstatement. In all other aspects, Your rights and Ours will be the same as before the policy terminated, unless there are new provisions added due to the reinstatement. The premium We accept for reinstatement may be used for the period for which premiums had not been paid. We can apply the premium back for as many as 60 days before the date of reinstatement.

Any Return of Premium Benefit You receive must be returned to Us before Your policy can be reinstated.

## SECTION 6:  THE CONTRACT

This section tells You:

1.  What makes up the contract;
2.  Situations where time limits apply to claims; and
3.  How the contract complies with state laws.

**WHAT MAKES UP THE CONTRACT**

This policy is a legal, binding contract between You and Us. The contract is made up of:
1.  the policy;

P1-16356-A                                    -16-

2. the application; and
3. any attached papers.

No one can change any part of this policy or waive any of its provisions unless the change is approved in writing on the policy by one of Our officers.

## IMPORTANCE OF INFORMATION ON THE APPLICATION/TIME LIMIT ON CERTAIN DEFENSES

We issued this policy based on the information You provided. Any incorrect or omitted information known to You at the time of application may cause Your policy to be voided or a claim to be denied.

After Your policy has been in force for 2 years, only fraudulent misstatements in the application can be used to void the policy or deny a claim for loss incurred after the 2 year period.

If You have a claim for a loss which begins more than 6 months after the Effective Date of Coverage, Your claim will not be reduced or denied because a disease or physical condition existed prior to the Effective Date of Coverage.

## CONFORMING WITH STATE LAWS

If any provision of this policy conflicts with the laws of the state where You live on the Effective Date of Coverage, the provision is automatically changed so as to comply with the minimum requirements of the state.

# EXHIBIT C

# Continental Casualty Company

**CNA**
For All the Commitments You Make®

CNA Plaza                    A Stock Company
Chicago, Illinois 60685

We are pleased to issue this Long-Term Care Insurance Policy to You.    It was issued in consideration of Your application and payment of the required premium.    We suggest You carefully read it.

**IN ADDITION, THIS POLICY MAY PROVIDE BENEFITS BEYOND THOSE WHICH QUALIFY FOR ASSET PROTECTION UNDER THE CONNECTICUT PARTNERSHIP PROGRAM.**

**NOTICE:  As long as this policy remains precertified for Medicaid Asset Protection, benefits provided under this policy may not be paid to the extent that benefits are payable under any other plans or programs to which You are entitled.    Please refer to the section entitled Exclusions and Limitations in the policy for a full explanation.  This provision will not reduce the benefits payable under Your policy for a Period of Care.**

## GUARANTEED RENEWABLE FOR LIFE
### PREMIUMS SUBJECT TO CHANGE

Your policy will remain in effect during Your lifetime as long as each premium is paid on time.    We cannot cancel or refuse to renew Your policy.    We cannot change Your policy without Your consent.  However, We may change the premium rates.  Any change will apply to all policies in the same class as Yours in the state where the policy was issued.  We will notify You in writing 31 days before Your premium changes.  Coverage begins and ends at 12:01 A.M. Standard Time at Your residence.

Your policy provides a refund of unearned premium when We are notified of Your death.  A refund of unearned premium will not be made for any other reason.

## 30-DAY REVIEW PERIOD

If You feel this policy does not meet Your insurance needs, return it to Us or Your agent within 30 days after You have received it.  We will return Your premium and consider the policy never to have been issued.

## CHECK YOUR APPLICATION

**Please read the attached application.  Check to see if the information is correct and if any medical history has been left out.  If there is an error, please notify Us immediately.  We issued this policy based on the information You provided.  Now is the time to correct any errors or to provide any missing information.  Incorrect information may cause Your policy to be voided or a claim to be denied. `This policy is a legal contract between You and Us.**

SIGNED FOR THE CONTINENTAL CASUALTY COMPANY

Corporate Secretary

Chairman of the Board

COUNTERSIGNED _____
                    LICENSED RESIDENT AGENT (WHERE REQUIRED BY LAW)

P1-17931-A06            LONG-TERM CARE INSURANCE POLICY

(THIS PAGE LEFT INTENTIONALLY BLANK)

## POLICY SCHEDULE

**This policy schedule provides You with specific information about the product You selected. It tells You which benefits You chose and how much they will cost.   General policy information is also provided.**

### BENEFITS

| | |
|---|---|
| Long-Term Care Daily Benefit Amount . . . . . . . . . . . . . . . . | $100 |
| Elimination Period . . . . . . . . . . . . . . . . . . . . . . . . . | 30 days |
| Benefit Period . . . . . . . . . . . . . . . . . . . . . . . . . . . | 730 days (2 years) |
| Compound Automatic Increase Benefit . . . . . . . . . . . . . . . . | 5% |

### OPTIONAL BENEFIT

Home and Community-Based Service Rider

| | |
|---|---|
| - Maximum Eligible Expense Per Visit . . . . . . . . . . . . . . . . | $60 |
|   Benefit Period . . . . . . . . . . . . . . . . . . . . . . . . . | 730 days (2 years) |
| - Compound Automatic Increase Benefit . . . . . . . . . . . . . . . | 5% |

### PREMIUM SUMMARY

| | |
|---|---|
| Total Annual Premium Before Discounts . . . . . . . . . . . . . . . | $1,280 |
| Total Annual Premium Less Spouse and/or Group Discounts . . . . | $1,152 |
| Mode of Payment. . . . . . . . . . . . . . . . . . . . . . . . . . . | Annual |
| Renewal Premium Based on Mode of Payment . . . . . . . . . . . | $1,152 |

### GENERAL POLICY INFORMATION

| | |
|---|---|
| Policy Number . . . . . . . . . . . . . . . . . . . . . . . . . . . | #01234567 |
| Effective Date of Coverage . . . . . . . . . . . . . . . . . . . . . | January 15, 1992 |
| First Renewal Date . . . . . . . . . . . . . . . . . . . . . . . . . | January 15, 1993 |
| Name of Insured . . . . . . . . . . . . . . . . . . . . . . . . . . | John Smith |

## GUIDE TO YOUR LONG-TERM CARE POLICY

**The following is a Guide to Your Long-Term Care Policy.   It tells You what is included in Your policy and on what page(s) You can find it.**

Page(s)

Guaranteed Renewable; Premiums Subject to Change . . . . . . . . . . . . . . 1
30-Day Review Period . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Check Your Application . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Policy Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SECTION 1:   DEFINITIONS OF IMPORTANT TERMS . . . . . . . . . . . . . . 6-10

• Activities of Daily Living (ADLs) . . . . . . . . . . . . . . . . . . . . 7
• Asset Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
• Benefit Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
• Cognitive Impairment . . . . . . . . . . . . . . . . . . . . . . . . . 8
• Effective Date of Coverage . . . . . . . . . . . . . . . . . . . . . . 10
• Eligible Confinement . . . . . . . . . . . . . . . . . . . . . . . . . 6
• Elimination Period . . . . . . . . . . . . . . . . . . . . . . . . . . 10
• Folstein Mini Mental State Examination . . . . . . . . . . . . . . . . . 6
• Inability to Perform Two or More Activities of Daily Living . . . . . . . . 7
• Long-Term Care . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
• Long-Term Care Facility . . . . . . . . . . . . . . . . . . . . . . . . 8-9
• Mental Status Questionnaire . . . . . . . . . . . . . . . . . . . . . . 6
• Mental or Nervous Disorder . . . . . . . . . . . . . . . . . . . . . . 9
• Period of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  - Restoration of Benefits . . . . . . . . . . . . . . . . . . . . . . . 9
• Pre-existing Condition . . . . . . . . . . . . . . . . . . . . . . . . 10
• We, Our, Us . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
• You, Your, Yourself . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SECTION 2:   BENEFITS . . . . . . . . . . . . . . . . . . . . . . . . . . 11-13

General Benefit Information . . . . . . . . . . . . . . . . . . . . . . . . 11

• What is in the Policy Schedule . . . . . . . . . . . . . . . . . . . . . 11
• Eligibility for Benefits . . . . . . . . . . . . . . . . . . . . . . . . . 11
• What Happens If You Terminate Your Policy . . . . . . . . . . . . . . . 11
• Coverage for Alzheimer's Disease . . . . . . . . . . . . . . . . . . . . 11
• No Need for Hospitalization . . . . . . . . . . . . . . . . . . . . . . 11

Long-Term Care Benefit . . . . . . . . . . . . . . . . . . . . . . . . . 11

• What is the Long-Term Care Benefit and How Does it Work . . . . . . . . 11

Waiver of Premium Benefit . . . . . . . . . . . . . . . . . . . . . . . . 12

• What is the Waiver of Premium Benefit and How Does it Work . . . . . . . 12

Compound Automatic Increase Benefit . . . . . . . . . . . . . . . . . . . 12

• What is the Compound Automatic Increase Benefit . . . . . . . . . . . . 12

Alternate Plan of Care Benefit . . . . . . . . . . . . . . . . . . . . . .   12-13

• What is the Alternate Plan of Care Benefit and How Does It Work . . . . .   12-13
• Examples of an Alternate Plan of Care . . . . . . . . . . . . . . . . . .   13

Bed Reservation Benefit . . . . . . . . . . . . . . . . . . . . . . . . .   13

• What is the Bed Reservation Benefit and How Does it Work . . . . . . . .   13

SECTION 3:   EXCLUSIONS AND LIMITATIONS . . . . . . . . . . . . . . . .   14-15

• Coordination of Benefits and Excess Provisions . . . . . . . . . . . . .   14
• When this Policy Will Not Provide Benefits . . . . . . . . . . . . . . .   14-15
• Pre-existing Condition Limitation . . . . . . . . . . . . . . . . . . . .   15

SECTION 4:   CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . .   16-17

• Notifying Us of a Claim . . . . . . . . . . . . . . . . . . . . . . . .   16
• How to File a Claim . . . . . . . . . . . . . . . . . . . . . . . . . .   16
• When to File a Claim . . . . . . . . . . . . . . . . . . . . . . . . .   16
• When Your Claim is Paid . . . . . . . . . . . . . . . . . . . . . . . .   16
• How Claims are Paid . . . . . . . . . . . . . . . . . . . . . . . . . .   16
• Our Rights in Investigating a Claim . . . . . . . . . . . . . . . . . . .   17
• Misstatement of Your Age . . . . . . . . . . . . . . . . . . . . . . .   17
• Limitations on Legal Actions . . . . . . . . . . . . . . . . . . . . . .   17

SECTION 5:   PREMIUM PAYMENT AND REINSTATEMENT OF YOUR POLICY .   18-19

• Paying Premiums . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18
• What Happens When Premiums Are Not Paid . . . . . . . . . . . . . . .   18
• What Happens To Your Premiums if You Die . . . . . . . . . . . . . . .   18
• Putting the Policy Back in Force . . . . . . . . . . . . . . . . . . . .   18-19
• Extension of Benefits for Cognitively Impaired . . . . . . . . . . . . . .   19

SECTION 6:   THE CONTRACT . . . . . . . . . . . . . . . . . . . . . .   20

• What Makes Up the Contract . . . . . . . . . . . . . . . . . . . . . .   20
• Importance of Information on the Application/Time Limit on Certain Defenses   20
• Conforming with State Laws . . . . . . . . . . . . . . . . . . . . . .   20

## SECTION 1:  DEFINITIONS OF IMPORTANT TERMS

This section provides the meaning of special terms used throughout this policy.  The first letter of each word or words in a phrase is capitalized to help You easily recognize them wherever they appear in the policy.

========================================================

### THE FOLLOWING DEFINITIONS REFER TO THOSE INVOLVED IN THE CONTRACT

========================================================

| | |
|---|---|
| **WE, OUR, US** | The Continental Casualty Company, CNA Plaza, Chicago, Illinois  60685. |

========================================================

| | |
|---|---|
| **YOU, YOUR, YOURSELF** | The insured named in the Policy Schedule. |

========================================================

### THE FOLLOWING DEFINITIONS RELATE TO THE ELIGIBILITY FOR LONG-TERM CARE BENEFITS

========================================================

| | |
|---|---|
| **ELIGIBLE CONFINEMENT** | Your confinement for Long-Term Care in a Long-Term Care Facility. |

========================================================

| | |
|---|---|
| **LONG-TERM CARE** | Care or services which qualify for benefits and Asset Protection, to the extent they do not exceed the actual charges, that are required due to: |

1.  The Inability to Perform Two or More Activities of Daily Living; or

2.  Cognitive Impairment.

========================================================

| | |
|---|---|
| **MENTAL STATUS QUESTIONNAIRE - (MSQ)** | The Short Portable questionnaire comprised of ten (10) questions used to assess cognitive impairment. |

========================================================

| | |
|---|---|
| **FOLSTEIN MINI MENTAL STATE EXAMINATION** | A method for clinicians to grade the cognitive state of patients. |

========================================================

**ASSET PROTECTION**

The rights extended to You to retain amounts of assets equal to the sum of qualifying insurance payments made on Your behalf, for Medicaid eligible long-term care services, in determining eligibility for the Medicaid program.

Qualifying insurance payments shall be the lesser of:

1. the amount of payments made under this policy; or

2. the actual charge for the services.

═══════════════════════════════════════════════════

**INABILITY TO PERFORM TWO OR MORE ACTIVITIES OF DAILY LIVING**

Dependence on someone else because of the need for continued human assistance or supervision in performing Two or More Activities of Daily Living.

**ACTIVITIES OF DAILY LIVING - (ADLS)**

The Activities of Daily Living are:

1. Eating.   Eating or consuming nourishment.

2. Dressing.  Putting on and taking off all necessary items of clothing including necessary braces or artificial limbs.

3. Bathing.  Washing oneself on a routine basis in the bathtub, shower or sponge bath.

4. Toileting.   Getting to and from the toilet, getting on and off the toilet and maintaining a reasonable level of associated personal hygiene.

5. Transferring.  Moving in and out of bed or chair, and changing positions, such as from bed or chair to standing.

═══════════════════════════════════════════════════

**COGNITIVE IMPAIRMENT**

Deterioration in Your intellectual capacity which:

1. is assessed using the Mental Status Questionnaire and You fail to answer correctly at least seven (7) of the ten (10) questions on the test; or

2. causes You to exhibit specific behavior problems requiring daily supervision, including but not limited to wandering, abusive or assaultive behavior, poor judgment or uncooperativeness which poses a danger to self or others, and extreme or bizarre personal hygiene habits; and You have either taken the Mental Status Questionnaire and failed to answer correctly at least four questions, or have taken the Folstein Mini Mental State Examination and achieved a score of twenty-three (23) or lower.

========================================================

**LONG-TERM CARE FACILITY**

A place primarily providing Long-Term Care and related services on an inpatient basis, which:

1. is licensed by the state where it is located; and

2. provides skilled, intermediate, or custodial nursing care under the supervision of a physician; and

3. has 24-hour-a-day nursing services provided by or under the supervision of a registered nurse (R.N.), licensed vocational nurse (L.V.N.), or licensed practical nurse (L.P.N.), and

4. keeps a daily medical record of each patient; and

5. may be either a freestanding facility or a distinct part of a facility such as a ward, wing, unit, or swing-bed of a hospital or other institution.

A Long-Term Care Facility does not mean a hospital or clinic, boarding home, home for the aged or mentally ill, rest home, community living center, place that provides domiciliary, residential, or retirement care, place which operates primarily for the treatment of alcoholics or drug addicts, or a hospice.    However, care or services provided in these facilities may be covered subject to the conditions of the Alternate Plan of Care Benefit provision.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**MENTAL OR NERVOUS DISORDER**

A neurosis, psychoneurosis, psychopathy, psychosis, mental or emotional disease or disorder of any kind.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

## THE FOLLOWING DEFINITIONS RELATE TO THE TIME PERIOD YOU RECEIVE BENEFITS

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**PERIOD OF CARE**

A continuous period in which You receive Long-Term Care or services provided by a nurse or home health care agency or services provided under an Alternate Plan of Care for the same or related condition. It begins with the first day You receive such care or services and ends when You no longer require such care or services for the condition.

**RESTORATION OF BENEFITS**

If one Period of Care ends, a new Period of Care may begin if:

1. as a result of a new condition, You receive Long-Term Care or services provided by a nurse or home health care agency or services provided under an Alternate Plan of Care; or

2. You have not received Long-Term Care or services provided by a nurse or home health care agency or services provided under an Alternate Plan of Care for the same or related condition for at least 90 consecutive days.

A new Period of Care fully restores Your Benefit Period and is subject to a new Elimination Period.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**BENEFIT PERIOD**

The length of time You are eligible to receive Long-Term Care benefits in a Period of Care as shown on the Policy Schedule page.

===============================================

**ELIMINATION PERIOD**

The days at the beginning of the Eligible Confinement in a Period of Care for which You do not receive benefits.  It is shown on the Policy Schedule page.

===============================================

**EFFECTIVE DATE OF COVERAGE**

The date when coverage starts under Your policy.  It is shown on the Policy Schedule page.

===============================================

**PRE-EXISTING CONDITION**

A health condition for which You received medical advice or treatment within the 6 months before Your Effective Date of Coverage.

===============================================

## SECTION 2:   BENEFITS

**This section provides the following information about Your policy:**

1.   **Your benefits under this policy;**
2.   **The conditions under which You will receive benefits;**
3.   **How long You will receive benefits.**

**You can refer back to Section 1 for definitions of terms found below.**

=========================================
### GENERAL BENEFIT INFORMATION

**WHAT IS IN THE POLICY SCHEDULE**

The Policy Schedule shows You the Long-Term Care Daily Benefit Amount, Elimination Period, and Benefit Period. It also includes optional benefit information, if applicable, premium, and general policy information.

**ELIGIBILITY FOR BENEFITS**

To receive benefits, Your Period of Care must begin while Your policy is in effect.

**WHAT HAPPENS IF YOU TERMINATE YOUR POLICY**

If You terminate Your policy, it will not affect any claim for an Eligible Confinement beginning before such termination.

**COVERAGE FOR ALZHEIMER'S DISEASE**

Your policy provides benefits, subject to all the provisions of this policy, for nervous or mental disorders of organic origin, including Alzheimer's Disease or senile dementia, which are determined by clinical diagnosis or tests.

**NO NEED FOR HOSPITALIZATION**

You are not required to be hospitalized before receiving benefits under this policy.

=========================================
### LONG-TERM CARE BENEFIT

**WHAT IS THE LONG-TERM CARE BENEFIT AND HOW DOES IT WORK**

We will pay You the Long-Term Care Daily Benefit Amount, as scheduled in Your policy, for each day of Your Eligible Confinement during a Period of Care which:

1.   occurs after the Elimination Period, and
2.   occurs during the Benefit Period.

Benefits paid under this provision will qualify for Asset Protection to the extent they do not exceed the actual charge.

=========================================

## WAIVER OF PREMIUM BENEFIT

**WHAT IS THE WAIVER OF PREMIUM BENEFIT AND HOW DOES IT WORK**

After an Eligible Confinement of 90 consecutive days (including the days used to satisfy the Elimination Period), You do not have to pay any future premiums that become due during any further Eligible Confinement in that Period of Care. Premiums that become due will be waived until You leave the Long-Term Care Facility or until the end of the Benefit Period, whichever occurs first. After that, You must pay the premiums when due.

=============================================

## COMPOUND AUTOMATIC INCREASE BENEFIT

**WHAT IS THE COMPOUND AUTOMATIC INCREASE BENEFIT**

On each anniversary of Your Policy Effective Date of Coverage, We will increase the Long-Term Care Daily Benefit Amount by 5% of the benefit in effect on the previous anniversary of Your Policy Effective Date of Coverage. Annual increases will occur even if benefits are being paid.

=============================================

## ALTERNATE PLAN OF CARE BENEFIT

**WHAT IS THE ALTERNATE PLAN OF CARE BENEFIT AND HOW DOES IT WORK**

If You would otherwise require an Eligible Confinement, We may pay for services under a written Alternate Plan of Care, if such plan is a medically acceptable option. This Alternate Plan of Care:

1. must be agreed to by You, Your physician, and Us;

2. can be initiated by You or Us; and

3. will be developed by or with health care professionals.

Any plan, including the benefit levels to be payable, which is mutually agreeable to You, Your physician and Us will be adopted.

Your agreement to participate in an Alternate Plan of Care will not waive any of Your or Our rights under the policy.

P1-17931-A06                                    -12-

The maximum dollar benefit, if any, otherwise payable due to the same or related causes within a **Period of Care**, will apply to the total of all benefits payable under the Long-Term Care Benefit and the Alternate Plan of Care Benefit.

**EXAMPLES OF AN ALTERNATE PLAN OF CARE**

This plan may specify special treatments or different sites or levels of care. Some of the services You may receive may differ from those otherwise covered by Your policy. In this situation, such services will be paid at the levels specified in the Alternate Plan of Care.

Examples include, but are not limited to:

1. building a ramp for wheelchair access; or

2. modifying a kitchen or bathroom; or

3. care provided in Alzheimer's Centers or similar arrangements.

Benefits may be paid under the Alternate Plan of Care that do not qualify for Asset Protection.

====================================================
### BED RESERVATION BENEFIT

**WHAT IS THE BED RESERVATION BENEFIT AND HOW DOES IT WORK**

We will pay a Bed Reservation Benefit when You are charged for Your room in a Long-Term Care Facility if You are temporarily hospitalized during the course of an Eligible Confinement. This benefit will be equal to the Long-Term Care Daily Benefit Amount. The benefit will be limited to 14 days per calendar year. Unused days cannot be carried over into the next calendar year. Such days may be used to satisfy the Elimination Period and will count against the Benefit Period.

Benefits paid under this provision will qualify for Asset Protection.

====================================================

## SECTION 3:   EXCLUSIONS AND LIMITATIONS

**This section tells You under what circumstances benefits are not payable even if You would otherwise qualify for benefits under another section of this policy.**

**COORDINATION OF BENEFITS AND EXCESS PROVISIONS**

The benefits of this Policy are designed to supplement and not duplicate the benefits available through any primary hospital, medical/surgical, major medical plan, Medicare or Medicare supplemental programs.

This means that if You have any basic hospital, medical/surgical, major medical plan, Medicare or Medicare supplemental programs and You are entitled to obtain benefits for covered services under those coverages (which also would be Covered Services under this Policy) You are required to obtain coverage for those benefits under such coverage prior to being eligible for benefits under this Policy.

If You are eligible to receive benefits under this Policy and any other Long-Term Care Policies or Precertified Long-Term Care Policies, then the policy with the earliest Effective Date shall be deemed to be the primary Policy of coverage and this Policy the secondary Policy.

If You are eligible to receive benefits under any other Long-Term Care Policy or Precertified Long-Term Care Policy and the other Long-Term Care Policy or Precertified Long-Term Care Policy has a provision which states that coordination of benefits is prohibited with any other Long-Term Care Policy or Precertified Long-Term Policy that

You may have, then the other Long-Term Care Policy or Precertified Long-Term Care Policy will be deemed to be the primary Policy of coverage, regardless of the earliest Effective Date of the Policies.

**WHEN THIS POLICY WILL NOT PROVIDE BENEFITS**

This policy will not pay benefits for any loss which is:

1.   due to a condition for which You can receive benefits under Workers' Compensation or the Occupational Disease Act or Law; or

2.   due to mental or nervous disorders without demonstrable organic disease; or

3.   the result of war or any act of war.

**PRE-EXISTING CONDITION LIMITATION**

Losses due to Pre-existing Conditions shown on the application are covered immediately.

We will not pay for a loss due to a Pre-existing Condition which You did not disclose in the application unless the loss begins more than 6 months after the Effective Date of Coverage. However, providing incorrect information may cause Your policy to be voided.

=======================================================

## SECTION 4:   CLAIMS

**This section tells You:**

1. **How to notify Us of a claim;**
2. **How to file a claim;**
3. **When to file a claim;**
4. **When and how claims are paid;**
5. **Our rights in investigating a claim;**
6. **What happens to a claim if Your age is stated incorrectly on the application; and**
7. **Your legal rights regarding claims.**

=======================================================

**NOTIFYING US OF A CLAIM**

You must notify Us in writing of a claim within 30 days after a covered loss begins, or as soon as reasonably possible.

The notice must identify You and be sent to Us at Our Home Office, CNA Plaza, Chicago, Illinois 60685 or Your agent.

**HOW TO FILE A CLAIM**

We will send You a claim form within 15 days after We receive notice of Your claim. If We do not, You can meet the requirements of providing Us with a written proof of loss by sending Us a written statement describing the type and nature of Your loss.

**WHEN TO FILE A CLAIM**

You must send Us written proof of loss within 90 days after the end of the period for which You are claiming benefits.

If this is not possible, Your claim will not be affected.   However, unless You are legally incapable, You must notify Us within one year from the time proof is otherwise required.

**WHEN YOUR CLAIM IS PAID**

We will pay Your claim immediately after We receive due written proof of loss.

**HOW CLAIMS ARE PAID**

We will pay benefits to You, or Your estate, unless You have requested in writing that payment be made otherwise.

If benefits are payable to Your estate, We may pay up to $1,000 to any relative of Yours We feel is entitled to the benefits. Any payment made in good faith will discharge Us to the extent of the payment.

**OUR RIGHTS IN INVESTIGATING A CLAIM**

At Our expense, We have the right to have a physician or other qualified medical personnel examine You as often as reasonably necessary while You are receiving benefits.

**MISSTATEMENT OF YOUR AGE**

If Your age has been misstated on the application, Your policy benefits will be based on the amount Your premium would have purchased at Your correct age. If We would not have issued a policy, We will refund the premium You paid.

**LIMITATIONS ON LEGAL ACTIONS**

You cannot sue or bring legal action against Us:

1. before 60 days after We receive written proof of loss; or

2. more than three years after written proof of loss is required.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

## SECTION 5:  PREMIUM PAYMENT AND REINSTATEMENT OF YOUR POLICY

**This section tells you:**

1. **When Your premium should be paid;**
2. **What happens if Your premium is not paid within a certain time period;**
3. **What happens to Your premium at Your death; and**
4. **How to reinstate Your policy if it is terminated.**

=================================================

**PAYING PREMIUMS**

Premiums are to be paid with United States currency.  They are due at the beginning of each policy term.  Payment may be made to Us at Our Home Office at CNA Plaza, Chicago, Illinois 60685, or to Your agent. You can change the policy term if You notify Us in writing.

**WHAT HAPPENS WHEN PREMIUMS ARE NOT PAID**

You are allowed a 31-day grace period for late payment of each premium due after the first premium.  Your policy will remain in force during this period.

If Your policy is about to lapse, and you are within 60 days of the grace period, You have the option to switch Your coverage to a shorter benefit period.  Premium will be based on Your age at the time of original issuance.

If You do not pay Your premium by the end of the grace period, the policy will terminate (Refer to Section 2 - What Happens If You Terminate Your Policy - for effect on claims).

**WHAT HAPPENS TO YOUR PREMIUMS IF YOU DIE**

When We are notified of Your death, We will make a refund of any unearned premium paid for the period beyond Your death.

**PUTTING THE POLICY BACK IN FORCE**

If Your policy is terminated, a subsequent acceptance of premium by Us or by Our agent without requiring an application for reinstatement will reinstate Your policy.

If We do require an application for reinstatement and accept Your premium, We may issue a conditional premium receipt. If We approve Your application, Your policy will be reinstated as of the date of Our approval.   If We do not approve Your application, We will notify You in writing within 45 days after the date of Your application.

If We do not notify You within 45 days, the policy will be reinstated on the 45th day after the date of the conditional premium receipt.

The reinstated policy will cover only losses that begin after the date of reinstatement. In all other aspects, Your rights and Ours will be the same as before the policy terminated, unless there are new provisions added due to the reinstatement.   The premium We accept for reinstatement may be used for the period for which premiums had not been paid.  We can
apply the premium back for as many as 60 days before the date of reinstatement.

===================================================

**EXTENSION OF BENEFITS FOR COGNITIVELY IMPAIRED**

If you have a Cognitive Impairment on the date Your policy terminates due to nonpayment of premium, we will reinstate Your policy if:

1.   You request continuation of Your policy within 9 months after date of such termination; and

2.   All past due premiums are paid.

===================================================

## SECTION 6:   THE CONTRACT

**This section tells You:**

1.   **What makes up the contract;**
2.   **Situations where time limits apply to claims; and**
3.   **How the contract complies with state laws.**

========================================================

**WHAT MAKES UP THE CONTRACT**

This policy is a legal, binding contract between You and Us.   The contract is made up of:

1.   the policy;
2.   the application; and
3.   any attached papers.

No one can change any part of this policy or waive any of its provisions unless the change is approved in writing on the policy by one of Our officers.

**TIME LIMIT ON CERTAIN DEFENSES**

This policy shall be incontestable, except for nonpayment of premium, after it has been in force for two years from its date of issue.

**CONFORMING WITH STATE LAWS**

If any provision of this policy conflicts with the laws of the state where You live on the Effective Date of Coverage, the provision is automatically changed so as to comply with the minimum requirements of the state.

# EXHIBIT D

CLAIM FORM
DALUGE v. CONTINENTAL CASUALTY COMPANY SETTLEMENT

| **WRITE ANY NAME AND ADDRESS CORRECTIONS BELOW** OR IF THERE IS NO PREPRINTED DATA TO THE LEFT, YOU MUST PROVIDE THE NAME AND ADDRESS OF THE CLASS MEMBER HERE: |
|---|
| Name: |
| Address: |
| |
| City, ST, Zip |
| Phone Number: |
| Email Address: |
| Policy Number: |

Our records indicate you have or had a long-term care insurance policy with Continental Casualty Co. (CNA). You may be eligible for a monetary payment from this class action settlement if you previously had a claim(s) for benefits denied under your CNA long-term care insurance policy for a stay at an assisted living facility in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee or Wisconsin.

Under the terms of the settlement, your previously-denied claim will be reevaluated if you return this Claim Form by **Month 00, 2018**. An envelope addressed to the Settlement Administrator has been provided for your convenience.

As described in more detail in the attached Notice and the Settlement Agreement (available at www.XXXXXX.com), if it is determined that you are a Class I Member, you may be eligible for the following monetary payment if you submit a valid Claim Form:

- Cash payment of up to 60% of the daily facility benefit for claims that were submitted to, and denied by, CNA for Qualified Care in a Qualified Facility, as described in the attached Notice and in the Settlement Agreement. In order to be eligible for this benefit, the original claim must have been submitted in writing and/or denied by CNA in writing during certain time periods depending on your home state, as more fully described in the attached Notice and in the Settlement Agreement;

- Cash reimbursement of up to 60% of the premiums you paid that would have been waived if your claim(s) had originally been approved ("Waiver of Premium Benefit") for Qualified Care in a Qualified Facility, as described in the attached Notice and in the Settlement Agreement.

If you are not the policyholder but represent the interests of the policyholder, you must submit valid power of attorney, trustee, executor/trix, estate administrator or guardianship documentation, or other documentation that would entitle you to receive confidential medical information about the policyholder under the provisions of the Health Insurance Portability and Accountability Act, 29 U.S.C. § 1181.

If you have any questions about this settlement or completing this Claim Form, you can call Class Counsel who represents you in this matter, Sean K. Collins, at 1-855-693-9256 or you can visit www.XXXXXXX.com or call 1-800-000-0000 for more information.

If you wish to submit a Claim Form to have your claim(s) reevaluated and potentially receive these benefits, please provide the following information. Print clearly in blue or black ink. This Form must be mailed, signed, and postmarked by **Month 00, 2018**. A preaddressed envelope is included for your convenience. If you are a Class I Member and do not exclude yourself from Class I, you are releasing certain rights as described in the attached Notice and in more detail in the Settlement Agreement. If you want to exclude yourself from Class I, do not submit this claim form and follow the instructions in the attached Notice.

1.  NAME AND ADDRESS OF PERSON COMPLETING THIS FORM

☐ I am the Policyholder named above

☐ I am completing this Form on Behalf of the Policyholder named above

Full Name              _____
Street Address        _____

City, State, Zip        _____
Phone                   _____
Email Address         _____
Relationship to Policyholder        _____

2.  NAME, ADDRESS, AND OTHER INFORMATION FOR ANY LEGALLY APPOINTED GUARDIAN, ATTORNEY-IN-FACT, EXECUTOR/TRIX, ESTATE ADMINISTRATOR, SOMEONE WITH POWER OF ATTORNEY OR THE LIKE FOR THE POLICYHOLDER

Name                   _____
Street Address        _____

City, State, Zip        _____
Phone                   _____
Email Address         _____
Person is:             ____ Legally Appointed Guardian
                            ____ Attorney-in-Fact
                            ____ Estate Administrator
                            ____ Executor/Executrix of Estate
                            ____ Power of Attorney
                            ____ Other (please specify) _____

3.  NAME, STATE AND DATES OF THE FACILITY FOR WHICH COVERAGE WAS SOUGHT AND DENIED (IF AVAILABLE)

Facility Name_____ State _____ Dates Resided there_____
Facility Name_____ State _____ Dates Resided there_____
Facility Name_____ State _____ Dates Resided there_____
Facility Name_____ State _____ Dates Resided there_____

4.  YOU MUST PROVIDE THE FOLLOWING INFORMATION TO BE ELIGIBLE FOR BENEFITS UNDER THIS SETTLEMENT.

All claims must be supported with documentation evidencing days of, types of and payments for services. CNA may have some of this information already in its possession but it is your responsibility to compile any additional information that you want considered.  You should provide as much information as possible that you believe will support your claim.

☐ I have included attachments with this Claim Form

5.  RELEASE

I AGREE TO BE BOUND BY ALL OF THE PROVISIONS IN THE SETTLEMENT AGREEMENT IN THIS CASE, INCLUDING GRANTING TO CONTINENTAL CASUALTY COMPANY ("DEFENDANT") A FULL AND COMPLETE RELEASE OF ALL RELEASED CLAIMS, AS DESCRIBED IN THE SETTLEMENT AGREEMENT AND THE COURT'S FINAL APPROVAL ORDER.  I UNDERSTAND THAT I AM BOUND BY THE RELEASE IN THE SETTLEMENT AGREEMENT EVEN IF THE CLAIM(S) I HAVE SUBMITTED FOR RE-EVALUATION ARE NOT

APPROVED AND I RECEIVE NO MONETARY BENEFIT FROM THIS SETTLEMENT.   I CERTIFY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

FOR SIGNERS WHO ARE NOT THE POLICYHOLDER:  I CERTIFY THAT I AM LEGALLY AUTHORIZED BY THE POLICYHOLDER TO BIND HIM OR HER TO THE PROVISIONS OF THE RELEASE IN THE SETTLEMENT AGREEMENT.

_____          _____          _____/____/____
*Signature (required)*          *Print Name*          *Month/Day/Year*

**6. MAIL YOUR CLAIM FORM.**

This Claim Form must be postmarked by **Month 00, 2018** and mailed to:

XXXXX XXXX
PO Box XXXX
City, ST Zip Code

# EXHIBIT E

<u>**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WISCONSIN**</u>

# You may be entitled to a monetary payment from a class action settlement because of a previous denial of a claim for benefits under your long term care insurance policy with CNA.

*A federal court authorized this notice.  This is not a solicitation from a lawyer.*

- A class action lawsuit was filed in 2015 challenging Continental Casualty Company's ("Defendant" or "CNA") denial of certain claims for stays in assisted living facilities in certain states under certain CNA long term care insurance policies.

- CNA's records show that you are or were a long term care insurance policyholder with a policy that is included in the settlement.  You may be eligible for a monetary payment under this proposed settlement if you made a prior claim for a stay in an assisted living facility in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee or Wisconsin, CNA denied your claim, and you satisfy the other requirements of this settlement.

- This notice relates to your potential eligibility for a monetary payment based on a past assisted living facility claim denial. If you still have an active and in force policy, you will also receive a separate notice that explains how your rights under your policy will be impacted by this settlement going forward.

- Your legal rights are affected whether you act, or don't act.  Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **YOU CAN SUBMIT A CLAIM FORM** | This is the only way to obtain a monetary payment under this settlement if you qualify. |
| **YOU CAN ASK TO BE EXCLUDED** | If you ask to be excluded, you will not be eligible to receive a monetary payment under the settlement and you should not submit a claim form. You may not object.  You may sue the Defendant as part of another lawsuit over the claims resolved by this settlement. |
| **YOU CAN OBJECT** | You can write to the Court about why you don't agree with the settlement. If you object, you will still be eligible to receive benefits under the settlement if it is approved provided that you also submit a valid claim form. |
| **YOU CAN GO TO A HEARING** | If you do not ask to be excluded, you can ask to speak in Court about the settlement. |
| **YOU CAN DO NOTHING** | If you do nothing, you give up rights to sue the Defendant as part of another lawsuit over the claims resolved by this settlement and you will not be eligible for any monetary payment under the settlement. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the settlement.  Monetary payments under the settlement will only become available if the Court approves the settlement and the settlement becomes final.  Your patience during this process is greatly appreciated.

QUESTIONS? CALL **1-800-000-0000** TOLL FREE, OR VISIT <u>WWW._____</u>.COM

## WHAT THIS NOTICE CONTAINS

BASIC INFORMATION ................................................................................. PAGE 3
    1. Why was this notice issued?
    2. What is this lawsuit about?
    3. Why is this a class action?
    4. Why is there a settlement?

WHO IS IN THE SETTLEMENT ..................................................................... PAGE 4
    5. How do I know if I am part of the settlement?
    6. Which policies are included?
    7. What can I do if I am still not sure if I am included?

THE SETTLEMENT BENEFITS—WHAT YOU GET IF YOU QUALIFY ............................. PAGE 5
    8. What does the settlement provide?

HOW TO APPLY FOR BENEFITS ................................................................... PAGE 6
    9. How can I apply for benefits?
    10. How will my benefits be determined?
    11. When will I get my benefits?
    12. Will receiving benefits impact my taxes?
    13. What am I giving up to get benefits or stay in the Class?

EXCLUDING YOURSELF FROM THE SETTLEMENT ....................................... PAGE 7
    14. How do I get out of the settlement?
    15. If I am a Class I Member and do not exclude myself, can I sue the Defendant for the same thing later?
    16. If I exclude myself, can I get benefits from this settlement?

THE LAWYERS REPRESENTING YOU ............................................................ PAGE 8
    17. Do I have a lawyer in this case?
    18. How will the lawyers be paid?

OBJECTING TO THE SETTLEMENT ............................................................... PAGE 8
    19. How do I tell the Court if I do not like the settlement?
    20. What is the difference between objecting and asking to be excluded?

THE COURT'S FAIRNESS HEARING ............................................................. PAGE 9
    21. When and where will the Court decide whether to approve the settlement?
    22. Do I have to come to the hearing?
    23. May I speak at the hearing?

IF YOU DO NOTHING ................................................................................. PAGE 10
    24. What happens if I do nothing at all?

GETTING MORE INFORMATION ................................................................... PAGE 10
    25. How do I get more information about the settlement?

# BASIC INFORMATION

## 1.  Why was this notice issued?

You have received this notice because CNA's records show that you (or your deceased relative, or someone for whom you act as a representative) are or were a CNA long term care insurance policyholder and that you may be eligible for a monetary payment under this proposed settlement if you had a claim denied for a stay at an assisted living facility in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee or Wisconsin during the relevant time period.  A Court authorized this notice because you have a right to know about a proposed settlement of this class action with CNA, and about all of your options, before the Court decides whether to give "final approval" to the settlement.  This notice explains the lawsuit, the settlement, your legal rights, and the benefits provided by the settlement.

The United States District Court for the Western District of Wisconsin is overseeing this class action.  The case is known as *Daluge, et. al., v. Continental Casualty Company*, No. 3:15-cv-00297.  The people who sued are called the "Plaintiffs," and the company they sued, Continental Casualty Company, is called the "Defendant" or "CNA."

## 2.  What is this lawsuit about?

The lawsuit stems from CNA's denial of certain claims for stays in assisted living facilities in certain states.  CNA denied the claims at issue because it believed that these facilities cannot and did not provide the level of care and services required by the policy.  The Plaintiffs believe these claims should not have been denied and should have been paid.  CNA strongly denies any wrongdoing and asserts that it complied with all laws and other requirements in connection with these policies.  CNA also says that any and all coverage denials were correct under the terms of the policies.

## 3.  Why is this a class action?

In a class action, one or more people called "Class Representatives" sue on behalf of people who the court determines have similar claims.  Collectively these people are a "Class" or "Class members."  This notice relates to the portion of the settlement that details the recovery of monetary benefits.  The Class and the Class members who may be entitled to monetary benefits are referred to as "Class I" and the "Class I Members" herein.  Because this is a class action, one court resolves the issues for all Class I Members, except for those who exclude themselves from Class I.  If you had an in force policy as of July 1, 2017, you will receive a separate notice that relates to how assisted living facility claims in certain states will be treated in the future under your CNA policy.  That separate notice will relate to "Class II," which is not covered by this notice.

## 4.  Why is there a settlement?

The Court did not decide in favor of Plaintiffs or the Defendant.  Instead, both sides agreed to settle this case to avoid the cost and risk of trial.  The settlement does not mean that any law was broken or that the Defendant did anything wrong.  The Defendant denies all legal claims in this case.  The Class Representatives and their lawyers think the settlement is in the best interest of all Class I Members.

# WHO IS IN THE SETTLEMENT

To see if you are eligible for benefits from this settlement, you first have to determine if you (or your deceased relative) are a Class I Member.

## 5. How do I know if I am part of the settlement?

Class I includes all CNA policyholders with the Policies listed below (which you or someone you represent likely owns given that you received this notice) and (1) who made a claim under a policy relating to a stay in an assisted living facility in the states of Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee or Wisconsin on or after the start of the Period of Payment; (2) who were medically eligible for benefits; (3) but were not afforded coverage for the costs and expenses relating to the stay; (4) on grounds that included that the facility or facilities did not provide the requisite 24-hour-a-day nursing services by or under the supervision of a registered nurse, licensed practical nurse, or licensed vocational nurse; and (5) who suffered ascertainable damages as a result of being denied coverage.  Call Class Counsel, Sean K. Collins at 1-855-693-9256 if you are not sure whether you are included in the Class.

## 6. Which policies are included?

The settlement includes any individual LTC 1 series policy numbered 15203, 16356, or 17931 purchased from CNA that contains the following language:

LONG TERM CARE FACILITY    A place primarily providing Long-Term Care and related services on an inpatient basis, which:

1.  is licensed by the state where it is located; and

2.  provides skilled, intermediate, or custodial nursing care under the supervision of a physician; and

3.  has 24-hour-a-day nursing services provided by or under the supervision of a registered nurse (R.N.), licensed vocational nurse (L.V.N.), or licensed practical nurse (L.P.N.), and

4.  keeps a daily medical record of each patient; and

5.  may be either a freestanding facility or a distinct part of a facility such as a ward, wing, unit, or swing-bed of a hospital or other institution.

## 7. What can I do if I am still not sure if I am included?

Class Counsel, Sean K. Collins is available to answer your questions and can be contacted free of charge at 1-855-693-9256. Mr. Collins represents the class members, not CNA.

# THE SETTLEMENT BENEFITS—WHAT YOU GET IF YOU QUALIFY

### 8.  What does the settlement provide?

If you are a Class I Member, and you submit a valid claim form, the settlement provides for:

- Cash payment of up to 60% of the daily facility benefit for a stay at a Qualified Facility where you received Qualified Care, as defined below.  These benefits are applicable for each covered day of stays at a Qualified Facility, as defined below, during only the following time periods for that state:

  o   Arizona facilities:  May 18, 2009 to June 30, 2017 for Arizona-issued policies, and May 18, 2011 to June 30, 2017 for policies issued in states other than Arizona.
  o   Florida facilities:  May 18, 2010 to June 30, 2017.
  o   Georgia facilities:  May 18, 2009 to June 30, 2017.
  o   Indiana facilities:  May 18, 2005 to June 30, 2017.
  o   Iowa facilities:  May 18, 2005 to June 30, 2017.
  o   Kentucky facilities:  May 18, 2000 to June 30, 2017.
  o   Massachusetts facilities:  May 18, 2009 to June 30, 2017.
  o   Minnesota facilities:  May 18, 2009 to June 30, 2017.
  o   New York facilities:  May 18, 2009 to June 30, 2017.
  o   Tennessee facilities:  May 18, 2009 to June 30, 2017.
  o   Wisconsin facilities:  May 18, 2009 to June 30, 2017.

  The original claim for coverage must have been made on or after the start date for each state listed above, and the original claim must have been submitted to CNA in writing and/or denied by CNA in writing.

- For qualifying claims, cash reimbursement of up to 60% of the premiums you paid that would have been waived during the above stays if your claim(s) had originally been approved ("Waiver of Premium Benefit").

- "Qualified Care" means: **(1)** skilled nursing or intermediate nursing care – which is medical care above the level of assistance with the activities of daily living – at least three times a week; or **(2)** assistance with one of the following activities of daily living, with the frequency as indicated:  Bathing (at least three times a week), dressing (at least five times a week), transferring (at least once a day), eating (at least once a day), incontinence care (at least once a day), medication (at least three times a week), mobility (at least once a day), or toileting (at least once a day); or **(3)** confinement in a locked or lockable memory care or dementia unit serving patients who are elopement risks with regular assistance.  Care provided by friends or family members of any kind is not included.

- "Qualified Facility" means:

  o   The facility must be located in and registered with, licensed or certified by one of the following states:  Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee or Wisconsin; and

  o   The facility must be legally able to provide at least the following care:  (a) skilled nursing or intermediate nursing care – which is medical care above the level of assistance with ADLs – at least 3 times a week; or (b)  two or more of the following activities of daily living, with the frequency as indicated:  bathing (at least 3 times a week), dressing (at least 5 times a week), transferring (at least once a day), eating (at least once a day), incontinence care (at least once a day), medication (at least 3 times a week), mobility (at least once a day), and toileting (at least once a day); or (c) confinement in a locked or lockable memory care or dementia unit serving patients who are elopement risks with regular assistance with at least one of the activities of daily living identified in subpart (b) above; and

  o   An RN, LPN or LVN must be on-site at the facility at least 5 hours a day, 7 days a week, and on call the remainder of the time; and

QUESTIONS? CALL **1-800-000-0000** TOLL FREE, OR VISIT <u>WWW._____.COM</u>

- o The facility must confirm in writing that an RN, LPN or LVN is responsible for the implementation or delegation of responsibility for providing at a minimum the care set forth above to its residents on a twenty four (24) hour basis. The facility must further confirm in writing that sufficient numbers of facility personnel are available to provide at minimum the care set forth above to its residents on a twenty-four (24) hour basis and to meet the needs of residents at all times based on the residents' service programs; and

  - o The facility must maintain a record or records documenting the daily care and/or treatment provided to the policyholder.

- A cap of $4.85 million applies to the total of (1) all payments to be made to Class I members who submit valid claims, (2) settlement administration and notice costs not to exceed $75,000, (3) attorneys' fees and expense reimbursements, and (4) any contribution award payments to the named plaintiffs. To the extent that the total of all these payments exceeds $4.85 million, the approvable claims submitted by the Class I Members will be reduced proportionately below the 60% maximum by the percentage necessary to bring the total of all payments described in the preceding sentence within the $4.85 million payment cap.

- Settlement benefits will be offset by any other payments made to the Class I Member under his or her policy for the same time period claimed, such as, by way of example, for a previously approved home health care benefit. The settlement benefit payments shall be capped by any applicable benefit periods and maximums in the policy.

- To determine your daily benefit amount, consult the declarations page of your policy and, if applicable, any inflation protection rider you may have purchased.

- The actual terms of the Settlement Agreement control, this is a mere summary of those terms. The Settlement Agreement, available at www.XXXXX.com, provides more information on the Claims process.

## HOW TO APPLY FOR BENEFITS

### 9.  How can I apply for benefits?

To ask for monetary payment benefits, you must complete and mail the attached Claim Form. You can also get another copy of the Claim Form at www._____.com. The Claim Form describes what you must do to apply for benefits. Please read the instructions carefully, fill out the Claim Form, and mail it postmarked no later than **Month 00, 2018**:

> XXX XXXXX
> PO Box 0000
> City, ST 00000-0000

An envelope addressed to the claims administrator is included for your convenience. If you return a valid Claim Form, you will receive a benefits determination letter after all claims are reviewed. If you have questions about the claim process, you can call Class Counsel Sean K. Collins at (855) 693-9256 at no cost to you.

### 10.  How will my benefits be determined?

A claims administrator will review your Claim Form and any documents or other information you mail with your Claim Form. The administrator will determine your settlement benefits, subject to review by CNA and Class Counsel (see "Do I have a lawyer in this case?" section below). You will then be informed of your eligibility for benefits. If you disagree with the claim administrator's final determination of your claim, you may appeal by mailing a notice of objection to the claim administrator, explaining the basis for your appeal or disagreement. Your notice of appeal must be postmarked no later than 30 days from the date that the claim administrator mailed the final determination letter to you. If you timely submit a notice of appeal, an independent neutral evaluator agreed upon by Plaintiffs and Defendant (and approved by the Court) will issue a binding, non-appealable decision within 30 days of receiving the notice of your appeal. The

decision by the neutral evaluator is final and binding, and not subject to further appeal or review.  The Settlement Agreement, available at www.XXXXX.com, provides more information on the Claims process.

## 11.  When will I get my benefits?

If you are a Class I Member and you send in a valid Claim Form on time, any benefits you may be eligible for will be paid after the Court grants final approval of the settlement, any appeals to the Federal Appellate Court(s) of the final settlement approval are resolved, and the settlement claims process is fully completed.  The settlement claims process and appeals of the final settlement approval, if any are filed, can take time to resolve, so your patience is appreciated.

## 12.  Will receiving benefits impact my taxes?

Receiving benefits under the settlement could have tax consequences for you, depending on your personal circumstances.  Neither the Plaintiffs nor the Defendant, nor any of their counsel, can provide advice concerning the possible tax consequences for you.  You should consult with your own tax advisor regarding the tax consequences of any payments, contributions or credits provided under the settlement along with any tax reporting obligations.

## 13.  What am I giving up to get benefits or stay in the Class?

If the settlement becomes final, Class I Members that submit a Claim Form or do nothing at all will be releasing the Defendant from all of the claims described and identified in the Settlement Agreement.  This means you will no longer be able to sue the Defendant regarding any of the claims described in the Settlement Agreement.  You will be bound by all of the provisions in the Settlement Agreement, including granting to Defendant a full and complete release of all Released Claims, as described in Section III of the Settlement Agreement and the Court's Final Approval Order.  This includes any Released Claims you now have or ever had relating to benefits under your Policy that are related to the allegations in this lawsuit.  The release does not prevent you from making a future claim to enforce the terms of the Settlement Agreement or other claims unrelated to this matter.  You should consult the Settlement Agreement at www.address.com for further details.  You can talk to the law firms representing Class I for free (see "Do I have a lawyer in this case?" section below) or you can, at your own expense, talk to your own lawyer if you have any questions about the settlement, the released claims or what they mean.

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you are a Class I Member and do not want any benefits to which you may be entitled from this settlement, but you want to keep the right to sue the Defendant about the issues resolved by the settlement that relate to the monetary benefits offered, then you must take steps to get out of the settlement.  This is called excluding yourself from Class I — or is sometimes referred to as "opting out" of Class I.

## 14.  How do I get out of the settlement?

If you are a Class I Member, to exclude yourself from the settlement as it relates to the monetary benefits offered, you must send a letter by mail saying that you want to be excluded from *Daluge v. Continental Casualty Company*.  Be sure to include the case number (3:15-cv-00297), your full name, address, policy number(s) for your long-term care insurance, and signature.  You must mail your request for exclusion postmarked by **Month 00, 2018** to:

XXXXX XXXXXX
PO Box 0000
City, ST 00000-0000

You can't exclude yourself on the phone, by email, or at the website.

## 15.  If I am a Class I Member and do not exclude myself, can I sue the Defendant for the same thing later?

No.  Unless you exclude yourself, you give up any right to sue the Defendant for all of the claims that this proposed settlement resolves relating to the monetary benefits offered.  You must exclude yourself to start your own lawsuit, continue with a lawsuit, or be part of any other future lawsuit seeking damages relating to the claims in this case. Remember, the exclusion deadline is **Month 00, 2018**.

## 16.  If I exclude myself, can I get benefits from this settlement?

No.  If you exclude yourself, you may not apply for any monetary payments under the proposed settlement and you cannot object to the proposed settlement as it relates to any monetary benefits.  However, if you ask to be excluded, you may sue, continue to sue, or be part of a different lawsuit against the Defendant in the future seeking damages relating to the claims in this case. If you ask to be excluded, you will not be bound by anything that happens in this lawsuit relating to the monetary benefits offered by this Class I settlement.

# THE LAWYERS REPRESENTING YOU

## 17.  Do I have a lawyer in this case?

The Court appointed (1) Sean K. Collins of the Law Offices of Sean K. Collins, (2) Lionel Z. Glancy and Ex Kano Sams II of Glancy Prongay & Murray LLP, (3) Jeffrey Goldenberg of Goldenberg Schneider LPA, and (4) Janet E. Pecquet of Burke & Pecquet, LLC  to represent you and other Class I Members as "Class Counsel."  You do not have to personally pay Class Counsel. Class Counsel Sean K. Collins is available to answer any questions you may have about this settlement or the claim process and can be reached at (855) 693-9256. If you want to be represented by your own lawyer, and have that lawyer appear in court for you in this case, you may hire one at your own expense.

## 18.  How will the lawyers be paid?

Class Counsel will ask the Court for a combined award of attorneys' fees and expense reimbursements not to exceed $1,300,000, and contribution awards to the Class Representatives in an amount not to exceed $17,500 per person for each of the three Class Representatives.  The Class Representatives' contribution awards are a way to recognize the efforts made by the Class Representatives on behalf of Class I and Class II.  The Court must approve all payments and may award less than these amounts.  The Defendant will pay the fees, expenses and contribution awards as approved by the Court.  The Defendant will also pay the costs to administer the settlement.  All these costs are subject to the $4.85 million payment cap, as described in paragraph 18, above.

# OBJECTING TO THE SETTLEMENT

You can tell the Court if you do not agree with the settlement or some part of it.

## 19.  How do I tell the court if I do not like the settlement?

If you stay in Class I and you do not want the Court to approve the settlement, you may file a written objection.  You can give reasons why you think the Court should not approve it.  To object, send a letter saying that you object to *Daluge v. Continental Casualty Company*.  Be sure to include the case number (3:15-cv-00297), your name, address, telephone number, your signature, the reasons why you object to the settlement, and all documents you want the Court to consider. Mail the objection to each of the three addresses below so that it is postmarked no later than **Month 00, 2018**:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of the Court<br>_____<br>_____ | Sean K. Collins<br>Law Offices of Sean K. Collins<br>184 High Street, Suite 503<br>Boston, MA 02110 | Brent R. Austin<br>Eimer Stahl LLP<br>224 S. Michigan Avenue, Suite 1100<br>Chicago, IL  60604 |

## 20.  What is the difference between objecting and asking to be excluded?

Objecting is simply telling the Court that you don't like something about the settlement.  You can object only if you are a Class I Member and choose to stay in Class I.  Excluding yourself is telling the Court that you don't want to be part of Class I relating to the monetary benefits offered by this settlement.  If you exclude yourself, you have no basis to object to the monetary benefits offered by this settlement because the case as it relates to these monetary benefits no longer affects you.

# THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the settlement.  You may attend and you may ask to speak, but you do not have to.

## 21.  When and where will the Court decide whether to approve the settlement?

The Court has scheduled a Fairness Hearing at **00:00 p.m.** on **Month 00, 2018**, at the United States District Court for the Western District of Wisconsin, 120 North Henry Street, Madison, WI 53703 in **Courtroom 000.**  The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www._____.com or call 1-800-000-0000 for current information.

At this hearing, the Court will consider whether the settlement is fair, reasonable, and adequate.  If there are objections, the Court will consider them.  The Court may listen to people who have asked to speak about an objection (*see* Objecting to the Settlement).  The Court may also decide how much to award Class Counsel as fees for representing the Classes and whether and how much to award the Class Representatives for representing the Classes.  At or after the hearing, the Court will decide whether to approve the settlement.   We do not know how long this decision will take.

## 22.  Do I have to come to the hearing?

No.  Class Counsel will answer any questions that the Court may have.  But, you are welcome to come at your own expense.  If you send an objection, you do not have to come to Court to talk about it.  As long as you filed and mailed your written objection on time, the Court will consider it.  You may also pay your own lawyer to attend if you so choose.

## 23.  May I speak at the hearing?

Yes.  You, or an attorney you hire at your own expense, may ask the Court for permission to speak at the Fairness Hearing.  To do so, you must send a letter saying that it is your "Notice of Intent to Appear in *Daluge v. Continental Casualty Company.*"  Be sure to include your name, address, telephone number, and your signature, any documents you will seek to introduce and witnesses who you want to testify at the hearing.  Your Notice of Intent to Appear must be postmarked no later than **Month 00, 2018**, and be sent to the addresses listed in Question 19.

# IF YOU DO NOTHING

## 24.  What happens if I do nothing at all?

If you are a Class I Member and you do nothing, you will get no benefits from this settlement.  And, unless you exclude yourself, you will not be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against the Defendant about the claims released in this case.

# GETTING MORE INFORMATION

## 25.  How do I get more information about the settlement?

This notice merely summarizes the proposed settlement, the actual terms of the settlement are in the Settlement Agreement.  You can get a copy of the Settlement Agreement at www._____.com.  You may also call with questions to 1-800-000-0000 or write to _____, PO Box 0000, City, ST 00000-0000.  You can also call Class Counsel Sean K. Collins at (855) 693-9256 with any questions you may have regarding the settlement, at no cost to you.

# EXHIBIT F

<u>**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WISCONSIN**</u>

# You may be entitled to expanded claims standards for your CNA long term care insurance policy because of a class action settlement.

*A federal court authorized this notice.  This is not a solicitation from a lawyer.*

- This is a class action about whether Continental Casualty Company ("Defendant" or "CNA") acted appropriately in the handling claims for stays in assisted living facilities in certain states under certain CNA long term care insurance policies.

- CNA's records show that you are a long term care insurance policyholder and that you are therefore automatically eligible for certain benefits through the proposed settlement.

- Your legal rights are affected whether you act, or don't act.  Read this notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| **YOU CAN OBJECT** | You can write to the Court about why you don't agree with the settlement. |
| **YOU CAN GO TO A HEARING** | You can ask to speak in court about the settlement. |
| **YOU CAN DO NOTHING** | If you do nothing, you will automatically receive the benefits of the settlement, and you give up your right to object to the settlement. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the settlement.  Benefits under the settlement will only become available if the Court approves the settlement and the settlement becomes final.  Your patience during this process is greatly appreciated.

## WHAT THIS NOTICE CONTAINS

BASIC INFORMATION ................................................................................. PAGE 3
    1.  Why was this notice issued?
    2.  What is this lawsuit about?
    3.  Why is this a class action?
    4.  Why is there a settlement?

WHO IS IN THE SETTLEMENT ..................................................................... PAGE 3
    5.  How do I know if I am part of the settlement?
    6.  Which policies are included?
    7.  What can I do if I am still not sure if I am included?

THE SETTLEMENT BENEFITS—WHAT YOU GET ........................................ PAGE 4
    8.  What does the settlement provide?

HOW TO GET BENEFITS ............................................................................ PAGE 5
    9.  How can I get benefits?
    10. When will I get my benefits?
    11. What am I giving up to get benefits?
    12. Can I choose to not participate in the Settlement?

THE LAWYERS REPRESENTING YOU ......................................................... PAGE 6
    13. Do I have a lawyer in this case?
    14. How will the lawyers be paid?

OBJECTING TO THE SETTLEMENT ............................................................ PAGE 6
    15. How do I tell the Court if I do not like the settlement?

THE COURT'S FAIRNESS HEARING ........................................................... PAGE 7
    16. When and where will the Court decide whether to approve the settlement?
    17. Do I have to come to the hearing?
    18. May I speak at the hearing?
    19. What happens if I do nothing at all?

GETTING MORE INFORMATION ................................................................PAGE 8
    20. How do I get more information about the settlement?

# BASIC INFORMATION

### 1. Why was this notice issued?

You received this notice because CNA's records show that you are a long term care insurance policyholder of Continental Casualty Company and that you are eligible for certain future benefits through this proposed settlement. A Court authorized this notice because you have a right to know about a proposed settlement of this class action with the Defendant, and about all of your options, before the Court decides whether to give "final approval" to the settlement. This notice explains the lawsuit, the settlement, your legal rights, and the benefits provided by the settlement.

The United States District Court for the Western District of Wisconsin is overseeing this class action. The case is known as *Daluge, et. al., v. Continental Casualty Company*, No. 3:15-cv-00297. The people who sued are called the "Plaintiffs," and the company they sued, Continental Casualty Company, is called the "Defendant" or "CNA."

### 2. What is this lawsuit about?

The lawsuit stems from CNA's denial of certain claims for stays in assisted living facilities in certain states. CNA denied the claims at issue because it believed that these facilities cannot and did not provide the level of care and services required by the policy. The Plaintiffs believe these claims should not have been denied and should have been paid. CNA strongly denies any wrongdoing and asserts that it complied with all laws and other requirements in connection with these policies. CNA also says that any and all coverage denials were correct under the terms of the policies.

You are receiving this notice because, in connection with this settlement, claims handling standards for your long term care insurance policy are being expanded. You may benefit from these expanded standards in the future, if you ever make a claim for a stay in an assisted living facility in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee or Wisconsin.

### 3. Why is this a class action?

In a class action, one or more people called "Class Representatives" sue on behalf of people who the court determines have similar claims. All these people are a "Class" or "Class members." One court resolves the issues for all Class members.

### 4. Why is there a settlement?

The Court did not decide in favor of Plaintiffs or the Defendant. Instead, both sides agreed to settle this case to avoid the cost and risk of a trial. The settlement does not mean that any law was broken or that the Defendant did anything wrong. The Defendant denies all legal claims in this case. The Class Representatives and their lawyers think the settlement is in the best interest of all Class members.

# WHO IS IN THE SETTLEMENT

To see if you are eligible for benefits from this settlement, you first have to determine if you are a Class member.

### 5. How do I know if I am part of the settlement?

The Class includes all CNA policyholders with the policies listed below that are in-force as of July 1, 2017. Call 1-800-000-0000 if you are not sure whether you are included in the Class or you may call Class Counsel, Sean K. Collins at 1-855-693-9256 at no cost to you. Mr. Collins represents the class members, not CNA.

## 6. Which policies are included?

The settlement includes any individual LTC 1 series policy numbered 15203, 16356, or 17931 purchased from CNA that contains the following language:

LONG TERM CARE FACILITY   A place primarily providing Long-Term Care and related services on an inpatient basis, which:

1.  is licensed by the state where it is located; and

2.  provides skilled, intermediate, or custodial nursing care under the supervision of a physician; and

3.  has 24-hour-a-day nursing services provided by or under the supervision of a registered nurse (R.N.), licensed vocational nurse (L.V.N.), or licensed practical nurse (L.P.N.), and

4.  keeps a daily medical record of each patient; and

5.  may be either a freestanding facility or a distinct part of a facility such as a ward, wing, unit, or swing-bed of a hospital or other institution.

This settlement however relates only to coverage at assisted living facilities in the following states: Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee or Wisconsin. Claim standards related to facilities located outside of these 11 states are not impacted whatsoever by this settlement.

## 7. What can I do if I am still not sure if I am included?

If you received this Notice, CNA believes you are part of the settlement. If you still have questions, you can call 1-800-000-0000 or you may call Class Counsel, Sean K. Collins at 1-855-693-9256, at no cost to you.

# THE SETTLEMENT BENEFITS—WHAT YOU GET

## 8. What does the settlement provide?

If you are a Class member, CNA is required to change the way in which it handles future claims for stays on or after July 1, 2017 in assisted living facilities in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee and Wisconsin. These changes will allow for coverage in more situations than CNA was providing prior to this lawsuit. These revised standards provide that going forward in order to receive facility benefits under the policies at issue for a stay at an assisted living facility in one of these 11 states, the following must apply:

- The policyholder must reside in the facility and receive care from personnel of that facility as set forth below. Facility personnel must be employed by, contracted with, or work for the facility. Home health care providers or outside third party care providers not contracted with the facility, or care provided by friends or family members of any degree or kind, will not qualify. The facility personnel must be present 24-hours-a-day, and be able to provide the care described below.

- The facility must be registered with, licensed or certified by the state and is legally able to provide at least the care set forth below.

- An RN, LPN or LVN must be on-site at least 5 hours a day, 7 days a week, and on call the remainder of the time. The facility must confirm in writing that an RN, LPN or LVN is responsible for the implementation or delegation of responsibility for providing at minimum the care set forth below to its residents on a twenty four (24) hour basis. The facility must further confirm in writing that sufficient numbers of facility personnel are available to provide at minimum the care set forth below to its residents on a twenty-four (24) hour basis and to meet the needs of residents at all times based on the residents' service programs.

- The policyholder must receive assistance from facility personnel with any of the following:

  o skilled nursing or intermediate nursing care – which is medical care above the level of assistance with ADLs – at least 3 times a week; or

  o two or more of the following activities of daily living, with the frequency as indicated: bathing (at least 3 times a week), dressing (at least 5 times a week), transferring (at least once a day), eating (at least once a day), incontinence care (at least once a day), medication (at least 3 times a week), mobility (at least once a day), and toileting (at least once a day); or

  o regular assistance with at least one of the activities of daily living identified above if the policyholder is confined in a locked or lockable memory care or dementia unit serving patients who are elopement risks.

- Every six months, a physician associated with the facility or the insured's personal physician must certify that the policyholder's care needs, as described above, are being met by the facility.

- The facility must verify in writing that it maintains a record documenting the daily care and/or treatment provided to the policyholder.

- The actual terms of the Settlement Agreement control, this is a mere summary of those terms. The Settlement Agreement, available at www.XXXXX.com, provides more information on the settlement.

# HOW TO GET BENEFITS

## 9.  How can I get benefits?

As a current policyholder as of July 1, 2017, you automatically receive the benefit of these changes in claims handling practices if you file a claim for an assisted living facility stay in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee or Wisconsin in the future. In that event, your claim may or may not be paid, depending on whether it satisfies the new agreed-upon criteria. For policyholders who want to seek coverage for a stay at an assisted living facility now, whether you are residing at such a facility now (or as of July 1, 2017) or planning to move in the near future, you must first initiate a claim with CNA in accordance with the terms of your policy. If you have any questions, you can contact Class Counsel Sean K. Collins at (855) 693-9256.

## 10.  When will I get my benefits?

Your benefits provided by this settlement will only be available after the Court grants "final approval" of the settlement, and after any appeals have been resolved. If the Judge approves the settlement after a hearing on **Month 00, 2018** (*see* the section "The Court's Fairness Hearing" below), there may be appeals. Resolving these appeals can take time, so your patience is greatly appreciated.

## 11.  What am I giving up to get benefits?

If the settlement becomes final, Class members will be releasing the Defendants for all the claims described and identified in the Settlement Agreement. You will be bound by all of the provisions in the Settlement Agreement in this case, including granting to Defendant a full and complete release of all Released Claims, as described in Section III of the Settlement Agreement and the Court's Final Approval Order. This includes any claims you have or may ever have relating to the interpretation, application, implementation or enforcement of the long term care facility benefit of the

Policies as applied to claims for stays in assisted living facilities in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee or Wisconsin.  The release does not prevent you from making a future claim to enforce the terms of the Settlement Agreement, nor does it impact claims you may file that are not the subject of this lawsuit.  You should consult the Settlement Agreement at www.address.com for further details.  Class Counsel Sean K. Collins is available to answer questions you may have for free and can be reached at 1-855-693-9256, or you can, of course, talk to your own lawyer if you have questions about the released claims or what they mean.

### 12.  Can I choose to not participate in the settlement?

No.  Because this class settlement does not involve money damages, but instead involves changes to the way CNA will handle certain coverage claims in the future for stays at assisted living facilities in certain states, class members may not exclude themselves from—or, as is sometimes referred to, "opt out" of—the Class.   Under the terms of the settlement, you give up any right to sue or be part of any other lawsuit against the Defendant for the claims that are released by this settlement, namely, as they relate to coverage for stays at assisted living facilities in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee and Wisconsin under the Long Term Care Facility Benefit.

# THE LAWYERS REPRESENTING YOU

### 13.  Do I have a lawyer in this case?

The Court appointed (1) Sean K. Collins of the Law Offices of Sean K. Collins, (2) Lionel Z. Glancy and Ex Kano Sams II of Glancy Prongay & Murray LLP, (3) Jeffrey Goldenberg of Goldenberg Schneider LPA, and (4) Janet E. Pecquet of Burke & Pecquet,  to represent you and other Class members as "Class Counsel."  You do not have to personally pay Class Counsel. Class Counsel Sean K. Collins is available to answer any questions you may have about this settlement free of charge and can be reached at (855) 693-9256. If you want to be represented by your own lawyer, and have that lawyer appear in court for you in this case, you may hire one at your own expense.

### 14.  How will the lawyers be paid?

Class Counsel will ask the Court for a combined award of attorneys' fees and expense reimbursements not to exceed $1,300,000, and contribution awards to the Class Representatives in an amount not to exceed $17,500 per person for each of the three Class Representatives.  The Class Representatives' contribution awards are a way to recognize the efforts made by the Class Representatives on behalf of the Class.  The Court must approve all payments and may award less than this amount.  The Defendant will pay the fees, expenses and contribution awards as approved by the Court.  The Defendant will also pay the costs to administer the settlement.  All these costs are subject to a $4.85 million payment cap, as described in the Settlement Agreement.

# OBJECTING TO THE SETTLEMENT

You can tell the Court if you do not agree with the settlement or some part of it.

### 15.  How do I tell the Court if I do not like the settlement?

If you do not want the Court to approve the settlement, you must file a written objection.  You must give reasons why you think the Court should not approve it.  To object, send a letter saying that you object to *Daluge v. Continental Casualty Company*.  Be sure to include the case number (3:15-cv-00297), your name, address, telephone number, your signature, the reasons why you object to the settlement, and all documents you want the Court to consider.  Mail the objection to each of the three addresses below so that it is postmarked no later than **Month 00, 2018**:

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of the Court<br>_____<br>_____ | Sean K. Collins<br>Law Offices of Sean K. Collins<br>184 High Street, Suite 503<br>Boston, MA 02110 | Brent R. Austin<br>Eimer Stahl LLP<br>224 S. Michigan Avenue, Suite 1100<br>Chicago, IL  60604 |

# THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the settlement.  You may attend and you may ask to speak, but you do not have to.

## 16.  When and where will the Court decide whether to approve the settlement?

The Court has scheduled a Fairness Hearing at **00:00 p.m. on Month 00, 2018,** at the United States District Court for the Western District of Wisconsin, 120 North Henry Street, Madison, WI 53703 in **Courtroom 000.**  The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www._____.com or call 1-800-000-000 for current information.

At this hearing, the Court will consider whether the settlement is fair, reasonable, and adequate.  If there are objections, the Court will consider them.  The Court may listen to people who have asked to speak about an objection (*see* Questions 18 and 21).  The Court may also decide how much to award Class Counsel as fees and expenses for representing the Class and whether and how much to award the Class Representatives for representing the Class.  At or after the hearing, the Court will decide whether to approve the settlement.  We do not know how long this decision will take.

## 17.  Do I have to come to the hearing?

No.  Class Counsel will answer any questions that the Court may have.  But, you are welcome to come at your own expense.  If you send an objection, you do not have to come to Court to talk about it.  As long as you filed and mailed your written objection on time, the Court will consider it.  You may also pay your own lawyer to attend if you so choose.

## 18.  May I speak at the hearing?

Yes.  You, or an attorney you hire at your own expense, may ask the Court for permission to speak at the Fairness Hearing.  To do so, you must send a letter saying that it is your "Notice of Intent to Appear in *Daluge v. Continental Casualty Company.*"  Be sure to include your name, address, telephone number, and your signature, any documents you will seek to introduce and witnesses who you want to testify at the hearing.  Your Notice of Intent to Appear must be postmarked no later than **Month 00, 2018**, and be sent to the addresses listed in Question 15.

## 19.  What happens if I do nothing at all?

If you are a Class member and you do nothing, and the settlement becomes final, you will get the benefits from this settlement.

GETTING MORE INFORMATION

| 20.  How do I get more information about the settlement? |
| --- |

This notice merely summarizes the proposed settlement, the actual terms of the settlement are in the Settlement Agreement.  You can get a copy of the Settlement Agreement at www._____.com.  You may also call with questions to 1-800-000-0000 or write to _____, PO Box 0000, City, ST 00000-0000. You can also call Class Counsel Sean K. Collins at (855) 693-9256 free of charge with any questions you may have regarding the settlement.

# EXHIBIT G

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| GWEN B. DALUGE, MURRAY YOUNG, AND HELENE K. BIRNBAUM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> CONTINENTAL CASUALTY COMPANY, <br><br> Defendant. | Civil Action No.: 3:15-cv-00297-WMC <br><br><br> SECOND AMENDED CLASS ACTION COMPLAINT <br><br><br> DEMAND FOR JURY TRIAL |

Plaintiffs Gwen B. Daluge, Murray Young, and Helene K. Birnbaum ("Plaintiffs"), bring this action on behalf of themselves and all others similarly situated (the "Class") against Defendant Continental Casualty Company ("Defendant" or "CNA").

### NATURE OF THE ACTION

1.    After decades of collecting billions of dollars in long-term care insurance premiums from its now elderly policyholders – and paying claims for years under certain policy forms while these consumers entered assisted-living facilities all over the country – CNA abruptly began denying claims for stays in assisted-living facilities that it had previously been

covering. Plaintiffs Gwen Daluge (Wisconsin), and Murray Young (Florida) both had previous claims paid at assisted-living facilities where CNA is now denying coverage.[1]

2.     Defendant has engaged in an illegal course of conduct designed to reduce its exposure to costly assisted-living facility claims in eleven states by asserting that the policies at issue were "written on a form that was designed exclusively to cover nursing facilities, not assisted-living facilities."

3.     CNA is engaged in this conduct in order to save money on claims, as it originally mispriced the policies when they were sold in the early 1990's by using the claims experience of a "skilled nursing facility policy" sold by CNA from 1979 to 1986.

4.     Defendant has taken broadly-worded long-term care insurance policies that, for years, covered stays at facilities ranging from assisted-living to nursing facilities, and converted them to nursing facility-only policies in eleven states when the policy language does not support such a narrow reading. Indeed, even CNA itself did not previously interpret the policies so narrowly.

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

6.     Venue is appropriate because Plaintiff Ms. Daluge is a citizen of the State of Wisconsin. Venue is also proper in this Court because Defendant systematically transacts business in the State of Wisconsin, and certain causes of action set forth in this Complaint, in

---

[1] An additional absent class member from Massachusetts also had a previous claim paid at an assisted living facility before having a subsequent claim denied at the same type of facility.

part, arose in the State of Wisconsin.  The policies, moreover, were sold in Wisconsin, premium payments were made from Wisconsin, claim denial letters were sent from CNA to Wisconsin, and some of the assisted-living facilities for which coverage is sought are located in the State of Wisconsin, and regulated by the State of Wisconsin.

## THE PARTIES

7.      Plaintiff Gwen Daluge ("Ms. Daluge") is a 94-year-old individual currently residing on the assisted-living floor of Cedar Crest, a Janesville, WI, long-term care facility ("Cedar Crest").  Ms. Daluge is the owner of a CNA long-term care insurance "LTC1" policy, is owed benefits under her policy, and is a citizen of Wisconsin.

8.      Plaintiff Murray Young ("Mr. Young") is an 87-year-old individual currently residing at Brookdale Palm Beach Gardens ("Brookdale"), a Palm Beach Gardens, Florida assisted-living facility.[2] Mr. Young is the owner of a CNA long-term care insurance "LTC1" policy, is owed benefits under his policy, and is a citizen of Florida.

9.      Plaintiff Helene K. Birnbaum ("Ms. Birnbaum") is an 88-year-old individual currently residing at Newbridge on the Charles ("Newbridge"), a Cambridge, Massachusetts assisted-living facility.  Ms. Birnbaum is the owner of a CNA long-term care insurance "LTC1" policy, is owed benefits under her policy, and is a citizen of Massachusetts.

10.     Defendant CNA is a corporation organized under the laws of Illinois, is the underwriter of the policies, has the authority to approve and/or deny claims under the policies, is financially responsible for claims made on the policies and other liabilities in connection therewith, and has a principal place of business and headquarters in Illinois.  CNA's corporate citizenship is Illinois.

---

[2] Mr. Young's current claim is now being paid at Brookdale Palm Beach Gardens, however previous claims at two other assisted living facilities in Florida remain unpaid.

3

# FACTUAL ALLEGATIONS

11.     Long-term care insurance provides benefits to an insured in the event that the individual's health situation requires a level of care that she cannot safely provide for herself.

12.     The policies at issue in this litigation were sold nationwide decades before the vast majority of claims were filed. Regardless of where the policies were originally sold - there is no restriction on insureds to only use a policy in the state where it was purchased - the focus of this litigation is on CNA's practice of categorically excluding assisted living facility coverage for residents of the following eleven states: Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee and Wisconsin (the "Class States"). [3]

13.     In order to qualify for long-term care benefits under the policies, claimants are required to demonstrate: (1) they are medically eligible; and (2) that the facility at which they will reside meets the definition of a Long-Term Care Facility.

14.     CNA does not dispute that all three Plaintiffs are medically eligible for benefits. The dispute in this matter solely relates to what type of facility can qualify for coverage under the policies.

15.     The issue raised in this litigation is whether CNA's treatment of the policies as so-called nursing home-only policies – to the exclusion of assisted-living facilities in eleven states – is supported by the policies' language, and whether CNA's interpretation of such policies is in bad faith.

---

[3] CNA's practice of categorically excluding assisted living facility coverage is also occurring in the State of Connecticut as alleged in the currently pending *Gardner et. al. v Continental Casualty Company*, No. 13-cv-01918-JBA (Dist. of Conn.). The *Gardner* matter was recently certified by Judge Arterton as a FRCP 23(b)(2) and (3) class action. *See* Exhibit A.

16.     The policies generally define a facility at which an insured can stay and receive policy benefits as a "Long-Term Care Facility," [4] which is defined within the LTC1 policies as follows:

| | |
|---|---|
| LONG-TERM CARE FACILITY | A place primarily providing Long-Term Care and related services on an inpatient basis, which: |

1. is licensed by the state where it is located; and

2. provides skilled, intermediate, or custodial nursing care under the supervision of a physician; and

3. has 24-hour-a-day nursing services provided by or under the supervision of a registered nurse (R.N.), licensed vocational nurse (L.V.N.), or licensed practical nurse (L.P.N.), and

4. keeps a daily medical record of each patient; and

5. may be either a freestanding facility or a distinct part of a facility such as a ward, wing, unit, or swing-bed of a hospital or other institution.

A Long-Term Care Facility does not mean a hospital or clinic, boarding home, home for the aged or mentally ill, rest home, community living center, place that provides domiciliary, residential, or retirement care, place which operates primarily for the treatment of

---

[4] The Class Policies issued in Massachusetts use the term "Nursing Home" rather than "Long Term Care Facility" however the definition of Nursing Home in the Massachusetts issued policies is exceedingly broad and not limited to just skilled nursing facilities as CNA contends - it should cover assisted living facilities in Massachusetts and elsewhere that are capable of providing nursing care and related services, "A facility which is primarily engaged In providing nursing care and related services on an inpatient basis under a license issued by the Department of Public Health or the appropriate licensing agency of the state in which it is located. It may be a freestanding facility, or it may be a distinct part of a facility, including a ward, wing, unit or a swing-bed of a hospital or other institution."

alcoholics or drug addicts, or a hospice.[5]

*See* Exhibit B.

## The Plaintiffs' Assisted-Living Facilities
## Are Covered by the Policies

17.     Each of the three named Plaintiffs filed a claim for a stay at an assisted-living facility in their home state. Each of these assisted-living facilities provided "Long-Term Care" to inpatients, was licensed by the state, offered custodial-nursing care supervised by at least the insured's treating physician, had custodial-nursing care available as needed whenever needed 24/7, had licensed nurses providing or supervising the custodial-nursing care 24/7, had licensed nurses on call 24/7 covering times when licensed nurses were not physically present on-site, and kept a daily medical record of any care or services received by the Plaintiffs.

18.     Despite their assisted-living facilities meeting all of the requirements of a Long-Term Care Facility under the policies, all three Plaintiffs had their claims wrongfully denied by CNA.

19.     These denials breached the contract of insurance and were all made in bad faith to save money on costly assisted-living facility claims in the Class States.

## Contrary to CNA's Repeated Assertions, the Policies are
## Not Nursing Home Only Policies

20.     CNA repeatedly claimed in correspondence with insureds that the policies at issue here are nursing home[6] only policies:

---

[5] Class members' policies that contain the APC Benefit, which is not the subject of this litigation, also go on to note "However, care or services provided in these facilities may be covered subject to the conditions of the Alternate Plan of Care Benefit provision."

[6] CNA uses the terms "nursing home" or "nursing facility" to mean skilled nursing facility. For the sake of consistency, Plaintiffs here do the same.

- "[]Ms. Daluge's [LTC1] policy was marketed and sold as financial protection against a nursing home confinement, not for care rendered in CBRF's or other types of assisted living facilities." May 6, 2014 letter to Gwen Daluge;

- "*The policy does not cover care provided in an assisted living facility.*" (emphasis in original). October 7, 2011 letter to LTC1 class member/Georgia Department of Insurance;

- "The policy does not cover care provided in an assisted living facility." October 17, 2011 letter to LTC1 class member/Kentucky Department of Insurance;

- "Second, we must emphasize that the policy purchased by Ms. [LTC1 policyholder] provides benefits for services rendered in a 'Long Term Care Facility.' This is a specifically defined term in the contract, which requires that services be rendered to the policyholder in a state licensed facility providing continual nursing services, not an 'assisted living facility.' By its plain terms, Ms. [LTC1 policyholder]'s policy does not afford coverage for an 'assisted living facility' or an 'assisted living' level of care." July 28, 2010 letter to LTC1 class member/Indiana Department of Insurance.

- "The Policy was written on a form that was designed exclusively to cover nursing facilities, not assisted living facilities." July 21, 2011 letter and May 3, 2012 letter to policyholders in Connecticut/Connecticut Insurance Department;

- "The LTCF Benefit is designed to cover nursing facilities, not assisted living facilities." October 24, 2012 letter to policyholders in Connecticut/ Connecticut Insurance Department.

21.    In a letter to the State of Washington's Office of the Insurance Commissioner, CNA went to great lengths to explain why it was so important that the LTC1 policies, as well as those written previously by CNA including the "Con Care B" policy forms also covered by this litigation, needed to be treated as nursing home only policies.  Indeed, that is how CNA priced the policies, and allowing for coverage at assisted-living facilities would be very expensive for CNA:

### A.    The Policy's Cost-Basis, As Approved By The States, Was Skilled Nursing Facilities.

The 15203 Policy was designed in 1989-90 and sold between 1991 and 1994  At the time the Policy was designed, skilled nursing facilities were the predominant form of long term care. Skilled nursing facilities ("SNFs") are required to have a licensed nurse onsite at all times. *See* 42 U.S.C. § 1395i-3; 42 C.F.R. § 483.30 (a)(2); *and* Department of Health and Human Services, *Center For Medicare & Medicaid Services. Guide to Choosing a Nursing Home*, at 20. The 24-hour-a-day onsite nursing requirement was crucial to the development, pricing, and approval of the Policy.

Thus, in the actuarial memorandum submitted to all the states asking that the Policy be approved for sale, the estimates and pricing assumptions were based on claims experience under a prior skilled nursing facility policy (the "P1-52212"). *See* Memo Regarding Method of Premium Calculation policy form 15203-Series, enclosed herewith as Attachment A.  For example, the pricing memo bases its calculation of claim frequency on "actual claim experience of skilled nursing facility policy P1-52212 for years 1979 through 1986." *Id.* Further, the calculation of average length of stay was based on the Continental's experience under the same skilled nursing facility policy. *Id*  Projected costs for were also adjusted to reflect the claims experience under the P1-52212 policy. *Id.*

This was the cost and pricing analysis that the states had when they approved the 15203 Policy for sale – including for sale in the State of Washington.  Such skilled nursing facilities had nurses onsite 24-hours-a-day.

*See* Exhibit C.

22.    CNA used loss ratios for nursing home only policies, but sold policies that afforded coverage beyond traditional nursing homes.  How CNA decided to price the loss ratios on the policies has absolutely nothing to do with the language CNA used to trigger coverage under the policies.

23. When the policies were written, the long-term care insurance industry knew that change in the delivery of long-term care was on the horizon, and given that claims under the policies were still decades away, CNA chose a broad definition to stay competitive with products sold by other carriers, choosing to cover more than traditional nursing homes. Actuarial Standard of Practice ("ASOP") No. 18 Long-Term Care Insurance, effective as of July 1991,[7] specifically noted that actuaries should be aware that new services may be developed and the fear and stigma associated with confinement could erode:

> Actuaries are accustomed to using current and past morbidity and other data as a basis for projecting future costs. Currently for LTC, such data come from a variety of sources and tend to be incomplete; great care and careful interpretation are needed in using such LTC data. Furthermore, there are a number of factors that could affect the reliability of projections based on currently available LTC morbidity data. For example:…e. The current stigma and fear associated with nursing home confinement might erode if improved funding made these more attractive places for care…i. New LTC services may be developed.

24. Simply because CNA mispriced these policies by relying on loss ratios associated with a skilled nursing facility form does not give CNA license to change the policies' terms to comport with the financial results that CNA needs to achieve. Treating these policies as nursing home only policies – to the exclusion of assisted-living facilities that meet the Long-Term Care Facility definition – breaches the insurance policy contract and is done in bad faith to achieve financial targets.

25. After CNA denies an insured's claim for a stay at an assisted-living facility, CNA provides the insured with a list of Medicare certified skilled nursing homes where coverage would be afforded. However, these nursing facilities are often twice the cost of an assisted-living facility, so the daily benefit amount under the CNA policy often does not come close to

---

[7] ASOP No. 18 (July 1991) was later superseded, but was in effect when most, if not all, of the policies at issue here were first written: http://www.actuarialstandardsboard.org/pdf/superseded/asop18_032.PDF at 5-6.

covering the full cost of the expensive nursing facility. In addition, skilled-nursing facilities provide a level of institutionalized medical care that far exceeds the needs of a claimant suffering from a cognitive impairment, such as Alzheimer's disease, or physical impairments that necessitate assistance with activities of daily living.

26.     For these reasons and others, after CNA denies an assisted-living facility claim, most insureds stay in the assisted-living facility and pay out-of-pocket, rather than move to a skilled nursing facility that CNA will agree to cover, thus drastically reducing CNA's claim liability on the policies in the Class States.

27.     As noted by CNA's former Actuarial Director during a March 2011 presentation discussing the advent of assisted-living facilities and the effect on the pricing of long-term care insurance policies in general:

> …I think a lot of us really failed to appreciate that here we have places where people actually wanted to live. And that points back to that first ASOP where they talk about stigma of the nursing facilities. And people use these [assisted living] facilities fairly frequently. On our CNA individual block [of long term care insurance], for the open claims on the policy forms where the assisted living facility benefits are available, ***about a third of the open claims now are assisted living facility claims, so they are pretty prevalent***. ***And you get really long continuance because they get into these facilities and that's where they stay until they die or until they get kicked out because the facility can't keep them any longer***. (Emphasis added).

28.     Accordingly, CNA attempts to avoid payment of assisted-living facility claims on the Class policies in the Class States.  Indeed, the financial exposure is massive, and if the insured dies while residing at an assisted-living facility and never moves to a nursing home, CNA escapes payment of the claims entirely.

29.     CNA, for many years, wrote policies that expressly covered only skilled-nursing facilities.  When CNA wants to use language to cover only skilled nursing homes, it knows how to do that, since it did that very clearly in the past.

30.    While CNA claims that, "[t]he '24-hour-a-day nursing services' language was borrowed from the Medicare Statute's definition of skilled-nursing facilities requiring a nurse always to be present [quoting Medicare statute:]…'a skilled nursing facility must provide 24-hour licensed nursing services,'" (*See* Exhibit C) a review of the actual policy language contained in the class policies does not support this interpretation since the term "licensed nursing" is not found in the policies under the "Long-Term Care Facility" definition.

31.    In older generations of policies, when CNA wanted to cover nursing homes only, this intention was specifically stated. On the other hand, the policies at issue here broadly define the term "Long-Term Care Facility" in such a manner that coverage is not limited to just nursing homes, as CNA now claims.

32.    Furthermore, certain CNA policy applications in use as late as May 1994 reveal "Nursing Home" policies were also available to insureds such as Ms. Daluge, but were not selected:

*See* Exhibit D at 3.

33.    Ms. Daluge's purchase of the LTC1 P1-15203 "Long Term Care" policy in May 1994 was part of a CNA program to "upgrade" and replace a CNA "Nursing Home" policy that she previously owned (see "NH" reference):

PART VI

1-800- 657- 0779

1. Do you now have in force or are you applying for any other long term care or nursing home policy or rider? ☑ Yes ☐ No
   List details below and indicate whether any health insurance coverage is to be replaced by the policy applied for

| Name of Company(ies) | Applied or Inforce | | Policy Number(s) | Type & Amount of Benefits | To be Replaced by This Coverage? | |
|---|---|---|---|---|---|---|
| CNA (upgrade) | ☐ | ☑ | 076265162 | 60/day NH | ☑ Yes | ☐ No |
| CNA (upgrade) | ☐ | ☑ | 076380124 | 50/1st | ☑ Yes | ☐ No |
| | ☐ | ☐ | | | ☐ Yes | ☐ No |

*See* Exhibit D at 2 ("60/day NH").

34.     If CNA wanted the Long-Term Care Facility definitions in the policies to cover only skilled nursing facilities, it would have drafted them accordingly.

35.     CNA knew how to explicitly limit coverage to nursing homes and it chose not to do that. Instead, knowing that a change in the provision of long-term care services was on the horizon, chose a definition that covers far more facilities than the traditional nursing home.

36.     CNA's attempt to get out of paying for claims at assisted-living facilities in the Class States under the policies at issue here is an improper and unconscionable tactic designed to do one thing – save money by reducing policy and claim reserves.

37.     These actions undertaken by CNA to avoid payment of claims for stays at assisted-living facilities (including assisted-living facilities that care exclusively for Alzheimer's and memory care patients) ***that it was previously covering under the policies*** is causing extreme harm to insureds and their loved ones who depend on these health-care benefits for financial, emotional, and physical survival.

38.     This is not CNA's first attempt to treat these policies as nursing-home only policies. Judge Sandra S. Beckwith in the Southern District of Ohio, in an order granting summary judgment to the plaintiff, specifically told CNA that the policy language in the LTC1

12

policy form did not allow for coverage of just nursing homes under the Long-Term Care Facility
definition:

> "Skilled nursing" for Medicare coverage purposes is not equivalent to the policy's
> description of a covered facility's nursing care, which includes not only skilled,
> but also intermediate or custodial nursing care. The Congressional determination
> that the necessarily higher levels of care provided by skilled nursing requires
> round the clock licensed nursing staff does not control the determination of
> coverage provided by Continental's policy.
>
> ***
>
> The policy requires that 24-hour nursing services be provided by **or under the
> supervision of** a registered nurse. The facility profile completed by Sunrise []
> states that Sunrise has an RN or LPN on staff to "direct & supervise care," and
> has an RN or LPN on call. That is all the policy terms require for provision of
> "24-hour-a-day nursing services provided by or under the supervision of a
> registered nurse." The Court agrees that if Continental intended its policy to cover
> only facilities in which an RN or LPN is physically present onsite 24 hours every
> day, it was required to plainly state that requirement in its policy.
>
> Plaintiff's motion for summary judgment on this issue is therefore granted, and
> Defendant's motion is denied. (emphasis in original) (internal citation omitted).
>
> See *Barbara Hoekenga v. Continental Casualty Company*, No. 06-458, Doc. 40
> (S.D. Ohio April 18, 2007) ("*Hoekenga*").

39.    CNA later settled a nationwide class action related to whether the presence of

licensed nurses on-site was required under the LTC1 policy.[8] Despite having lost on summary

judgment and settled a class action both specifically aimed at affording coverage at assisted-

living facilities, CNA has gone back to the well – now claiming that only those facilities capable

of providing 24-hour continuous licensed nursing care to a particularly sick resident are eligible

for coverage in the Class States. This tactic is nothing more than a creatively repackaged attempt

to avoid assisted-living facility coverage, yet again, except this time ***CNA is denying claims even***

***when licensed nurses are present on-site 24/7 at an assisted-living facility***.

---

[8] *Dorothea Pavlov, et al. v. Continental Casualty Company*, No. 07-02580, Doc. 107 (N.D. Ohio October 7, 2009)
("*Pavlov*").

### The "has 24-hour-a-day nursing services"
### and "continuous nursing care" Requirements.

40.    The LTC1 policies require that a covered facility "has 24-hour-a-day nursing services[.]"

41.    CNA interprets this provision, and substantially similar provisions in the Con Care B forms, to mean that in order for a facility to be covered, it must be legally capable of admitting a resident in need of 24-hour around-the-clock *licensed* nursing care. This interpretation eliminates assisted-living facilities in the Class States, and is the cornerstone of CNA's claim that the policies only cover nursing homes. CNA conveniently ignores that the policies' use of the terms "nursing care" and "nursing services" includes unlicensed, unskilled custodial-nursing care.

42.    CNA's explanation for this interpretation is as follows, "[t]he '24-hour-a-day nursing services' language was borrowed from the Medicare Statute's definition of skilled nursing facilities requiring a nurse always to be present [quoting Medicare statute:]…'a skilled nursing facility must provide 24-hour *licensed* nursing services[.]'" *See* Exhibit C.

43.    However, noticeably absent from the Class Policies' definition is the term "licensed": "24-hour licensed nursing services" v. "24-hour-a-day nursing services". The difference in choice of language is significant and intentional.

44.    The LTC1 policy expressly covers facilities "primarily providing Long-Term Care" that "provide[] skilled, intermediate **or** custodial nursing care" and defines "Long-Term Care" as "Care or services which are required… Due to the Inability to Perform Two or More Activities of Daily Living [or] Due to Cognitive Impairment." *See* Exhibit B.

14

45.     The correct interpretation of the policies' "24-hour-a-day" nursing requirement is that a covered facility must at least have the ability to provide unlicensed, custodial-nursing services at any time of day, seven days a week, as needed by residents. In practice, this means, at a minimum, that the facility is staffed by someone 24-hours-a-day who can legally attend to the custodial-nursing needs of a resident at any time of day and who operates under the supervision of a licensed nurse.

46.     CNA's interpretation, that a covered facility must be capable of providing 24-hour licensed nursing care to a particularly sick resident, is designed to eliminate coverage for assisted-living facilities in the Class States – *facilities that it had previously been covering* – thereby significantly reducing its claim exposure and associated policy reserves associated with the policies.

47.     A telephone call recording between undersigned counsel and a senior member from CNA's third-party claim administrator documents that claims at assisted-living facilities had been previously paid under the policies, and that assisted-living facilities are being denied based on a misapplication of the "24-hour-a-day" and "continuous" nursing services provisions:

MR. COLLINS:        Okay.  I think that should be -- I'll speak to my client and communicate all this and try to explain to them.  Like I said, the biggest thing that's hard for them to understand and swallow is that they had their claim paid and then all of a sudden now it won't be paid.  That's something I can imagine is very confusing.

CNA CLAIM ADMINISTRATOR:  Sure.

MR. COLLINS:        Especially when they're getting rate increases.

CNA CLAIM ADMINISTRATOR: Oh, I totally hear you.  I'm -- again, they definitely aren't the first and it's happened before on claims that I personally have worked on.  And I guess the positive thing is that they did get benefits where if they had filed their original claim -- their first claim after 2009, they wouldn't have gotten anything under it so I guess that's the positive slant to it but certainly I can understand why it would be confusing.  Absolutely.

MR. COLLINS:      People have called -- like this is -- they're not the only people from Connecticut who have called with this exact issue, right?  I imagine that this comes up for people in Connecticut because of the licensing problem, right?

CNA CLAIM ADMINISTRATOR:  Yeah, not just Connecticut -- all over the place.  We have a lot of states who have -- different assisted living facilities in most states are regulated as far as the level of -- and whether or not they can provide nursing care services and to the degree that they can provide nursing care services is fairly strictly regulated in most states.  And whether it be that they license the facility separately from the actual care provider itself or whether the facility can provide care but they regulate what type of care can be provided.  Most states have some kind of stipulation that an assisted living cannot provide continuous ongoing nursing care because that's not what they were ever designed to do.  They were designed to provide support of living services not nursing.  So I would say in most cases that I've seen -- most assisted-living facilities are not approved under these type of policies just because of how states have regulated them.

MR. COLLINS:      Most of it's due to (inaudible) –

CNA CLAIM ADMINISTRATOR:  Nursing services.   Yeah, nursing services.  Eight hours a day, seven days a week -- I mean five hours a day, seven days a week, 24 hours a day nursing services.  And most states their assisted living level licenses does not permit a facility to provide 24 hour a day continuous nursing services whether the nurse is present or on call because they are designed to provide support of care not nursing.

48.      While it is true that assisted-living facility statutes typically prohibit the facilities from admitting patients in need of 24-hour around-the-clock skilled nursing care – people in need of this intense level of licensed nursing-care should generally reside in a skilled nursing facility – *no assisted-living facility statute in the Class States prohibits a facility from making unlicensed custodial-nursing care available to residents 24/7*.

49.      To be sure, custodial-nursing care can be provided by unlicensed nursing aides.  The federal government's Centers for Medicare & Medicaid Services ("CMMS") defines custodial-nursing care as follows:

Custodial Care – Nonskilled personal care, like help with activities of daily living like bathing, dressing, eating, getting in or out of a bed or chair, moving around, and using the bathroom. It may also include the kind of health-related care that most people do themselves, like using eye drops. In most cases, Medicare doesn't pay for custodial care.[9]

50.　　Additionally, Actuarial Standard of Practice ("ASOP") No. 18 Long-Term Care Insurance, effective as of July 1991,[10] notes that custodial-nursing care is:

Custodial Care – Care that is primarily for the purpose of meeting personal needs such as help in walking, bathing, dressing, eating, prevention of bed sores, etc. Unlike acute care, its purpose is not to restore or stabilize health or the ability to function. Custodial care can be provided by someone with-out professional medical skills or training, under the supervision of a licensed health practitioner.

51.　　The policies' use of the terms "nursing services" and "nursing care" is clearly intended to broadly cover all levels of nursing care, both skilled-licensed nursing care and unskilled, unlicensed custodial-nursing care: "skilled, intermediate **or** custodial nursing care[.]"

52.　　In its claim denial decisions, CNA cites various state statutes that generally prohibit assisted-living facilities from accepting residents who need the type of around-the-clock skilled-nursing care that only skilled-nursing facilities are capable of providing. CNA ignores that the policies do not require the Long-Term Care Facility to be capable of providing 24-hour licensed-nursing services to a particular resident.  On the contrary, the policies merely require that nursing services, at a minimum unskilled custodial nursing care, are available at the facility on a 24-hour basis.

53.　　Contrary to the positions taken in CNA's claim denial letters, no assisted-living statute in the Class States prohibits an assisted-living facility from making custodial-nursing care available to residents on a 24/7 basis; in fact most assisted-living statutes *require* it.  This

_____

[9] *See* http://www.medicare.gov/Pubs/pdf/10153.pdf at 47. Also note that "custodial care" is referred to as "custodial nursing care." Id. at 29.

[10] ASOP No. 18 (July 1991) was later superseded , but was in effect when most, if not all, of the policies at issue here were first written: http://www.actuarialstandardsboard.org/pdf/superseded/asop18_032.PDF at 3.

requirement is the very purpose for the development of assisted-living facilities all over the country. Individuals did not need the level of skilled-nursing care offered at Medicare-certified skilled-nursing facilities, but did need significant help with custodial-nursing care – including monitoring due to Alzheimer's disease – available to them on a 24/7 basis.

54.     Custodial-nursing care in the form of assistance with the activities of daily living, such as eating, dressing, bathing, toileting and walking, ***is the very type of care that these long-term care policies are designed to cover through the activities of daily living benefit trigger***. Unskilled-nursing services such as this do not require the assistance of a licensed nurse, yet are still clearly considered nursing services under the policies.

55.     CNA's attempt to confuse policyholders by citing statutes that prevent assisted-living facilities from admitting patients who are in need of 24-hour-a-day, around-the-clock licensed nursing, ***but that do not prevent the assisted-living facility from offering unskilled custodial-nursing care on a 24-hour basis***, is merely an attempt by CNA to avoid payment of claims where liability is clear.

56.     In Wisconsin, CNA claims that assisted-living facilities, termed Community-Based Residential Facilities ("CBRF's"), "cannot, per Wisconsin law, provide 24 hour a day nursing services to residents. A CBRF may not provide more than 3 hours of nursing care per week to any individual resident." (citing Wis. Stat. § 50.01(1g)). *See* Exhibit E.

57.     Contrary to CNA's position, however, Wis. Stat. § 50.01(1g) merely prohibits a CBRF from accepting residents who require skilled nursing care and/or more than three hours-per-week of intermediate nursing care, unless an exception has been granted. There is no limitation whatsoever placed on the amount of custodial-nursing care (termed "personal care" in the statute) that a CBRF may offer, and Wisconsin Department of Health Services Regulation

83.36 which addresses the staffing requirements at all Wisconsin CBRF's specifically notes that "[t]he CBRF shall provide employees in sufficient numbers on a 24-hour basis to meet the needs of the residents."

58.     When denying claims in Massachusetts, CNA cites to various assisted-living regulations and comes to the conclusion that:

> A certified Assistance (sic) Living Residence may not provide skilled or other nursing care under the supervision of a physician, and may not provide nursing services or nursing care by or under the direction of a registered or licensed nurse…Assisted Living Residences may provide or arrange for services such as supervision and assistance with Activities of Daily Living, Instrumental Activities of Daily Living, Self-Administered Medication Management, timely assistance and response in emergencies, and three meals per day (*see* 651 CMR 12.04). However, none of the services rendered to residents by an Assisted Living Residence constitute nursing services or nursing care, as they are performed by non-licensed, paraprofessional personal care staff whose competency to provide care is evaluated only semi-annually by a nurse. (citing 651 CMR 12.07). *See* Exhibit F.

59.     CNA ignores that the policies' use of the terms "nursing services" and "nursing care" were clearly intended to cover all levels of nursing care, including unskilled custodial care (*i.e.* "assistance with Activities of Daily Living").  Assisted-living facilities in Massachusetts, therefore, are perfectly capable of offering custodial-nursing care to residents as needed 24-hours-a-day.

60.     Similarly, in Florida, CNA claims that only nursing homes, and only certain assisted-living facilities holding certain special licensing designations, can meet the 24-hour-a-day nursing services requirement in the policies. This interpretation eliminates the majority of Florida's assisted-living facilities from eligibility for coverage:

> [Assisted Living Facility – Standard] level of license permits an assisted living facility to provide supportive services including assistance in performing activities of daily living, medication management, supervision, health monitoring, social and leisure activities, and transportation. It also allows the facility to employ or contract with a nurse to take vital signs, give medications and

prepackaged enemas, and keep nursing progress notes. However, residents who require ongoing nursing and other health care services must contract with a licensed home health care provider to provide such care, as it may not be provided by the facility. *See* Exhibit G.

61.     CNA clarifies in later correspondence that facilities licensed as Assisted Living Facility – Standard are "not licensed to provide 24-hour-a-day nursing services[.]" *See* Exhibit H.

62.     This lockstep conduct on the part of CNA to avoid assisted-living facility coverage is not limited to the home states of the named Plaintiffs – Wisconsin, Massachusetts, and Florida – but is also occurring in the Class States.

63.     For example, in Georgia, CNA claims that assisted-living facilities, termed "Personal Care Homes" in Georgia, are incapable of legally providing "24-hour-a-day nursing services." *See* Exhibit I.

64.     However, Personal Care Homes in Georgia are ***required*** to make custodial-nursing care (termed "personal services" in the statute) available to residents 24-hours-a-day. *See* Georgia's Rules And Regulations For Personal Care Homes, Staffing 111-8-62-.10(1)(b) ("At least one administrator, on-site manager, or a responsible staff person must be on the premises 24 hours per day and available to respond to residents' needs.")

65.     CNA's goal is made explicitly clear – to avoid covering assisted-living facilities under the policies: "The fact that Ms. [redacted]'s treatment providers have recommended that she reside in an assisted living facility does not alter the terms and provisions of coverage. By its express terms, the policy affords coverage for care provided in a Long Term Care Facility. *The policy does not cover care provided in an assisted living facility*." (Emphasis in original). *See* Exhibit I at 3.

he 

66.     In Kentucky, CNA states to policyholders that "coverage for care rendered by a facility that is certified in Kentucky as an Assisted Living Community" will not be provided since,

> Assisted Living Communities in Kentucky are specifically precluded by statute from providing health services such as diagnostic, treatment or rehabilitative services…Therefore, an Assisted Living Community does not provide 'skilled, intermediate, or custodial nursing care under the supervision of a physician' and may not employ nurses to provide 24 hour a day nursing services, also in compliance with state statutes. *See* Exhibit J.

CNA ignores that Assisted-Living Communities in Kentucky **must** provide custodial-nursing care to residents ("[a]ssistance with activities of daily living") on a 24-hour-a-day basis in order to "meet the twenty-hour (24) hour scheduled needs of each client[.]" *See* Kentucky Revised Statutes 194A.705 and 194A.717. [11]

67.     While the assisted-living statutes cited by CNA in each Class State differ, CNA's consistent policy interpretation that the Class Policies' should be read as only covering facilities capable of providing around the clock 24-hour-a-day licensed skilled nursing services to a particularly sick patient. This is the common root of the wrongful claim denials in the Class States.

### The "Licensed By The State" Requirement

68.     In addition to denying claims based on a facility not having 24-hour-a-day or nursing services, in certain states, CNA is denying claims on the additional basis that assisted-living facilities in said state are not "licensed by the state."

---

[11] Mr. Young had a claim denied for a stay at an assisted living facility in Florida, Fountainview Assisted Living, over the phone with no written record of this decision provided by CNA. The Kentucky insured who is the subject of Exhibit J also apparently had her claim verbally denied without a proper explanation of the denial set forth in writing by CNA. *See* Exhibit J at 1-2. ("…a representative in our Claim Intake Department spoke with Ms. REDACTED via telephone regarding the benefits available under Ms. REDACTED's policy as well as claim filing procedures. However, to date, CCC has no record of a claim filed under Ms. REDACTED's policy…She also states that CCC has informed her that benefits are not payable under Ms. REDACTED's policy for assisted living in the state (sic) of Kentucky."

69.     In Massachusetts for example, CNA claims that assisted-living facilities that receive a "certificate" to operate as an Assisted Living Residence from the Massachusetts Executive Office of Elder Affairs are nonetheless not licensed by the Commonwealth of Massachusetts, "As an initial matter, Newbridge on the Charles has obtained a certificate to operate an Assisted Living Residence from the Massachusetts Executive Office of Elder Affairs. It is not licensed by the state." *See* Exhibit F.

70.     CNA's strict reading of the "licensed by the state" requirement in the policies to mean that a facility actually has to have a purported document called a "license" rather than a "certificate" or some other similar approval from the state granting permission to operate the facility, is unsupported by the policies' language.

71.     If a facility has been given permission by its home state to operate an assisted-living facility, whether it is provided with a purported document that says "license" on it or not, the facility is "licensed by the state" since the state is permitting it to operate in accordance with the state's applicable assisted-living statutes and regulations.

## CLASS ALLEGATIONS

72.     This class action is brought on behalf of the Plaintiffs and all others similarly situated to recover for the harm caused by Defendant's breaches of the policies' terms.

73.     There is no dispute that all Plaintiffs are eligible medically for coverage.

74.     All Plaintiffs filed claims for stays at assisted-living facilities that met the policies' respective Long-Term Care Facility definitions, and all Plaintiffs had their claims denied in violation of the terms of their respective policies.

75.     All Plaintiffs fully performed their obligations under their respective policies, and yet Defendant failed to pay their claims in violation of the terms of the policies.

76.     All Plaintiffs have suffered damages as a result.

77.     Defendant is uniformly and systematically breaching the terms of the policies by only covering facilities that are legally capable of admitting patients in need of 24/7 licensed nursing care, when the policies place no such requirement on covered facilities.

78.     In fact, Defendant repeatedly states in denial letters to insureds that "We must adjudicate all policies in a consistent manner under the terms of the contract."

79.     Defendant is uniformly and systematically breaching the terms of the policies by denying coverage and claiming that assisted-living facilities in certain states are not licensed, even though these facilities' operate with permission of their home state and comply with all applicable assisted-living facility statutes and regulations.

80.     Defendant is denying claims that Defendant knows should be paid under the terms of the policies.  Rather than abide by the terms of the policies, Defendant, affirmatively and deliberately, is engaged in a scheme to categorically exclude claims for stays at assisted-living facilities in the Class States.

81.     The acts, practices, and conduct of which Plaintiffs complain commonly affect the Class.

82.     All current policyholders in the Class seek injunctive relief that would prevent CNA from categorically excluding assisted living facilities in the Class States from coverage under the policies.

83.     All members of the Class seek declaratory relief that the policies' "licensed by the state" requirement is met when a facility is operating with permission from their home state and pursuant to the applicable statutes and regulations governing assisted-living facilities.

84.     All members of the Class seek declaratory relief confirming that the policies do not require a facility to be capable of providing 24/7 licensed nursing care to a particularly sick individual in order to comply with the "has 24-hour-a-day nursing services" and "continuous nursing care" requirements in the policies.

85.     Members of the Class who had a claim(s) for a stay(s) at an assisted-living facility in one of the Class States denied based on the conduct described above seek monetary damages.

86.     The proposed Classes consist of:

*Rule 23(b)(2) Class*: All current CNA long term care insurance policyholders of the following policy forms - "LTC1" (Forms 15203/16356/17931) or "Con Care B" (Forms 59433/59806) ("Class Policies") who (1)  reside in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee or Wisconsin ("Class States"), and/or, (2) whose policy was issued in a Class State.

*Rule 23(b)(3) Class*: All current and former CNA long term care insurance policyholders of the Class Policies: (1) who were residing in an assisted living facility[12] in one of the Class States (2) who were medically eligible for benefits (3) but who were not afforded coverage for the costs of the facility (4) on the grounds that the facility (a) was not licensed by the state and/or (b) could not legally provide 24-hour-a-day, or continuous, nursing services/care, and (5) who suffered ascertainable damages as a result of being denied coverage.

Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

87.     If the Court determines that certification of the above eleven state Class definitions is not appropriate, in the alternative, Plaintiffs will seek certification of sub-classes utilizing the same Class definitions but only for claims filed for stays at assisted-living facilities

---

[12] The term "assisted living facility" refers to these specific facility types in each of the Class States: "Assisted Living Center" or "Assisted Living Home" (Arizona), "Assisted Living Facility-Standard" (Florida), "Personal Care Home" or "Community Living Arrangements" (Georgia), "Residential Care Facility" (Indiana), "Assisted Living Programs" or "Residential Care Facilities" (Iowa), "Assisted Living Community" (Kentucky), "Assisted Living Residence" (Massachusetts), "Housing with Services Establishment" (Minnesota), "Adult Care Homes," "Enriched Housing Programs," or "Assisted Living Residence" (New York), "Assisted-Care Living Facilities" (Tennessee) or "Community-Based Residential Facility," "Adult Family Home," or "Residential Care Apartment Complex" (Wisconsin).

in Massachusetts ("MA Alternative Sub-Class"), Florida ("FL Alternative Sub-Class") and Wisconsin ("WI Alternative Sub-Class").

88.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed prior and up to the time when the Court determines whether class certification is appropriate.

89.     **Numerosity:**  The individual class members are so numerous that joinder of all members is impracticable.  Based upon CNA rate filing information published by the State of Connecticut, as of December 31, 2010, there were 39,631 individuals nationwide who own either a LTC1 or Con Care B policy, therefore the number of members in the eleven state Classes here are certainly in the thousands.

90.     Although the precise number of Class members cannot be ascertained until the parties conduct discovery, the number is certainly in excess of that required to satisfy the numerosity requirement.

91.     Moreover, the identities of the individual Class members, including their names and addresses, are readily ascertainable through Defendant's records.

92.     **Commonality:**  There are questions of law and fact that are common to Plaintiffs' and the Class Members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Classes.  Among such common questions of law and fact are the following:

        a.   Whether Defendant issued long-term care policies of insurance to Plaintiffs
             and the Classes;

b.   Whether a facility must be legally capable of providing 24/7 licensed nursing care to a particular resident in order for the facility to ever qualify for coverage as a Long-Term Care Facility;

c.   Whether assisted living facilities in the Class States are legally prohibited from ever meeting the Long-Term Care Facility requirements in the policies;

d.   Whether the policies' "licensed by the state" requirement is met when a facility is legally permitted to operate as an assisted-living facility according to the applicable statutes and regulations in its home state;

e.   Whether Defendant breached its policies of insurance with Plaintiffs and the Classes; and

f.   Whether Defendant's failure to pay claims under the policies was in bad faith.

93.   **Typicality:**  Plaintiffs' claims are typical of the claims of the Classes because of the similarity, uniformity, and common purpose of Defendant's unlawful conduct.  Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendant's wrongful conduct.

94.   **Adequacy of Representation:**  Plaintiffs are adequate representatives for the Classes and will fairly and adequately protect the interests of the Classes.  Plaintiffs are committed to vigorous prosecution of this action, and have retained competent counsel who are experienced in class action litigation, and, in particular, consumer-related class actions.

95.   Plaintiffs have retained law firms that are experienced in both class action and health insurance litigation to prosecute this action.  The firms are highly experienced in handling class action litigation matters and have the financial and other resources to meet the substantial costs and complex litigation issues inherent in this matter.

96. **Requirements of Fed. R. Civ. Proc. 23(b)(3):**  The questions of fact and law in Plaintiffs' and the Classes' claims predominate over any questions of fact and law applicable to any individual member of the Class.  Due to the nature of the common questions of fact and law, a class action is the superior method for resolving these issues.

97. Specifically, a class action is superior because the issues relating to the Defendant's liability can be resolved on a class-wide basis, leaving only the issues of calculation of each Class member's individual damages.

98. **Superiority:**   A class action is superior to individual actions because of the following non-exhaustive factors:

a. Joinder of the Class members would be impracticable due to the number of anticipated Class members and would create a hardship in the management of the case;

b. The Class consists of elderly individuals, many of whom suffer from serious health problems including Alzheimer's disease and similar cognitive impairments, who are incapable of pursuing these matters on their own or even aware of their rights under the Class Policies;

c. Resolution of the Class members' claims on an individual basis would run the risk of inconsistent legal rulings and judgments;

d. The interests of justice would be best served by resolution of all of the Class' claims in one judicial forum; and

e. There are no anticipated management problems in handling this matter as a class action.

99.   **Requirements of Fed. R. Civ. Proc. 23(b)(1) & (2):**   Prosecuting each Class member's claims separately would result in a significant risk of inconsistent legal rulings and/or judgments that would create incompatible standards of conduct for the Defendant.

100.   Furthermore, Defendant has acted in a similar manner, employing consistent business practices, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I
## (BREACH OF CONTRACT)

101.   Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

102.   Defendant formed an agreement and entered into a contract with Plaintiffs and the Class including offer, acceptance, and consideration (hereinafter called the "Contract").

103.   Pursuant to that Contract, Plaintiffs and the Class paid money to Defendant in exchange for Defendant providing a long-term care insurance policy to Plaintiffs and the Class. Defendant received premiums in exchange for the issuance of a policy of long-term care insurance.

104.   The Contract included, without limitation, Defendant's right to charge a premium in exchange for its promise to pay all claims promptly and justly when all requirements under the policies have been met.

105.   Plaintiffs and the Class performed all of their obligations under the contract.

106.   Defendant is obligated pursuant to the Contract, without limitation, to "pay [Plaintiff's and the Class'] claim[s] immediately after [CNA] receive[s] due written proof of loss."

107.    Defendant is also obligated to honor the Waiver of Premium Benefit in the policies when an insured qualifies for coverage, which Defendant has not.

108.    Defendant breached the Contract by, without limitation, denying claims for stays at assisted-living facilities that should have been afforded coverage and thereby denying all associated Waiver of Premium Benefit claims as well.

109.    Defendant further breached the Contract by refusing to send out claim forms or open a claim when a Class member requested coverage for stays at a facility determined by CNA as not covered, resulting in certain claims being denied without any written basis for CNA's coverage position.

110.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs and the Class have suffered damages in an amount to be proved at trial.

**<u>COUNT II</u>**
**<u>(BAD FAITH/ BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING)</u>**

111.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

112.    Defendant, acting through its officers, agents, servants and/or employees, acted unreasonably and in bad faith in refusing to pay claims for policyholders' stays at assisted-living facilities in the Class States.

113.    Defendant, acting through its officers, agents, servants and/or employees, acted unreasonably and in bad faith in refusing to open a claim, send out claims forms and issue written claim denials for stays at facilities determined by CNA as not covered.

114.     Plaintiff Mr. Young had a claim denied verbally by CNA, a sharp and unconscionable tactic designed to discourage follow up and make it difficult for an insured to pursue their benefits.

115.     In addition to all of the reasons stated above, CNA's bad faith is further exemplified by its self-serving and unsupported change in policy interpretation after paying claims for years at assisted-living facilities in order to reduce its claim exposure while simultaneously seeking approval for rate increases.

116.     CNA's bad faith is also demonstrated by its misrepresentation of the terms of the policy and assisted-living facility regulatory schemes in the Class States.

117.     Lastly, CNA's failure to act in a timely manner with respect to the adjudication of Plaintiffs' claims, and its inability to provide a clear statement as to the basis for its claim denials, is additional evidence of bad faith.

118.     In addition to liability in other states, CNA's bad faith entitles Wisconsin insureds to prejudgment interest on all benefits that have accrued prior to the date of judgment at a rate of 12% annum pursuant to Wis. Stat. § 628.46.

## COUNT III
## (EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF)

119.     Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

120.     Plaintiffs seek a declaration that the policies' "24-hour-a-day nursing services" provision is met if a facility in a Class State offers to residents, at a minimum, unlicensed custodial-nursing care as needed at any time of day, seven days a week.

121.    Plaintiffs seek a declaration that the policies' "licensed by the state" provisions are met if a facility in a Class State operates with the permission of the state in which it is located and is in compliance with all statutes and regulations applicable to the facility.

122.    Plaintiffs seek a declaration that the assisted living facility statutes and regulations in the Class States do not legally prevent assisted living facilities operating in said states from meeting the Long-Term Care Facility definition in the policies.

123.    Plaintiffs seek an injunction prohibiting Defendant from engaging in the conduct described above, including but not limited to, the denial of claims based on misapplication of the "has 24-hour-a-day nursing services," and "licensed by the state" provisions in the policy, and issuing verbal claim denials.

124.    There is a bona fide, actual, and present practical need for declaration.

125.    The declaration concerns a present, ascertained, and ascertainable state of facts.

126.    An immunity, power, privilege or right of Plaintiffs and the Class is dependent upon the facts or the law applicable to the facts.

127.    Plaintiffs and Defendant have an actual, present, adverse and antagonistic interest in the subject matter, either in fact or law.

128.    The antagonistic and adverse interest(s) are all before the Court by proper process or class representation.

129.    The relief sought is not merely giving of legal advice or the answer to questions propounded for curiosity.

## COUNT IV
## (VIOLATION OF M.G.L. C. 93A AND C. 176D
## - MA ALTERNATIVE SUB-CLASS ONLY)

130.    On August 7, 2015, Plaintiffs mailed a demand letter to Defendant seeking relief under M.G.L c. 93A and c. 176D. Plaintiffs were not offered adequate relief by Defendant.

131.    Plaintiffs hereby incorporate by reference each and every allegation contained in the preceding paragraphs as if fully alleged herein.

132.    At all times relevant hereto, Defendant has been engaged in trade or commerce as those terms are defined under M.G.L c. 93A.

133.    Defendant has committed acts and followed practices substantially within the Commonwealth of Massachusetts, with respect to its denial of claims at Massachusetts assisted-living facilities, which constitute unfair and deceptive acts and practices in the conduct of a trade or commerce as prohibited by M.G.L. c. 93A and c. 176D.

134.    Defendant has committed acts and followed practices with respect to Ms. Birnbaum and the MA Alternative Sub-Class which constitute unfair and deceptive acts and practices in the conduct of trade or commerce and violated M.G.L. c. 93A by its oppressive acts and omissions.

135.    Defendant has committed numerous unfair, oppressive, and deceptive acts, practice and omissions in the business of insurance against Ms. Birnbaum and the MA Alternative Sub-Class, in violation of M.G.L. c. 176D.

136.    Defendant's violations of M.G.L. c. 176D constitute violations of M.G.L. c. 93A.

137.    Defendant materially violated M.G.L. c. 93A and 176D by its oppressive acts and omissions.

138.   The unfair and deceptive acts and practices of Defendant were performed willingly and knowingly.

139.   As a direct and proximate result of the acts and omission of Defendant, particularly its refusal to afford coverage for stays at qualified Massachusetts assisted-living facilities, Ms. Birnbaum and the MA Alternative Sub-Class suffered damages.

## APPLICATION FOR A PERMANENT INJUNCTION

140.   Because Defendant has engaged in the unlawful acts and practices described above, Defendant has violated and will continue to violate the law as alleged in this Complaint. Unless restrained by this Honorable Court, Defendant will continue to violate the laws of the State of Wisconsin and the Class States, and cause immediate, irreparable injury, loss and damage to the Plaintiffs and the Class - which is composed of many vulnerable elderly individuals seeking coverage for stays at assisted-living facilities. Therefore, in addition to monetary damages, Plaintiffs request a Permanent Injunction as indicated below.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs pray for judgment and relief in their favor and against Defendant as follows:

A.   Certifying this action as a class action as set forth herein and designating Plaintiffs as the Class Representatives of, and their attorneys' as class counsel for, the Classes described above;

B.   Plaintiff prays that a PERMANENT INJUNCTION be issued, restraining and enjoining Defendants, Defendants' successors, assigns, officers, agents, servants, employees and attorneys and any other person in active concert or participation with Defendants, from engaging in the acts or practices complained of herein;

C.   Declaring that: (a) Plaintiffs and the Class members can qualify for benefits under the policies' Long-Term Care Facility language, for stays at assisted-living facilities in the Class States; (b) Defendant was obligated to pay claims of Plaintiffs and Class members made for qualifying stays at assisted-living facilities in the Class States; and (c) Defendants' targeted denial of claims for stays at assisted-living facilities in the Class States was in bad faith;

D.   Issuing a permanent injunction requiring Defendant to identify and notify in writing all Class members that their claims for qualified stays at assisted-living facilities will once again be considered for coverage in the Class States;

E.   Awarding compensatory damages with interest on behalf of Plaintiffs and the Class members in an amount to be proved at trial;

F.   Awarding punitive damages;

G.   Ordering Defendants to pay Plaintiff and the Class prejudgment interest on all benefits that have accrued prior to the date of judgment, at a rate of 12% annum pursuant to Wis. Stat. § 628.46, and at applicable rates according to similar statutes in other states;

H.   Ordering Defendant to disgorge all ill-gotten profits and gains related to their scheme;

I.   Ordering Defendant to provide Plaintiff and the Class with all available relief under M.G.L c. 93A and c. 176D including but not limited to treble damages, interest and attorneys' fees;

J.   Awarding Plaintiffs and the Classes all expenses, costs and disbursements incident to the prosecution of this action, including reasonable attorneys' fees; and

K.    For such other and further relief as allowed by law and/or as is equitable under the

circumstances.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 23, 2016                     THE PLAINTIFFS,
                                        GWEN B. DALUGE, MURRAY YOUNG, AND
                                        HELENE K. BIRNBAUM BY THEIR
                                        ATTORNEYS



                                        /s/ *Sean K. Collins*
                                        Sean K. Collins

                                        SEAN K. COLLINS
                                        Sean K. Collins, Attorney at Law
                                        184 High Street, Suite 503
                                        Boston, MA 02110
                                        Telephone: 617-320-8485
                                        Fax: 617-227-2843
                                        sean@neinsurancelaw.com

                                        LIONEL Z. GLANCY
                                        EX KANO S. SAMS II
                                        KARA WOLKE
                                        Glancy Prongay & Murray LLP
                                        1925 Century Park East, Suite 2100
                                        Los Angeles, CA 90067
                                        Telephone: 310-201-9150
                                        Fax: 310-201-9160
                                        lglancy@glancylaw.com
                                        esams@glancylaw.com
                                        kwolke@glancylaw.com

                                        PATRICK V. DAHLSTROM
                                        Pomerantz LLP
                                        10 South LaSalle Street, Suite 3505
                                        Chicago, IL 60603
                                        Telephone: 312-377-1181
                                        Fax: 312-377-1184
                                        pdahlstrom@pomlaw.com

MARK D. DEBOFSKY
DeBofsky & Associates, P.C.
200 West Madison Street, Suite 2670
Chicago, IL 60606
Telephone: 312-702-1842
Fax: 312-929-0309
mdebofsky@debofsky.com

JEFFREY GOLDENBERG
Goldenberg Schneider, LPA
One West Fourth Street, 18th Floor
Cincinnati, Ohio 45202
Telephone: 513-345-8291
Fax: 513-345-8294
jgoldenberg@gs-legal.com

JANET PECQUET
PETER CASSADY
Beckman Weil Shepardson, LLC
American Book Building
300 Pike Street, Suite 400
Cincinnati, OH 45202
Telephone: 513-621-2100
Fax: (513) 621-0106
jpecquet@beckman-weil.com
petercassady@beckman-weil.com

PATRICK SHEEHAN
Whatley Kallas, LLP
60 State Street Seventh Floor
Boston, MA 02109
Telephone: 617-573-5118
Fax: 617-371-2950
psheehan@whatleykallas.com

Attorneys for Plaintiffs and the Class

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2016, a copy of the foregoing Second Amended Class Action Complaint was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

*s/ Sean K. Collins*
SEAN K. COLLINS

Case: 3:15-cv-00297-wmc   Document #: 172-2   Filed: 05/09/18   Page 181 of 203

Case: 3:15-cv-00297-wmc   Document #: 47   Filed: 05/23/16   Page 38 of 38

# Mailing Information for a Case 3:15-cv-00297-wmc Daluge, Gwen v. Continental Casualty Company

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Brent Austin**
  baustin@eimerstahl.com

- **Sean K. Collins**
  sean@neinsurancelaw.com

- **Patrick Vincent Dahlstrom**
  pdahlstrom@pomlaw.com

- **Mark D. DeBofsky**
  mdebofsky@debofsky.com,scottrell@debofsky.com

- **Jeffrey Goldenberg**
  jgoldenberg@gs-legal.com,svaaler@gs-legal.com,cpence@gs-legal.com

- **James W. Joseph**
  jjoseph@eimerstahl.com,shargadon@eimerstahl.com,fharvey@eimerstahl.com,nnowacki@eimerstahl.com,jwiltscheck@eimerstahl.com

- **Ameri Klafeta**
  aklafeta@eimerstahl.com

- **Janet Eileen Pecquet**
  jpecquet@beckman-weil.com

- **Ex Kano Sams II**
  esams@glancylaw.com

- **John Street**
  jstreet@eimerstahl.com,llawes@eimerstahl.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT H

Case: 3:15-cv-00297-wmc   Document #: 72-1   Filed: 11/20/15   Page 1 of 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

---

GWEN B. DALUGE, MURRAY YOUNG, AND
HELENE K. BIRNBAUM, Individually and on
Behalf of All Others Similarly Situated,

        Plaintiffs,

        v.

CONTINENTAL CASUALTY COMPANY,

        Defendant.

No. 3:15-cv-297-WMC

STIPULATED AND HIPAA
QUALIFIED PROTECTIVE
ORDER

---

## 1. PURPOSES AND LIMITATIONS

Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure is warranted. Accordingly, in accordance with Federal Rule of Civil Procedure 26(c) and 45 C.F.R. § 164.512(e)(1), the parties hereby stipulate to and petition the court to enter the following Stipulated and HIPAA Qualified Protective Order ("Order").

## 2. DEFINITIONS

**2.1** <u>**Challenging Party**</u>: a Party or Non-Party that challenges the designation of information or items under this Order.

**2.2** <u>**"CONFIDENTIAL" Information or Items**</u>: information (regardless of how it is generated, stored, or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

**2.3** <u>**"CONFIDENTIAL PHI: Attorneys' Eyes Only" Information or Items**</u>: information (regardless of how it is generated, stored, or maintained) or tangible things that

1

qualify for protection as Protected Health Information (defined below).

    **2.4**   **Counsel (without qualifier)**:  Outside Counsel and House Counsel (as well as their support staff).

    **2.5**   **Covered Entity**: Covered Entity shall have the same scope and definition as set forth in 45 C.F.R. § 160.103.  Specifically, Covered Entity means (a) a health plan; (b) a health care clearinghouse; and (c) a health care provider who transmits any health information in electronic form in connection with a transaction covered by Subchapter A of 45 C.F.R. Part 160.

    **2.6**   **Designating Party**: a Party or Non-Party that designates information or items that it produced in disclosures or in responses to discovery as "CONFIDENTIAL" or "CONFIDENTIAL PHI: Attorneys' Eyes Only."

    **2.7**   **Disclosure or Discovery Materials**: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

    **2.8**   **Expert**: A person with specialized knowledge or experience in a matter pertinent to this lawsuit who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action.

    **2.9**   **House Counsel**: attorneys who are employees of a party to this action.  House Counsel does not include Outside Counsel.

    **2.10**  **Non-Party**: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

    **2.11**  **Outside Counsel**: attorneys who are not employees of a party to this action but who are or have been retained or consulted to represent or advise a party to this action.

**2.12 Party**: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel (and their support staffs).

**2.13 Protected Health Information**: Protected Health Information (or "PHI") shall have the same scope and definition as set forth in 45 C.F.R. § 160.103 and § 164.501. Protected Health Information includes, but is not limited to, health information, including demographic information, relating to either (a) the past, present, or future physical or mental condition of an individual, (b) the provision of care to an individual, or (c) the payment for care provided to an individual, which identifies the individual or which reasonably could be expected to identify the individual or which reasonably could be expected to identify the individual involved in an insurance claim that is at issue in this lawsuit.

**2.14 Producing Party**: a Party or Non-Party that produces Disclosure or Discovery Materials in this action.

**2.15 Professional Vendors**: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

**2.16 Protected Material**: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL" or "CONFIDENTIAL PHI: Attorneys' Eyes Only."

**2.17 Receiving Party**: a Party that receives Disclosure or Discovery Material from a Producing Party.

**2.18 Requesting Party**: a Party that requests the production of information or items from another Party to this action.

### 3. SCOPE

The protections conferred by this Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that discloses Protected Material. The protections conferred by this Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial is not covered by this Order.

### 4. DURATION

Even after the final disposition of this lawsuit, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

### 5. DESIGNATING PROTECTED MATERIAL

**5.1** <u>**Restraint in Designating Material for Protection.**</u> The Designating Party must

designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or oral or written communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.  The Parties have established a procedure to meet and confer to resolve challenges to specific confidentiality designations, as set forth below.  If it comes to a Designating Party's or a Non-Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party or Non-Party must promptly notify all other parties that it is withdrawing the mistaken designation.

    **5.2**    **Manner and Timing of Designations**. Except as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.  Designation in conformity with this Order requires:

    **(a)**    For information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "CONFIDENTIAL PHI: Attorneys' Eyes Only" to each page that contains Protected Material.  A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced.  During the inspection and before the designation, all of the material made available for inspection shall be deemed "CONFIDENTIAL PHI: Attorneys' Eyes Only."  After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order.  Then, before producing the specified documents, the Producing Party may affix the "CONFIDENTIAL" or

"CONFIDENTIAL PHI: Attorneys' Eyes Only" legend to each page that contains Protected Material. A Party may have the right to designate documents produced by another Party or Non-Party "CONFIDENTIAL" or "CONFIDENTIAL PHI: Attorneys' Eyes Only" subject to the terms of this Order including, but not limited to, the provisions for challenging confidentiality designations set forth below. Within 21 days of receipt of such documents, the Designating Party shall provide notice to all other Parties and the producing Non-Party of such designation. After receiving this notice and upon agreement from the Producing Party, the Designating Party or the Producing Party or Non-Party shall affix the "CONFIDENTIAL" or "CONFIDENTIAL PHI: Attorneys' Eyes Only" legend to the documents designated.

(b)     For testimony given in deposition or in other pretrial proceedings, that the Designating Party identify on record, before the close of the deposition, hearing, or other proceeding, all protected testimony. Within 10 business days of receipt of the final transcript of the testimony given in deposition or in other pretrial proceedings, the Designating Party may make specific page and line designations of all protected testimony. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "CONFIDENTIAL PHI: Attorneys' Eyes Only."

(c)     For information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "CONFIDENTIAL PHI: Attorneys' Eyes Only." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

**5.3** **<u>Inadvertent failures to designate</u>**. If timely corrected, an inadvertent failure to

designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

## 6. AUTHORIZATION TO RECEIVE, SUBPOENA, AND TRANSMIT PROTECTED HEALTH INFORMATION

**(a)** The Parties and their Counsel are hereby authorized to receive, subpoena, and transmit Protected Health Information (also referred to herein as "PHI") pertaining to the insurance claims at issue in this lawsuit to the extent and subject to the conditions outlined herein.

**(b)** All Covered Entities are hereby authorized to disclose Protected Health Information pertaining to the insurance claims at issue in this lawsuit to all Counsel in this lawsuit. Documents containing such Protected Health Information shall be marked "Confidential PHI: Attorneys' Eyes Only." Counsel shall only be permitted to use the Protected Health Information to litigate the above-captioned lawsuit.

**(c)** This Order shall not control or limit the use of Protected Health Information pertaining to the insurance claims at issue in this lawsuit that comes into the possession of any Party or Counsel from a source other than a Covered Entity.

**(d)** Nothing in this Order authorizes any Party to obtain Protected Health Information through means other than formal discovery requests, subpoena, deposition, pursuant to a patient authorization or through attorney-client communications. Likewise, nothing in this Order relieves any Party from complying with the requirements of all applicable state and federal laws.

## 7. ACCESS TO AND USE OF PROTECTED MATERIAL

**7.1** **Basic Principles**. A Receiving Party may use Protected Material that is disclosed

or produced by another Party or by a Non-Party only in connection with this lawsuit, except see 9 (PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION) below. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When this lawsuit has been terminated, a Receiving Party must return the Protected Material to the Producing Party or destroy the Protected Material in accordance with section 14 below (FINAL DISPOSITION). Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

**7.2** **Disclosure of Information or Items Designated "CONFIDENTIAL" or "Confidential PHI: Attorneys' Eyes Only."** Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" or "Confidential PHI: Attorneys' Eyes Only" only to:

**(a)** The Receiving Party's Outside Counsel in this action, as well as employees of said Outside Counsel to whom it is reasonably necessary to disclose the information for this lawsuit and who have signed the "Acknowledgement and Agreement to Be Bound" that is attached hereto as Exhibit A;

**(b)** The officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this lawsuit and who have signed the "Acknowledgement and Agreement to Be Bound" (Exhibit A);

**(c)** Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this lawsuit and who have signed the "Acknowledgement and Agreement to Be Bound" (Exhibit A);

**(d)** The court and its personnel;

8

(e)      Court reporters, or videographers, and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this lawsuit and who have signed the "Acknowledgement and Agreement to Be Bound" (Exhibit A);

(f)      During their depositions, witnesses in the action to whom disclosure is reasonably necessary for this lawsuit and who have signed the "Acknowledgement and Agreement to Be Bound" (Exhibit A).  Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order; and

(g)      The author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

## 8.  CHALLENGING CONFIDENTIALITY DESIGNATIONS

**8.1**      **Timing of Challenges**.  Any Party or Non-Party may challenge a designation of confidentiality at any time.  A Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

**8.2**      **Meet and Confer**.  The Challenging Party shall initiate the dispute resolution process by providing the Designating Party with written notice of each designation that the Challenging Party is challenging and describing the basis for each challenge.  To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to the confidentiality designation is being made in accordance with this specific paragraph of the Order.  The parties shall attempt to resolve each challenge in good faith.  In conferring, the Challenging Party must give the Designating Party an opportunity to review the

challenged material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation.

**8.3    <u>Judicial Intervention</u>**. If, after making a good faith attempt to resolve the dispute regarding the challenged designation(s), the parties are still unable to reach a resolution, the Challenging Party may thereafter seek resolution from the Court. The burden of persuasion in any such challenge proceeding shall be on the Designating Party.  The Designating Party bears the burden, for each particular document it seeks to protect, of showing that the confidentiality designation is proper under the terms of this Order.

## 9.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in another lawsuit or action that compels disclosure of any information or items designated "CONFIDENTIAL" or "CONFIDENTIAL PHI: Attorneys' Eyes Only"  in this action, that Party must:

**(a)**      Promptly notify in writing the Designating Party.  Such notification shall include a copy of the subpoena or court order;

**(b)**      Promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Order and deliver a copy of this Order promptly to the party in the other action that caused the subpoena or order to issue; and

**(c)**      If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "CONFIDENTIAL PHI: Attorneys' Eyes Only" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission.  The Designating Party shall bear the burdens and the expenses

of seeking protection in that court of its Protected Material. Nothing in these provisions should

be construed, however, as authorizing or encouraging a Receiving Party in this action to disobey

a lawful directive from another court.

### 10. A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LAWSUIT

   **(a)**      The terms of this Order are applicable to information produced by a Non-Party in

this action and designated as "CONFIDENTIAL" or "CONFIDENTIAL PHI: Attorneys' Eyes

Only."  Such information produced by Non-Parties in connection with this lawsuit is protected

by the remedies and relief provided by this Order.  Nothing in these provisions should be

construed as prohibiting a Non-Party from seeking additional protections.

   **(b)**      In the event that a Party is required, by a valid discovery request, to produce

information or items in this action that a Non-Party has designated as "CONFIDENTIAL" or

"CONFIDENTIAL PHI: Attorneys' Eyes Only," and the Party is subject to an agreement with

the Non-Party not to produce such information or items, then the Party shall: (1) promptly notify

in writing the Requesting Party and the Non-Party that some or all of the information or items

requested are subject to a confidentiality agreement with the Non-Party; (2) promptly provide the

Non-Party with a copy of the Order in this lawsuit, the relevant discovery request(s), and a

reasonably specific description of the information or items requested; and (3) make the

information or items requested available for inspection by the Non-Party.

   **(c)**      If the Non-Party fails to object or seek a protective order from this court within 14

days of receiving the notice and accompanying information, the Receiving Party may produce

the Non-Party's information or items designated as "CONFIDENTIAL" or "CONFIDENTIAL

PHI: Attorneys' Eyes Only" and that are responsive to the discovery request.  If the Non-Party

timely seeks a protective order, the Receiving Party shall not produce any information or items in

its possession or control that are subject to the confidentiality agreement with the Non-Party before a determination by the court. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

## 11. UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or person to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or person to execute the "Acknowledgement and Agreement to Be Bound" (Exhibit A).

## 12. INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

Pursuant to Federal Rules of Evidence 502(d) and (e), the inadvertent production of information that is privileged or otherwise protected will not operate as a waiver of privilege or work-product protection in this proceeding or in any other federal or state proceeding. Nothing in this Section precludes a Party from otherwise challenging a claim of privilege or work-product protection.

In the event that privileged or otherwise protected information is inadvertently produced, the following procedures will apply:

(a)     If a Producing Party discovers that it inadvertently produced information that the Producing Party claims is privileged or otherwise protected work product, the Producing Party will promptly: (i) advise the Receiving Party of the inadvertent disclosure in writing (unless written notification is impractical); and (ii) explain the basis for the claim of privilege or

12

work-product protection. After being notified, the Receiving Party shall treat the information in compliance with the procedures set forth in Federal Rule of Civil Procedure 26(b)(5)(B).

(b)     If a Receiving Party discovers information that it reasonably believes to be privileged or protected work product, the Receiving Party will treat the information in compliance with Federal Rule of Civil Procedure 26(b)(5)(B) and notify the Producing Party of the disclosure and identify the information.  The Producing Party then has five (5) business days to: (i) confirm whether it intends to assert that the information is privileged or work product; and (ii) provide the basis for the claim of privilege or protection.  The Receiving Party shall at all times treat the specified information in accordance with the procedures set forth in Federal Rule of Civil Procedure 26(b)(5)(B).

(c)     To extent the Receiving Party challenges the claim of privilege or work product under this Section, the Parties must meet and confer in an attempt to resolve the matter. If the Parties cannot resolve the dispute, the Party challenging the claim of privilege or work product shall have a reasonable amount of time to present the issue to the Court consistent with Federal Rule of Civil Procedure 26(b)(5)(B).

(d)     If a Party receives information that it does not reasonably believe to be privileged or otherwise protected work product, disclosure or use of the information by the Receiving Party, including production to a third party before notice from the Producing Party that the information was inadvertently produced, will not be deemed a violation of this Order. Under these circumstances, however, the Receiving Party is precluded from arguing that the Producing Party waived privilege or work-product protection based solely on the Receiving Party's disclosure of the inadvertently produced information to a third party.

(e)     If the Receiving Party disclosed the inadvertently produced information to a third party before receiving notice of a claim of privilege or work-product protection, it must take reasonable steps to retrieve the information and to return it, sequester it until the claim is resolved, or destroy it.

(f)     If, during a deposition, the Producing Party asserts for the first time that information contained in a marked exhibit was inadvertently produced and is privileged or protected work product and the Receiving Party disputes the assertion, the Receiving Party may present the information to the Court under seal for a determination of the claim on an expedited basis, where appropriate, and reserve the right to seek to question the deponent regarding the challenged information on an expedited basis, if necessary, to the extent not privileged or protected.  The Producing Party shall make reasonable efforts to cooperate with the Receiving Party regarding additional questioning, if any, on such information to the extent ordered by the Court.

(g)     Compliance with Federal Rule of Civil Procedure 26(b)(5)(B) does not waive the Receiving Party's right to challenge the Producing Party's assertion of privilege or work-product protection.

## 13. MISCELLANEOUS

**13.1  <u>Right to Further Relief</u>**.  Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

**13.2  <u>Right to Assert Other Objections</u>**.  By stipulating to the entry of this Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order.  Similarly, no Party waives the right to object on any ground to use in evidence of any of the material covered by this Order.

**13.3  Filing Protected Material**.  Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file any Protected Material in the public record in this action, with the exception of trial proceedings which are not covered by this Order.  A Party that seeks to file any Protected Material under seal must comply with the Local Rules and Administrative Orders.

**13.4  No Waiver**.  Entering into, agreeing to, and/or producing or receiving material designated as Protected Material or otherwise complying with the terms of this Order shall not:

**(a)**     Operate as an admission by any party that any particular material designated as Protected Material constitutes or does not constitute trade secrets, proprietary or commercially sensitive information, or any other type of Protected Material;

**(b)**     Prejudice in any way the rights of the Parties to object to the production of documents they consider not subject to discovery;

**(c)**     Prejudice in any way the rights of any Party to object to the authenticity or admissibility into evidence of any document, testimony, or other evidence subject to this Order;

**(d)**     Prejudice in any way the rights of a Party to petition the Court for a further protective order relating to any purportedly Protected Material;

**(e)**     Prevent the Parties to this Order from agreeing in writing or on the record during a deposition or hearing in this action to alter or waive the provisions or protections provided for herein with respect to any particular information or material;

**(f)**     Be deemed to waive any applicable privilege or work product protection, or to affect the ability of a Party to seek relief for an inadvertent disclosure of material protected by privilege or work product protection; and/or

15

**(g)** Prevent a Party or Non-Party from objecting to discovery that it believes to be improper, including objections based upon the privileged, confidential, or proprietary nature of the Protected Material requested.

**13.5 <u>Subject to Jurisdiction</u>**. All persons who have access to information or material designated as Protected Material under this Order acknowledge that they are bound by this Order and submit to the jurisdiction of this Court for the purposes of enforcing this Protective Order.

## 14. FINAL DISPOSITION

Within 90 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material (including all Protected Health Information) to the Producing Party or destroy such material. As used in this section, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, the Designating Party) by the 90 day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed, and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries, or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motions papers including declarations and exhibits, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Order as set forth in Section 4 (DURATION).

**IT IS SO STIPULATED, THROUGH COUNSEL.**


**DATED: November 20, 2015**        /s/ Sean K. Collins_____
                                    Attorney for Plaintiffs



**DATED:  November 23, 2015**       /s/  R. John Street_____
                                    Attorney for Defendant

17

Sean K. Collins
SEAN K. COLLINS, ATTORNEY AT LAW
184 High Street, Suite 503
Boston, MA 02110
Tel: 617-320-8485
Fax: 617-227-2843
sean@neinsurancelaw.com

Lionel Z. Glancy
Ex Kano S. Sams II
Kara Wolke
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: 310-201-9150
Fax: 310-201-9160
lglancy@glancylaw.com
esams@glancylaw.com
kwolke@glancylaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Tel: 312-377-1181
Fax: 312-377-1184
pdahlstrom@pomlaw.com

Mark D. Debofsky
DEBOFSKY & ASSOCIATES, P.C.
200 West Madison Street, Suite 2670
Chicago, IL 60606
Telephone: 312-702-1842
Fax: 312-929-0309
mdebofsky@debofsky.com

*Attorneys for Plaintiffs and the Class*

Brent R. Austin
R. John Street
James W. Joseph
Ameri R. Klafeta
Eimer Stahl LLP
224 S. Michigan Avenue, Suite 1100
Chicago, IL 60604
Tel: (312) 660-7600
Fax: (312) 692-1718
baustin@eimerstahl.com
jstreet@eimerstahl.com
jjoseph@eimerstahl.com
aklafeta@eimerstahl.com

*Attorneys for Defendant Continental Casualty Company*

Case: 3:15-cv-00297-wmc  Document #: 125-1  Filed: 11/23/15  Page 19 of 19

## EXHIBIT A: ACKNOWLEDGEMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of

_____ [print or type full address], declare under penalty

of perjury that I have read in its entirety and understand the Stipulated and HIPAA Qualified

Protective Order that was issued by the United States District Court for the Western District of

Wisconsin on _____ in the case of *Gwen B. Daluge et al. v. Continental Casualty

Company*, Case No. 3:15-cv-297-WMC.  I agree to comply with and to be bound by all the terms

of this Stipulated and HIPAA Qualified Protective Order and I understand and acknowledge that

failure to so comply could expose me to sanctions and punishment in the nature of contempt.

I solemnly promise that I will not disclose in any manner any information or item that is

subject to this Stipulated and HIPAA Qualified Protective Order to any person or entity except in

strict compliance with the provisions of this Order.


Signature: _____

Date: _____

# EXHIBIT I

**The Law Offices of Sean K. Collins, Glancy Prongay & Murray & Goldenberg Schneider Jointly Announce Long Term Care Insurance Class Action Settlement Against Continental Casualty Company (CNA)**

In a consumer class action brought on behalf of CNA long term care insurance policyholders seeking coverage for stays at certain assisted living facilities in Arizona, Florida, Georgia, Indiana, Iowa, Kentucky, Massachusetts, Minnesota, New York, Tennessee and Wisconsin ("Class States"), The Law Offices of Sean K. Collins, Glancy Prongay and Murray LLP, and Goldenberg Schneider, LPA announce that as part of a settlement CNA has agreed to modify its claim handling standards with respect to certain policy forms which will now allow for coverage of assisted living facilities in the Class States if certain criteria are met. Through the settlement, Class Counsel have secured more concrete and expanded benchmarks for coverage. Previously, CNA was denying these claims. This settlement confers substantial and tangible benefits to these policyholders. In addition to these changes to its claim practices, CNA agreed to pay up to $4.85 million to those qualifying class members who previously had their assisted living facility claims denied under their long term care insurance policy in a Class State.

Co-lead counsel for the class, Sean K. Collins noted, "We are very happy for our clients and with the result that we were able to achieve for this class of policyholders. We appreciate CNA's willingness to step up and do the right thing by its valued customers." The action, *Gwen B. Daluge et al. v. Continental Casualty Company*, Civil Action No. 3:15-cv-00297-WMC, is pending in the United States District Court for the Western District of Wisconsin. Plaintiffs and the Class are represented in this matter by The Law Offices of Sean K. Collins, Glancy Prongay & Murray LLP, Goldenberg Schneider, LPA, and Burke & Pecquet, LLC.

This press release may be considered Attorney Advertising in some jurisdictions under the applicable law and ethical rules.

## Contacts

**The Law Offices of Sean K. Collins** represents individuals and classes in connection with consumer disputes, including long term care insurance matters, with offices in Boston, Massachusetts and Hartford, Connecticut. Contact: Sean K. Collins, Esq., 855-693-9256, www.insuranceconsumerlaw.com.

**Glancy Prongay & Murray LLP** has represented investors, consumers and employees for over 25 years. Based in Los Angeles with offices in New York City and Berkeley, the Firm has successfully prosecuted class action cases and complex litigation in federal and state courts throughout the country. Contact: Ex Kano S. Sams II, Esq., 310-201-9150 or 888-773-9224, www.glancylaw.com.

**Goldenberg Schneider, LPA** is based in Cincinnati, Ohio and represents consumers, employees, and businesses in class actions throughout the U.S. Contact: Jeffrey S. Goldenberg, Esq., 513-345-8291, www.gs-legal.com.